CONSEJO DE EDUCACIÓN SUPERIOR de la UNIVERSIDAD DE PUERTO RICO y OTROS, demandantes y apelantes, *v.* HON. PEDRO J. ROSSELLÓ GONZÁLEZ, GOBERNADOR DE PUERTO RICO, demandado y apelado.

*Número:* AC-93-426     *Resuelto:* 23 de septiembre de 1994

*Lino J. Saldaña,* de *Saldaña, Rey & Alvarado,* abogado de los apelantes; *Pedro A. Delgado Hernández, Procurador General, Daniel R. Domínguez, Jorge C. Pizarro* y *Marie E. López Adames,* de *Domínguez y Totti,* abogados del apelado; *Rafael L. Martínez Torres* y *Carlos Santiago Tavarez,* abogados del Consejo de Educación Superior creado en 1993, interventor; *Rubén T. Nigaglioni, Jorge A. Antongiorgi* y *Julio Nigaglioni Arrache,* de *Ledesma, Palou & Miranda,* abogados de la Universidad de Puerto Rico, interventora; *José E. de la Cruz Skerrett,* abogado de la Asociación de Colegios y Universidades Privadas, *amicus curiae.*

## SENTENCIA

El Consejo de Educación Superior de la Universidad de Puerto Rico, creado por la Ley Núm. 1 de 20 de enero de 1966 (18 L.P.R.A. sec. 601 *et seq.*), y algunos de sus miembros solicitan que revisemos la sentencia del Tribunal Superior que declaró sin lugar su demanda que impugna la constitucionalidad de la Ley Núm. 12 de 7 de junio de 1993 (18 L.P.R.A. sec. 621c) y de las Leyes Núms. 16 y 17 de 16 de junio de 1993 (18 L.P.R.A. sec. 602 y 18 L.P.R.A. secs. 852–852*l* y 2101, respectivamente). Estos estatutos elimi-

naron dicho cuerpo y crearon otros dos (2): un nuevo Consejo de Educación Superior, con la única función de acreditar a instituciones privadas de educación superior, y otro, la Junta de Síndicos para gobernar la universidad, función que —junto a la acreditación— antes le correspondía al Consejo creado por la legislación de 1966. Confirmamos la sentencia recurrida.

## I

Al aprobarse la legislación citada, los miembros del Consejo de Educación Superior instaron una acción contra el Hon. Pedro J. Rosselló, Gobernador del Estado Libre Asociado de Puerto Rico (en adelante Gobernador). Alegaron que las leyes eran inconstitucionales porque violan la libertad académica y la autonomía de la Universidad de Puerto Rico —las cuales, alegadamente, fluyen del derecho constitucional a la libertad de expresión— y les privan de su libertad y propiedad sin el debido proceso de ley.

El Tribunal Superior resolvió que el Consejo carecía de legitimación activa para demandar; que la autonomía universitaria no tenía rango constitucional; que la libertad académica bajo la Primera Enmienda a la Constitución federal no amparaba a los miembros del Consejo en su reclamo, y que no se les privó de un interés propietario a los fines de la cláusula constitucional de debido proceso.

Inconformes, los miembros del Consejo apelaron dicho dictamen ante este Tribunal. Acogimos la apelación y autorizamos a todas las entidades interesadas en participar en este proceso apelativo a que sometieran sus posiciones por escrito.

## II

Procede la confirmación del resultado dispuesto por la sentencia recurrida. Aunque la Universidad de Puerto Rico

tiene un derecho constitucional de libertad académica institucional, y así lo reconocen todas las partes en este caso,[1] la mera creación de una Junta de Síndicos y la separación de las funciones de acreditación de instituciones privadas de educación superior y de gobierno de la Universidad de Puerto Rico, de por sí, no infringen este derecho. Además, un análisis cuidadoso de los autos revela que no se alegó ni demostró que, al aprobar esta legislación, se vulneraron los derechos constitucionales de los apelantes ni de la institución.

En estas circunstancias, *confirmamos la sentencia apelada.*

Así lo pronunció y manda el Tribunal y certifica la señora Subsecretaria General. El Juez Asociado Señor Negrón García emitió una opinión concurrente. El Juez Asociado Señor Rebollo López emitió una opinión concurrente. El Juez Asociado Señor Hernández Denton emitió una opinión concurrente, a la cual se unieron el Juez Presidente Señor Andréu García y la Juez Asociada Señora Naveira de Rodón. El Juez Asociado Señor Alonso Alonso emitió una opinión disidente, a la cual se unió el Juez Asociado Señor Fuster Berlingeri. El Juez Asociado Señor Fuster Berlingeri emitió un voto particular.

*(Fdo.)* Carmen E. Cruz Rivera
*Subsecretaria General*

---

[1] Tanto en su contestación a la demanda como en su alegato ante nos, el Gobernador aceptó y reconoce que este derecho constitucional protege a la Universidad de Puerto Rico contra "intervenciones indebidas del Estado". Véanse: Contestación a la demanda, pár. 19; Alegato del demandado, pág. 29.

— O —

Opinión concurrente del Juez Asociado Señor Negrón García.

La sentencia mayoritaria recoge hoy, de forma escueta, la esencia de nuestro voto disidente de 24 de septiembre de 1993 y llega al mismo resultado. Revisitémosla.

Merece recordarse que

> ... en recta juridicidad, difícilmente en este caso puede sostenerse un decreto de inconstitucionalidad fundamentado en loas a la autonomía universitaria y libertad de cátedra, corolarios del derecho de expresión y asociación. No podemos tomar la autonomía universitaria y la libertad académica dogmáticamente, como artículos de fe, ni sobrecargarlos conceptualmente con una densidad jurídica doctrinal que no poseen. Hacerlo desbordaría el ámbito de revisión judicial. Autonomía universitaria no significa una isla institucional al margen de los otros poderes del Gobierno.

.    .    .    .    .    .    .    .

> En buena metodología apelativa-adjudicativa, la determinación inicial de la existencia o no de una cuestión constitucional sustancial depende de que se demuestre que tal reclamo aduzca hechos que razonablemente permitan concluir que efectivamente se han infringido intereses constitucionales protegidos y susceptibles de un remedio judicial. Sólo entonces cabe evaluar si tales intereses son sustanciales y si hay ausencia de justificación razonable que avale las acciones del Estado. Hemos dicho, al respecto, que "no existe tal cuestión [constitucional sustancial] si un examen del planteamiento invocado refleja la presencia de un error, que tiende a involucrar un argumento constitucional inexistente". (Énfasis suplido.) Com. de la Mujer v. Srio. de Justicia, 109 D.P.R. 715, 720 (1980). Véase, además, Calderón, Rosa-Silva & Vargas v. García, 120 D.P.R. 803, 809–812 (1988).

.    ..    .    .    .    .    .    .

> Ciertamente —no es objeto de argumentación seria— que la Legislatura actuó, dentro del ámbito de su autoridad, en la aprobación de estas leyes al crear la Junta de Síndicos de la U.P.R. como un nuevo departamento ejecutivo y modificar las funciones de otro (el Consejo). Tal facultad le fue conferida expresamente en nuestra Constitución[.]

.    .    .    .    .    .    .    .

No se ha aportado evidencia suficiente para poner a este Tribunal en la posición de cuestionar la legitimidad de los propósitos de esta legislación. Todo lo contrario, según el ilustrado foro de instancia sentenció, obran en autos numerosas comunicaciones y ponencias —de la Asociación de Colegios y Universidades Privadas en Puerto Rico, de la Comisión de Educación de la *Middle States Association,* e, incluso, del entonces Presidente del Consejo, doctor Padró Yumet— expositivas del conflicto de interés aludido. En la Asamblea Legislativa del cuatrienio pasado (1988–1992), se presentaron dos (2) proyectos para deslindar ambas funciones.

Más aún, en el plano de la campaña electoral, los candidatos a la gobernación por el Partido Popular Democrático (P.P.D.) y el Partido Nuevo Progresista (P.N.P.) prometieron que el Consejo cesaría de licenciar programas universitarios privados.

Aun así, los peticionarios Awilda Aponte Roque *et al.,* aducen un discrimen político apuntalado en que, a raíz de las elecciones, el Gobernador electo doctor Rosselló González conminó a todos los miembros del Consejo, Presidente U.P.R., rectores y decanos a que renunciaran, y que se crearía una nueva Junta de Síndicos para regir los destinos universitarios.

La naturaleza de nuestra función revisora de la Constitución impide, ante una declaración clara y legítima de propósitos de la Asamblea Legislativa —apoyado por un amplio historial legislativo— *que emprendamos a destiempo, con una lámpara vacía de quinqué, una búsqueda de motivos obscuros o escondidos fundados en tales aseveraciones.*[5] Nuevamente, parece olvidado que la *"política pública y la intención legislativa se investigan en los trámites, debates, informes y finalmente en los textos culminantes de los estatutos".* (Énfasis suplido.) *Pueblo v. González Malavé,* 116 D.P.R. 578, 586 (1985).

## IV

Ni el reclamo de autonomía universitaria ni tampoco la libertad de cátedra están lesionados en este caso o respaldados por una prueba que justifique. la intervención de este Tribunal. Un análisis de las facultades conferidas a la nueva Junta de Sindicos de la U.P.R. no revela amenazas *nuevas,* per se, a la auto-

---

[5] *García Pagán v. Shiley Caribbean, etc.,* 122 D.P.R. 193 (1988); *Kassel v. Consolidated Freighways Corp.,* 450 U.S. 1, 662 (1981); *Weinberger v. Weinsenfeld,* 420 U.S. 636, 648 esc. 16 (1975); *Chevron U.S.A. v. Natural Res. Def. Council,* 467 U.S. 837 (1984).

nomía universitaria, pues simplemente las facultades que tenía el Consejo han sido transferidas a esa Junta. Si algo reflejan los autos, es que estamos ante un planteamiento prematuro y conceptual, *que la mayoría del Tribunal no debe adjudicar a destiempo.* Hacerlo es enterrar de un plumazo las normas de abstención hace unos días reconocidas: "[e]ste Tribunal tiene el deber, reiterado y cumplido en repetidas ocasiones, de no decidir a destiempo cuestiones constitucionales y así evitar pronunciamientos de índole consultiva, *sin proporción a los hechos.* Véanse, *e.q.*: *Hernández Agosto v. Betancourt,* 118 D.P.R. 79, 86–87 (1986); *Molina v. C.R.U.V.,* 114 D.P.R. 295, 297 (1983); *Cerame-Vivas v. Secretario de Salud,* 99 D.P.R. 45, 51 (1970); *Esso Standard Oil v. A.P.P.R.,* 95 D.P.R. 772, 783 (1968)." (Énfasis suplido y en el original.) *Caquías v. Asoc. Res. Mansiones Río Piedras,* 134 D.P.R. 181, 188 (1993).

Por otro lado, la composición de la nueva Junta de Síndicos de la U.P.R. tampoco presenta, de su faz, defectos constitucionales o infracción a la libertad de cátedra. Se argumenta el hecho de que los nombramientos del Consejo se hacen de forma escalonada para impedir que éste se encuentre a merced de los cambios de gobierno. Es un dato histórico, de fácil comprobación, que la Ley Núm. 135 de 1942 (18 L.P.R.A. secs. 631–636 y 638–658) la cual creó el Consejo Superior de Enseñanza, y la Ley Núm. 1, *supra,* la cual derogó a aquél y estableció el *Consejo,* aumentaron su composición, lo cual unido a las vacantes existentes *siempre* han permitido que los gobernadores incumbentes pudieran nombrar personas de su *predilección.* Obviamente, el elemento político partidista estuvo presente en ese proceso de selección y viabilizó un control institucional. Ante esta realidad, más allá del papel legal, ¿cómo pueden entonces los peticionarios Awilda Aponte Roque *et al.,* argumentar que la fórmula de escalonamiento en los términos de la Ley Núm. 1, *supra,* "dio plena vigencia a los postulados de autonomía y libertad académica"?

Naturalmente, los puestos creados por la nueva ley son inicialmente ocupados por las personas que nombre el Gobernador.([6]) Ello no la invalida, pues es *incidental* a su aprobación. *No crea una situación distinta a las leyes antecesoras del Consejo,* ni se aparta a lo que de ordinario ocurre al

---

([6]) Excepto el representante estudiantil y los dos (2) profesores.

crearse o ampliarse nuevas juntas o departamentos ejecutivos. Además, luego de estos primeros nombramientos, la ley reproduce la fórmula de que los subsiguientes se harán en forma escalonada. *Si antes fue bueno y constitucional, ¿por qué ahora no lo es?*

Este enfoque no es ad hoc. No puede divorciarse el clima universitario —libertad de asociación y expresión, esto es, los derechos civiles de los educadores, profesores y estudiantes— de los poderes de la Asamblea Legislativa. "Este es un asunto *que corresponde atender a la Asamblea Legislativa*, en cumplimiento de los *mandatos constitucionales*, para marcar los límites de la reglamentación intrauniversitaria. *No se trata de una cuestión que corresponda exclusivamente a la autonomía de la Universidad.*" (Énfasis suplido.) Informe Especial Sobre la Libertad Académica en la U.P.R., Comisión de Derechos Civiles, *Lino J. Saldaña*, Presidente, 15 de marzo de 1967, pág. 22.

Finalmente, se alega que la promulgación de estas medidas ha tenido el efecto de destituir ilegalmente a los miembros del Consejo. El argumento adolece del mismo defecto. ¿En qué consiste la destitución aludida? Ellos continúan siendo miembros del Consejo, no se han alterado las dietas que perciben ni el término por el cual fueron nombrados; sólo se han modificado algunas de sus funciones. Antes estaban a cargo de la acreditación y corrección de las licencias a Instituciones Privadas de Educación Superior y administrar la U.P.R. Las nuevas leyes le asignan sólo la primera de estas dos (2) funciones.

Curiosamente, los propios peticionarios, Awilda Aponte Roque *et al.*, implícitamente aceptan la facultad legislativa para efectuar estos cambios al argumentar, como alternativas menos drásticas, "*aumentar* el número de miembros del Consejo para dar representación a estudiantes —y profesores— y delegar en un nuevo cuerpo las funciones de supervisar las instituciones privadas". (Énfasis suplido.) Moción en auxilio de jurisdicción, pág. 12. Esa argumentación derrota su tesis central. Si en lugar de separar las funciones, la Ley Núm. 16, *supra*, hubiese *duplicado* el número de miembros del Consejo —propiciando así una mayoría de nombramientos por el actual Poder Ejecutivo— ¿sería inconstitucional? *Obviamente no. ¿Podemos entonces, en abstracto*, forzar nuestra intervención para variar o anular el esquema legislativo? *¿Bajo qué misteriosa lógica la mayoría pretende sostener que los actuales concejales —nombrados por la anterior administración— están más capacitados e investidos de un don privilegiado para garantizar y velar la autonomía universitaria y la libertad académica?*

V

*Teóricamente*, a través de las facultades de la Junta de Síndicos de la U.P.R. —*al igual que las anteriores que tenía el Consejo*—, puede interferirse indebidamente con las áreas relacionadas con quién habrá de enseñar, qué se enseñará, cómo se enseñará y quién ha de ser admitido a estudiar en la U.P.R. Sin embargo, repetimos, sólo podemos enfrentarnos a situaciones concretas y reales. De ello ocurrir, *sin duda*, como en el pasado procederíamos a vindicar inmediatamente los derechos constitucionales de todos los afectados. *García Cabán v. U.P.R.*, supra.

*En ausencia de reclamo específico de un menoscabo real a los derechos constitucionales sustanciales*, hemos de superar la tentación de atender y entender cuestiones hipotéticas, abstractas o contingentes. Ello equivaldría a emitir una opinión consultiva. R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, 1ra ed., San Juan, Ed. C. Abo. P.R., 1986, Vol. I, págs. 116–119. *Nos convertiría en un super gobierno usurpando funciones que no nos competen.*

En *resumen*, según enjuició el reputado tribunal de instancia, los peticionarios Awilda Aponte Roque *et al.*, como "miembros del CES desean continuar como hasta el presente o en la alternativa que se adopte la idea que otras personas han propuesto. Al día de hoy existe un enfoque distinto por el nuevo gobierno en funciones. No corresponde a este Tribunal entrar a la arena política para dirimir si tal o cual programa del nuevo gobierno es sabio o no. Ello es prerrogativa de las ramas políticas de nuestro gobierno (Ejecutiva y Legislativa)". Sentencia, pág. 27.

Ese deseo de los peticionarios Awilda Aponte Roque *et al.*, no es suficiente. Ciertamente no hay interconexión o ligazón de causa o efecto en sus planteamientos. *Así aclarado, en el fondo, sólo estamos ante una tesis de origen político-partidista no susceptible de ser configurada como lesión constitucional legítima, que pretende únicamente controlar las estructuras prevalecientes y perpetuar incumbentes nombrados por una administración de un partido (Partido Popular Democrático) que perdió las elecciones. C.E.S. v. Gobernador I*, 134 D.P.R. 350, 355–363 (1993).

Sinceramente, ¿planteaba esta apelación una cuestión constitucional sustancial?

— O —

Opinión concurrente emitida por el Juez Asociado Señor Rebollo López.

Hace aproximadamente un (1) año —específicamente, el 24 de septiembre de 1993— al disentir de la acción de una mayoría de los integrantes del Tribunal de "acoger" el recurso de apelación que ante este Foro radicara la parte demandante apelante, expresamos, entre otras cosas, que el recurso de apelación radicado era *claramente inmeritorio* al cual *no* se le debía dar curso y que la acción mayoritaria, de así hacerlo,

> ... pone en grave riesgo, durante el tiempo que le tome a este Tribunal resolver el recurso, el buen funcionamiento, y estabilidad, de la única institución pública universitaria de nuestro País; ello con el consabido perjuicio a nuestra juventud. (Énfasis suprimido.) *C.E.S. v. Gobernador I*, 134 D.P.R. 350, 364 (1993), voto disidente.

Durante los pasados doce (12) meses, término durante el cual los integrantes de este Tribunal han estado, *innecesariamente*, discutiendo qué hacer con esta *inmeritoria* apelación, *la Universidad de Puerto Rico ha sufrido graves perjuicios*. Tomamos conocimiento judicial de reportajes que se han publicado en los distintos rotativos de nuestra Isla, en los cuales varios funcionarios universitarios han expuesto los perjuicios sufridos por la principal institución universitaria del País como consecuencia de la pendencia del presente recurso de apelación; *perjuicios que la Universidad nunca ha debido sufrir.*

En el día de hoy, el recurso de apelación radicado —originalmente acogido por la mayoría supuestamente debido al hecho, *conforme surge de la resolución mayoritaria entonces emitida*, de que el mismo planteaba "una cuestión constitucional sustancial y novedosa —de vital importancia pública—" (*C.E.S. v. Gobernador I*, supra, pág. 351)—

es *despachado* por el Tribunal mediante la emisión de una *escueta* sentencia; ponencia en la cual se hace constar, *como si se hubiera descubierto por primera vez a América,* que

> ... la mera creación de una Junta de Síndicos y la separación de las funciones de acreditación de instituciones privadas de educación superior y de gobierno de la Universidad de Puerto Rico, de por sí, no infringen [el] derecho [de libertad académica]. Además, un análisis cuidadoso de los autos revela que no se alegó ni demostró que, al aprobar esta legislación, se vulneraron los derechos constitucionales de los apelantes ni de la institución. Sentencia, pág. 86.

Eso, dicho con el mayor respeto, lo sabíamos —*o lo debía haber sabido la mayoría*— hace un (1) año. Esto es, *nunca existió la necesidad de expedir el recurso radicado y de poner en riesgo y peligro no sólo la salud fiscal de la Universidad de Puerto Rico, sino que hasta la existencia misma de dicha institución universitaria.*

## I

En relación con ello, resultan pertinentes y atinadas las breves expresiones que hiciéramos el 24 de septiembre de 1993, respecto a los alegados "méritos" del recurso radicado, al disentir de la acción mayoritaria de acoger el recurso de apelación radicado. Expresamos, *entonces*, que:

> El recurso radicado es *obviamente inmeritorio.* Resulta *palpablemente claro* que una "criatura" del Estado, como lo es el Consejo Superior de Enseñanza (en adelante C.E.S.), *no* tiene "legitimación activa", *como institución*, para impugnar la validez constitucional, frente al Estado "su creador", de las Leyes Núm. 12 de 7 de junio de 1993 (18 L.P.R.A. sec. 621c) y la Núm. 16 de 16 de junio del mismo año (18 L.P.R.A. sec. 602). La jurisprudencia federal y estatal citada por el C.E.S., en apoyo de su contención de que sí posee legitimación activa, es *completamente* distinguible e inaplicable.
> Por otro lado, *y ya específicamente en cuanto a los integrantes del referido Consejo en su capacidad individual*, resulta *igual-*

*mente obvio* que, a pesar de que éstos *podrían* tener legitimación activa para radicar el pleito, *los derechos constitucionales de los referidos funcionarios no son afectados en forma alguna por la legislación en controversia.* Dicha legislación lo que, *meramente*, hace es *transferir* una (1) de las dos (2) funciones que hasta ahora había venido desempeñando el C.E.S. a la nueva Junta de Síndicos de la Universidad; acción por la que habían venido *clamando* muchos educadores en Puerto Rico. El hecho de que los miembros del C.E.S. *prefieran* desempeñar la función que fuera transferida a la nueva Junta *no* hace que la legislación sea inconstitucional. *Ello es una determinación de política pública, la que tiene derecho a hacer la Asamblea Legislativa de Puerto Rico, que está fuera del ámbito de la revisión judicial.* Nuevamente, la jurisprudencia que citan los apelantes en apoyo de su posición, es *claramente* distinguible e inaplicable.

Por último —y aun asumiendo a los fines de la argumentación que los apelantes, en su capacidad individual, efectivamente tienen "legitimación activa" para radicar el presente pleito— *tenemos que un examen objetivo y desapasionado de las leyes en controversia revela que las mismas, de su faz, no afectan en forma alguna ni la libertad de cátedra, ni el derecho a la libre expresión, ni ningún otro derecho constitucional, que nuestra Constitución le pueda garantizar a los miembros de la comunidad universitaria.* Por otro lado, la prueba señalada en la demanda radicada por la representación legal de los apelantes —con la que, alegadamente, éstos pueden demostrar que la aprobación de las mencionadas leyes obedeció, de manera principal, a motivaciones políticas partidistas— *es palpablemente insuficiente en derecho, aun cuando, como hizo el foro de instancia, se admitiera su certeza.* Dicha prueba, *únicamente*, puede ser considerada suficiente en derecho para demostrar ese hecho *por una mente interesada o prejuiciada.*

*En resumen, nos enfrentamos a una actuación legislativa legítima que es completamente constitucional y de sencilla interpretación, entendimiento y comprensión;* lo cual hace que sea *verdaderamente difícil* de entender la acción tomada en el día de hoy por una mayoría de los integrantes del Tribunal. La determinación del Tribunal de darle curso a una apelación *claramente inmeritoria* tendrá la lamentable consecuencia de —*no importa cuál sea la decisión que finalmente emita el Tribunal en relación con la misma*— causar una grave *incertidumbre e inestabilidad* en la Universidad de Puerto Rico .... (Énfasis suplido y en el original.) *C.E.S. v. Gobernador I*, ante, págs. 364–366.

La *conclusión* a los efectos de que el recurso era, y es, claramente inmeritorio la sabíamos, *repetimos*, desde el 24

de septiembre de 1993; conclusión avalada por los fundamentos jurídicos que, entonces, expresamos, los cuales son, hoy, igualmente correctos y enteramente aplicables. *Cabe preguntarse por qué le tomó un (1) año a la mayoría de los integrantes del Tribunal realizar este hecho.* ¿Acaso no podía llevarse a cabo —hace un (1) año y antes de tomarse la decisión mayoritaria de expedir el recurso— "un análisis cuidadoso de los autos" con el propósito de que se pudiera determinar, *en ese momento,* si el recurso era uno meritorio o no? Sobre los hombros de estos Jueces descansa la responsabilidad de los perjuicios sufridos por la Universidad de Puerto Rico durante ese período de tiempo.

## II

Por último resulta, *cuando menos,* curioso cómo es que el Tribunal llega a confirmar la sentencia del foro de instancia, la cual determinó que la Ley Núm. 12 de 7 de junio de 1993 (18 L.P.R.A. sec. 621c) y las Leyes Núms. 16 y 17 de 16 de junio de 1993 (18 L.P.R.A. sec. 602 y 18 L.P.R.A. secs. 852–858*l* y 2101, respectivamente) no adolecen de defecto constitucional alguno. Decimos lo anterior debido al hecho de que una lectura de la opinión concurrente del Juez Asociado Señor Hernández Denton demuestra que ésta *no* se diferencia mucho de la opinión disidente emitida por el Juez Asociado Señor Alonso Alonso.

De hecho, y como surge de las páginas primera y segunda de la opinión disidente publicada, el Juez Asociado Señor Alonso Alonso *coincide y se une* "a las expresiones hechas en las partes I, III, IV y V de la Opinión concurrente" del Juez Asociado Señor Hernández Denton *y está conforme* "con las partes VIII, IX, X y XI de" la mencionada opinión concurrente del referido Juez; expresiones y fundamentos que, no debemos olvidar, suscriben cinco (5) de los integrantes del Tribunal.

Se puede decir —sin temor a equivocarse— que en lo

*único* sustancial que difieren estas dos (2) ponencias lo es respecto al criterio, y resultado, de constitucionalidad, o inconstitucionalidad, de la legislación en controversia. Ello así ya que los *fundamentos principales* que ambos Jueces aducen, en apoyo de los *resultados distintos* a los que llegan, son *prácticamente* idénticos.

"En guerra avisada", expresa el refrán popular, "no muere gente". A nuestra manera de ver las cosas, es bien significativo que estos cinco (5) integrantes del Tribunal, no obstante no poderse poner de acuerdo sobre el resultado, *sí* han coincidido respecto a una filosofía judicial común, referente la misma a la cuestión universitaria. Dicha actuación debe constituir suficiente aviso para el "buen entendedor"; esto es, la referida filosofía judicial con toda probabilidad *servirá de base* a decisiones futuras de este Tribunal, referentes a actuaciones posteriores del Estado y/o de la Junta de Síndicos, relacionadas con el funcionamiento y administración de los asuntos de la Universidad de Puerto Rico. El tiempo lo dirá.

— O —

Opinión concurrente del Juez Asociado Señor Hernández Denton, a la cual se unen el Juez Presidente Señor Andréu García y la Juez Asociada Señora Naveira de Rodón.

El Consejo de Educación Superior de la Universidad de Puerto Rico, creado por la Ley Núm. 1 de 20 de enero de 1966 (18 L.P.R.A. sec. 601 *et seq.*), y algunos de sus miembros solicitan que revisemos la sentencia del Tribunal Superior que declaró sin lugar su demanda, que impugnaba la constitucionalidad de las Leyes Núm. 12 de 7 de junio de 1993 (18 L.P.R.A. sec. 621c) y Núms. 16 y 17 de 16 de junio de 1993 (18 L.P.R.A. sec. 602 y 18 L.P.R.A. secs. 852–852*l* y 2101, respectivamente). Estos estatutos eliminaron dicho

cuerpo y crearon otros dos (2): un nuevo Consejo de Educación Superior con la única función de acreditar instituciones privadas de educación superior, y otro, la Junta de Síndicos para gobernar la Universidad, función que —junto a la de acreditar— antes le correspondía al Consejo creado por la legislación de 1966.

Al evaluar la controversia del caso de marras, partimos de la premisa de que la Universidad de Puerto Rico tiene funciones únicas en nuestra vida democrática: conservar y transmitir nuestra herencia cultural y académica; esclarecer y analizar la realidad del país; propiciar el diálogo creativo, y transmitir y respetar los valores básicos de la civilización, particularmente los derechos humanos. También partimos de la premisa de que la misión de la Universidad —en nuestra sociedad— requiere que el claustro disfrute de una libertad académica amplia para pensar, enseñar, investigar y expresarse libremente.

Preocupados por la alegación de los miembros del Consejo de que la actuación de las ramas políticas del Estado viola la libertad académica de la Universidad de Puerto Rico al cambiar mediante legislación las funciones del Consejo, votamos para expedir el recurso y evaluar, con cuidado, los señalamientos de los peticionarios y de todas las entidades interesadas.

Por la importancia que tiene la Universidad de Puerto Rico en nuestro sistema educativo y en el país, y en vista de que era la primera vez que se invocaban los principios de libertad académica y autonomía universitaria para cuestionar los profundos cambios introducidos en la administración universitaria por las leyes impugnadas, consideramos que esta Curia tenía la obligación de examinar la constitucionalidad de las Leyes Núms. 12, 16 y 17 de 1993, *supra.*

Después de examinar con cuidado los distintos escritos que fueron sometidos por todos los protagonistas de este conflicto, estamos de acuerdo con la sentencia emitida por

el Tribunal por entender que los peticionarios no alegaron ni probaron que, mediante la legislación impugnada, el Gobernador intervino directa o indirectamente con los asuntos académicos universitarios medulares.

No obstante, por entender que el asunto traído ante nos por los miembros del Consejo nos ofrece una oportunidad histórica para pronunciarnos sobre el derecho de libertad académica y el alcance de su protección sobre las instituciones universitarias, suscribimos esta opinión concurrente.

I

La Ley de la Universidad de Puerto Rico de 1966 (en adelante Ley Universitaria), Ley Núm. 1, *supra*, creó un Consejo de Educación Superior (en adelante Consejo) con la responsabilidad de gobernar la Universidad de Puerto Rico.[1] A la misma vez, a este organismo se le delegó el poder para licenciar y acreditar las instituciones privadas de educación superior en Puerto Rico. Los miembros de dicho Consejo eran nombrados por el Gobernador con el consejo y consentimiento del Senado.

A raíz del cambio de gobierno y la instalación del Gobernador del Estado Libre Asociado, Hon. Pedro J. Rosselló, el año pasado se aprobaron tres (3) leyes que cambiaron este esquema: la Ley Núm. 12, *supra*, y las Leyes Núms. 16 y 17, *supra* (en adelante Ley Núm. 16 y Ley Núm. 17).[2] Dicha legislación separó las funciones de acreditación y gobierno universitario, de modo que no fuera un solo organismo quien las desempeñara. Para lograr ese objetivo, se

---

[1] Cuando hablemos de la Ley de la Universidad de Puerto Rico (en adelante Ley Universitaria), Ley Núm. 1 de 20 de enero de 1966 (18 L.P.R.A. sec. 601 *et seq.*), sin más descripción, estaremos haciendo referencia a dicha ley según estaba antes de ser enmendada por las estatutos impugnados.

[2] Esta legislación dejó prácticamente inalterada la Ley Universitaria en cuanto a asuntos no relacionados a la existencia y composición del cuerpo rector de la Universidad.

eliminó el Consejo y, en su lugar, se creó un nuevo organismo llamado también "Consejo de Educación Superior", y una Junta de Síndicos. Se le asignó la labor de acreditación al nuevo Consejo y la de gobierno universitario a la Junta.

La legislación reciente dispone que los miembros del Consejo pasarían a formar parte del nuevo Consejo hasta la expiración de sus términos originales. A su vez, se dispuso que diez (10) de los trece (13) miembros de la Junta de Síndicos serían nombrados por el Gobernador actual con el consejo y consentimiento del Senado. Los otros tres (3) puestos corresponden a un (1) estudiante y dos (2) profesores, los cuales se escogerían mediante otros mecanismos.

Los miembros del Consejo incoaron una acción contra el Hon. Pedro J. Rosselló, Gobernador del Estado Libre Asociado de Puerto Rico (en adelante Gobernador). Alegaron que las leyes eran inconstitucionales por violar la libertad académica y la autonomía de la Universidad de Puerto Rico —que fluyen, alegadamente, del derecho constitucional a la libertad de expresión— y por privarlos de su libertad y propiedad sin el debido proceso de ley. Art. II, Secs. 4 y 7 de la Carta de Derechos, Const. E.L.A., L.P.R.A., Tomo 1; Enmdas. I, V y XIV, Const. E.E. U.U., L.P.R.A., Tomo 1.

El Tribunal Superior resolvió que el Consejo carecía de legitimación activa para demandar; que la autonomía universitaria no era de rango constitucional; que la libertad académica bajo la Primera Enmienda a la Constitución federal, *supra*, no amparaba a los miembros del Consejo en su reclamo, y que no se les privó de un interés propietario a los fines de la cláusula constitucional de debido proceso.

Inconformes, los miembros del Consejo apelaron dicho dictamen ante este Tribunal. Esbozan que erró el tribunal de instancia en todo lo que resolvió, al añadir, además, que las leyes impugnadas son inconstitucionales por establecer un despido ilegal motivado por discrimen político-partidista. Por su parte, el Gobernador niega que las leyes

sean inconstitucionales y, además, plantea la falta de capacidad del Consejo para demandar, así como la naturaleza no justiciable de la controversia por falta de legitimación activa de los miembros del cuerpo, de academicidad y de cuestión política.

En vista de que las cuestiones constitucionales planteadas en la apelación no habían sido resueltas por esta Curia, acogimos el recurso. Por la importancia de la controversia del caso, el Tribunal acordó darle atención prioritaria. Durante la etapa apelativa autorizamos la intervención de la Universidad de Puerto Rico y del recién creado "Consejo de Educación Superior", así como la comparecencia de la Asociación de Colegios y Universidades Privadas Inc. de P.R. (A.C.U.P.) como *amicus curiae*.

## II

*Capacidad del Consejo para demandar*

El Consejo comparece como demandante en este pleito "en representación de la Universidad". El Consejo alega que está capacitado y autorizado para invocar a su favor los derechos de la Universidad de Puerto Rico y solicitar que, al amparo de éstos, se declaren inconstitucionales los estatutos que lo eliminaron como cuerpo rector de la Universidad.

Por su parte, el Gobernador sostiene que el Consejo no tiene la capacidad para comparecer como demandante en un tribunal. Tiene razón.

Como regla general, un departamento ejecutivo o agencia no tiene personalidad jurídica para demandar o ser demandado. *Rivera Maldonado v. E.L.A.*, 119 D.P.R. 74, 82 (1987); *Pagán et al. v. E.L.A. et al.*, 131 D.P.R. 795, 801 esc. 2 (1992). Un organismo creado por ley sólo tendrá la capacidad para comparecer en los tribunales cuando su ley orgánica le otorgue expresamente dicha capacidad o cuando

ésta pueda ser razonablemente inferida del esquema estatutario.

La Ley Universitaria, estatuto orgánico del Consejo, no le concede expresamente la facultad de demandar o ser demandado. Art. 3 de la Ley Universitaria, 18 L.P.R.A. sec. 602(d)–(e). Tampoco podemos deducir del esquema de dicha ley que el Consejo tuviera la capacidad para demandar. En primer lugar, la ley no establece que este organismo será una "persona" o una "corporación". Tampoco contiene un lenguaje del cual se pueda inferir que dicho cuerpo tendría la capacidad para demandar. La ley establece que la Universidad de Puerto Rico ejercerá sus funciones "a través del Consejo". Art. 3 de la Ley Universitaria, 18 L.P.R.A. sec. 602(f)(1). Esta disposición expone que si la Universidad fuera a demandar, sería el Consejo quien así lo determinaría y quien contrataría la representación legal. Sin embargo, esto no implica que el Consejo tenga la facultad para demandar por sí solo o en representación de la Universidad.

Aunque en dos (2) instancias muy específicas y particulares se autoriza al Consejo a comparecer a los tribunales, estas disposiciones no le conceden una capacidad general al Consejo para demandar bajo cualquier circunstancia.[3] Por el contrario, lo más razonable es pensar que al otorgarle dicha capacidad al Consejo, fue necesaria una legislación especial para establecer estas excepciones que le permitieron al Consejo, en esas dos (2) situaciones particulares, comparecer a los tribunales.

La organización de la Ley Universitaria también debilita el planteamiento de que el Consejo tiene la capacidad para demandar. Es a la Universidad a quien esta ley expresamente otorga poderes plenarios como corporación pú-

---

[3] El Consejo de Educación Superior (en adelante Consejo) tenía capacidad para demandar en casos de expropiación, Art. 2 de Ley Núm. 263 de 14 de mayo de 1945 (18 L.P.R.A. sec. 671), así como para solicitar una orden de interdicto contra una institución educativa que insista en operar sin la licencia correspondiente. Art. 8 de Ley Núm. 31 de 10 de mayo de 1976 (18 L.P.R.A. sec. 2108).

blica, incluyendo los de demandar y ser demandada. 18 L.P.R.A. sec. 602(f). El Art. 3 de dicha ley, *supra*, define al Consejo como la junta de gobierno de la Universidad de Puerto Rico y procede a establecer su estructura, funciones y deberes. En el penúltimo inciso de ese mismo artículo se establecen las facultades de la Universidad y allí se dispone que ésta tendrá autoridad para demandar y ser demandada. 18 L.P.R.A. sec. 602(f). En estas circunstancias, no podemos considerar como accidental la omisión de expresamente conceder al Consejo dicha autoridad.[4]

No obstante, esta discusión no dispone del recurso ante nos. Como los miembros del Consejo tienen la capacidad para demandar, como personas naturales, procede que examinemos los otros errores señalados por éstos.

## III

*Cuestión política*

Los miembros del Consejo sostienen que esta controversia es justiciable y, por lo tanto, es capaz de ser resuelta por los tribunales. El Gobernador argumenta lo contrario, al alegar que está presente una cuestión política, que los miembros del Consejo carecen de legitimación activa y que el recurso es académico.

La doctrina de cuestión política, según desarrollada en la jurisdicción federal, surge de consideraciones sobre la separación de poderes en dicha esfera. *Baker v. Carr*, 369 U.S. 186, 210 (1962). Según esta doctrina, si en un caso hay presente una cuestión política, el caso no será justicia-

---

[4] Reconocemos que nuestra jurisprudencia no ha limitado la capacidad del Consejo para ser demandado. *Henríquez v. Consejo Educación Superior*, 120 D.P.R. 194 (1987); *Fac. C. Soc. Aplicadas, Inc. v. C.E.S.*, 133 D.P.R. 521 (1993); *Bayrón Toro v. Serra*, 119 D.P.R. 605 (1987); *Pagán Hernández v. U.P.R.*, 107 D.P.R. 720 (1978); *Berríos Martínez v. U.P.R.*, 107 D.P.R. 144 (1978). Dicho asunto no había sido abordado antes, puesto que el Consejo nunca lo había presentado como defensa. De todas maneras, lo cierto es que no le hemos reconocido capacidad al Consejo para demandar, fuera de las dos (2) excepciones establecidas por ley.

ble y el tribunal deberá abstenerse de adjudicarlo. "La doctrina de cuestión política plantea, en esencia, 'que hay asuntos que no son susceptibles de determinación judicial porque su resolución corresponde a las [otras] ramas ... del gobierno —la legislativa o la ejecutiva— o, en última instancia, al electorado'." *Noriega v. Hernández Colón*, 135 D.P.R. 406, 422 (1994).

Recientemente, en *Noriega v. Hernández Colón*, supra, expresamos, citando al profesor Serrano Geyls, que existen tres (3) vertientes de la doctrina de cuestión política: "(a) la que requiere que los tribunales no asuman jurisdicción sobre un asunto porque éste ha sido asignado textualmente por la Constitución a otra rama del Gobierno; (b) aquella según la cual las cortes deben de abstenerse de intervenir, bien porque no existan criterios de decisión susceptibles de descubrirse y administrarse por los tribunales, o bien por la presencia de otros factores análogos, y (c) la que aconseja la abstención judicial por consideraciones derivadas de la prudencia". (Citas omitidas.) Íd., pág. 422.

En *Silva v. Hernández Agosto*, 118 D.P.R. 45, 54 (1986), expresamos, tomando como fundamento la doctrina federal, que la existencia de una cuestión política depende de los siguientes factores: "(1) una delegación expresa del asunto en controversia a otra rama del gobierno; (2) la ausencia de criterios o normas judiciales apropiadas para resolver la controversia; (3) la imposibilidad de decidir sin hacer una determinación inicial de política pública que no le corresponde a los tribunales; (4) la imposibilidad de tomar una decisión sin expresar una falta de respeto hacia otra rama de gobierno; (5) una necesidad poco usual de adherirse, sin cuestionar, a una decisión política tomada previamente, y (6) potencial de confusión proveniente de pronunciamientos múltiples de varios departamentos del Gobierno sobre un punto."

Para determinar si está presente una cuestión política que nos impida adjudicar una controversia, examinamos

todas las circunstancias del caso al amparo de los principios generales de separación de poderes que prevalecen en nuestra jurisdicción. No hay una fórmula matemática para decidir si se aplica la doctrina. Ninguno de los criterios por sí solo es determinante al resolver si está presente una cuestión política.

El Gobernador expone que está presente una cuestión política debido a que nuestra Constitución delegó en la Asamblea Legislativa el poder para crear, consolidar y reorganizar las agencias de gobierno y, además, están presentes los demás factores antes expuestos, indicadores de la existencia de cuestión política.

La Constitución le confiere a la Rama Legislativa la facultad para reorganizar los departamentos ejecutivos de nuestro Gobierno. Sin embargo, esto por sí solo no es suficiente para hacer una cuestión política de cualquier controversia en la cual se impugne una actuación de la Asamblea Legislativa en el ejercicio de esa facultad. Al ejercitar la facultad de reorganización, las ramas políticas tienen que obrar conforme a todos los demás preceptos constitucionales.

Al igual que cualquier otra ley, un estatuto que reorganice algún departamento ejecutivo no puede violar los derechos constitucionales relacionados a la libertad de expresión y la Rama Judicial no está impedida de revisar la actuación legislativa. No se ha expresado razón alguna por la cual, a diferencia de las leyes relacionadas a otras materias, los tribunales no puedan revisar una alegación de violación a derechos individuales de rango constitucional, cuando la ley impugnada reorganice un departamento ejecutivo. Al igual que otros casos relacionados a la libertad de expresión, tenemos los criterios necesarios para resolver la controversia ante nos.

Además, al revisar la constitucionalidad de esta ley no hacemos una determinación impermisible de política pública. La teoría de los miembros del Consejo se apoya en

los derechos de la libertad de expresión y del debido proceso, los cuales, por tradición responden a intereses individuales. Al resolver este recurso, no estaríamos decidiendo cuál política pública es la más sabia. Al examinar la procedencia del reclamo de libertad académica institucional para la Universidad de Puerto Rico, estamos ponderando valores dimanantes de la libertad de expresión, los cuales, además de proteger intereses individuales, también incorporan beneficios para la sociedad. Ello no significa que estemos determinando una política pública; simplemente estamos poniendo en vigor aquella que se incorporó a la Constitución mediante la cláusula de libertad de expresión. Estamos ante una situación típica, en la cual tenemos la responsabilidad ineludible de determinar si el Estado ha violado unos derechos fundamentales, tarea precisamente para la cual los tribunales están, en general, mejor equipados y que acostumbran realizar.

En vista de lo anterior, concluimos que este caso no presenta una cuestión política que nos impida que revisemos la constitucionalidad de la legislación impugnada.

## IV

*Legitimación activa*

Aunque el Tribunal Superior aceptó de forma implícita que los miembros del Consejo poseían una legitimación activa, en su carácter individual, para instar este pleito, el Gobernador sostiene ante nos que éstos carecen de dicha legitimación.[5] Procedemos a examinar esta controversia.

Hemos establecido que para tener una legitimación activa es necesario haber sufrido un daño claro y palpable; que el daño sea real, inmediato y preciso, y no abstracto o hipotético; que exista una conexión entre el daño sufrido y

---

[5] No tenemos que resolver si el Consejo carece de legitimación activa, dada nuestra conclusión de que dicho organismo carece de capacidad para demandar.

la causa de acción ejercitada, y finalmente, que la causa de acción surja bajo el palio de la Constitución o de una ley. *Hernández Torres v. Hernández Colón et al.*, 131 D.P.R. 593 (1992).

Los miembros del Consejo sufrieron un daño claro, inmediato y real. Todos ellos tenían un nombramiento por un término fijo que no había concluido y que habían ejercido a través de los últimos años. Sin embargo, la nueva legislación les despojó de la función de dirigir la Universidad de Puerto Rico. Éste es un daño concreto y palpable por virtud del cual los miembros del Consejo tienen legitimación para alegar que jurídicamente dicho despojo no fue válido.

No hay duda de la existencia de una conexión entre este daño y la causa de acción ante nos. Precisamente, la causa de acción persigue anular —por inconstitucionales— las leyes que tuvieron el efecto de despojar a los miembros del Consejo de sus prerrogativas y funciones. Por otro lado, de tener éxito en este caso, tendríamos que concluir que el Consejo nunca dejó de existir, por lo cual sus miembros continuarían ejerciendo las facultades de gobierno universitario.

Finalmente, la causa de acción ejercitada surge bajo los derechos de libertad de expresión y debido proceso, que contiene tanto la Constitución federal como la nuestra. Por ende, concluimos que los miembros del Consejo tienen legitimación activa para instar este pleito.

El Gobernador argumenta, además, que los miembros del Consejo no tienen legitimación, por formar parte del poder ejecutivo contra el cual oponen el reclamo de inconstitucionalidad. No tiene razón. En primer lugar, este argumento está dirigido principalmente contra el Consejo, quien, como ya resolvimos, carece de capacidad para demandar. En cuanto a sus miembros, no hay duda de que éstos tienen legitimación para cuestionar la inconstitucionalidad de la legislación. Cada uno de estos funcionarios juró defender la Constitución de Puerto Rico y, al verse

afectado por una legislación que estime inconstitucional, está legitimado para impugnarla judicialmente. *Board of Education v. Allen*, 392 U.S. 236, 241 esc. 5 (1968).([6])

Finalmente, los miembros del Consejo sostienen que ellos tienen legitimación activa para invocar los derechos constitucionales de la Universidad de Puerto Rico, en particular el derecho de libertad académica institucional. Como regla general, hemos establecido que las partes "tienen capacidad tan solo para plantear sus propios derechos contra actos alegadamente ilegales del gobierno". *E.L.A. v. P.R. Tel. Co.*, 114 D.P.R. 394, 396 (1983). Véase *Zachry International v. Tribunal Superior*, 104 D.P.R. 267, 271 (1975). La norma no tiene rango constitucional y únicamente es un método que los tribunales emplean de forma voluntaria para ejercer con moderación y prudencia sus poderes constitucionales. *P.R. Tel. Co.*, supra, págs. 396–397; Nota, *Standing to Assert Constitutional Jus Tertii*, 88 Harv. L. Rev. 423 (1974). Para determinar si existe una legitimación para invocar los derechos constitucionales de terceros, es esencial analizar al menos, entre otros factores correspondientes al caso particular que se trate, la conexión entre el daño sufrido por el reclamante y los derechos constitucionales del tercero. Nota, *supra*, pág. 431. Debe examinarse el efecto del daño sufrido por el reclamante sobre la capacidad del tercero de ejercitar sus derechos constitucionales.

En este caso, los miembros del Consejo han sufrido un daño consistente en ser privados de realizar una función que previamente realizaban y para la cual habían sido

---

([6]) El caso *Gobierno de la Capital v. Consejo Ejecutivo*, 63 D.P.R. 434 (1944), citado por el Gobernador en apoyo de su posición, no aplica al caso ante nos. La determinación que allí hicimos fue substantiva y no tenía que ver con una legitimación. Rechazamos que dicho caso apoye la norma de que personas y organismos de la Rama Ejecutiva nunca tienen legitimación para plantear, en los tribunales y contra el Estado, la inconstitucionalidad de una legislación. Véase, a estos efectos, J.J. Álvarez González, *Derecho Constitucional*, 61 Rev. Jur. U.P.R. 637, 652–656 (1992).

nombrados por el Gobernador y confirmados por el Senado. Dicho daño causa que la Universidad de Puerto Rico no pueda reclamar sus propios derechos constitucionales. Por la propia naturaleza del estatuto impugnado, sólo la Junta de Síndicos podía, luego de 23 de julio de 1993 (fecha cuando se constituyó formalmente la Junta), reclamar dichos derechos, lo cual era una posibilidad remota dado que la Junta estaría sosteniendo la inconstitucionalidad de la legislación que le dio vida, lo cual sería incompatible con la aceptación por cada miembro de un puesto en dicho cuerpo. La conexión entre el daño a los miembros del Consejo y la alegada violación de los derechos de la Universidad es claro —dicho daño, el despido de los miembros del Consejo y su reemplazo por otro cuerpo es el que, precisamente, se ha alegado que violenta la libertad académica institucional que posee la Universidad.

Aunque la Universidad de Puerto Rico, como parte interventora, sostiene la constitucionalidad de la legislación, esto no puede ser un factor determinante para negarles a los miembros del Consejo la legitimación para invocar derechos de la Universidad, dado que ésta comparece por gestiones de la Junta de Síndicos en virtud de la nueva legislación. De resolver lo contrario, estaríamos poniendo una ficción jurídica sobre la realidad de que tenemos ante nos: una disputa entre dos (2) grupos de personas, en la cual cada uno alega ser el legítimo gobernante de la Universidad. No podemos negarles a los dirigentes anteriores la oportunidad de invocar los derechos de la Universidad sólo porque la nueva ley le da al segundo grupo el gobierno universitario; es precisamente la constitucionalidad de esta nueva ley la que impugna el primer grupo.

Examinada la normativa aplicable, concluimos que los miembros del Consejo tienen legitimación para argumentar que la legislación en controversia viola la libertad académica de la Universidad de Puerto Rico.

# V

## Academicidad

El Gobernador argumenta que el caso de marras es académico porque los miembros del Consejo no aceptaron sus nombramientos al nuevo organismo de acreditación de instituciones privadas de educación superior. No tiene razón. Veamos.

Un caso se convierte en académico cuando ocurren cambios, durante el trámite judicial de una controversia particular, que hacen que ésta pierda su actualidad, de modo que el remedio que pueda dictar el tribunal no ha de llegar a tener efecto real alguno en cuanto a esa controversia. *C.E.E. v. Depto. de Estado*, 134 D.P.R. 927 (1993). Se tiene que examinar si un fallo que favorezca a los demandantes tendrá alguna consecuencia práctica sobre las relaciones jurídicas entre las partes. *Gobernador v. Alcalde de Coamo*, 131 D.P.R. 614 (1992); *Berberena v. Echegoyen*, 128 D.P.R. 864 (1991); *Asoc. de Periodistas v. González*, 128 D.P.R. 704 (1991).

El hecho de que los miembros del Consejo no hayan aceptado sus cargos en el nuevo cuerpo, al cual según la legislación impugnada tenían derecho, no convierte el caso en académico. De concederse el remedio solicitado por los miembros del Consejo, para declararse inconstitucional la legislación impugnada, ellos tendrían derecho a continuar en el organismo anterior debido a que éste nunca habría cesado de existir.

Más aún, la actuación de los miembros del Consejo de no aceptar los puestos en la nueva entidad es compatible con su posición de que la legislación que eliminó el Consejo es inconstitucional. Si los miembros del Consejo hubieran aceptado los nuevos puestos, estarían tomando parte activa de un esquema que alegan es inconstitucional y se podría alegar en su contra que —mediante dicha aceptación— renunciaron al planteamiento de que la nueva legis-

lación no es válida. Por tal razón, los miembros del Consejo actuaron de un modo perfectamente conforme a su teoría jurídica y, al así hacerlo, no causaron que la controversia se convirtiera en académica.

Por entender que las doctrinas de academicidad, legitimación activa y cuestión política no impiden la adjudicación del caso de marras, concluimos que la controversia de este caso es justiciable. Procede que examinemos los méritos del recurso.

## VI

*Debido proceso*

Los miembros del Consejo sostienen que la legislación aprobada por el Gobernador infringe la cláusula constitucional de debido proceso tanto en su modalidad substantiva como procesal.

En su vertiente procesal, la cláusula de debido proceso le impone al Estado la obligación de garantizar que la interferencia, con los intereses de libertad y de propiedad del individuo, se haga a través de un procedimiento que en esencia sea justo y equitativo. La validez de la ley, en términos substantivos, no es pertinente a los fines de evaluar si cumple con el debido proceso de ley procesal. *Rodríguez Rodríguez v. E.L.A.*, 130 D.P.R. 562 (1992).

Para determinar si una persona posee un interés propietario dentro del contexto de un ataque bajo la cláusula de debido proceso en su vertiente procesal, es necesario que se tenga algo más que una mera expectativa unilateral de titularidad; se debe tener un derecho concreto protegido por el ordenamiento jurídico estatal. *Board of Regents v. Roth*, 408 U.S. 564 (1972); *Orta v. Padilla Ayala*, 131 D.P.R. 227 (1992). En Puerto Rico, un empleado público tiene un reconocido interés en la retención de su empleo si dicho interés está protegido por la ley (empleado de carrera) o cuando las circunstancias crean una expectativa

de continuidad. *Díaz Martínez v. Policía de P.R.*, 134 D.P.R. 144 (1993); *Orta v. Padilla Ayala,* supra; *Torres Solano v. P.R.T.C.,* 127 D.P.R. 499 (1990). Por otro lado, un empleado de confianza no tiene interés propietario sobre su puesto. Más aún, la incorporación, mediante un contrato, de un requisito de justa causa para la terminación del empleo de un funcionario de confianza, con responsabilidad para formular la política pública, constituye un acto nulo por ser contrario a la ley y a la política pública del Estado Libre Asociado de Puerto Rico. *McCrillis v. Aut. Navieras de P.R.,* 123 D.P.R. 113, 132 (1989).

Los miembros del Consejo alegan que tienen un interés propietario sobre la función de gobernar la Universidad de Puerto Rico. Implícitamente reconocen que no se les privó del interés propietario que pudiesen tener sobre sus puestos. Sin embargo, como hemos señalado, nuestro ordenamiento sólo le reconoce al empleado público de carrera un interés propietario sobre el cargo o empleo que desempeñe, pero no sobre las funciones que realiza.[7]

Un análisis integral de la legislación revela que, en términos prácticos, los estatutos impugnados sólo afectaron las funciones que los miembros del Consejo ejercían, para permitirles continuar, si así lo deseaban, con la facultad de acreditación de instituciones privadas, de ese modo conservarían sus puestos hasta la expiración del término original para el cual fueron nombrados.[8] Por tal razón, no es pertinente el hecho de que los miembros del Consejo, bajo la legislación anterior, ocupaban sus cargos por un término fijo; bajo la legislación vigente, éstos pudieron continuar en sus puestos hasta que finalizara dicho término. En estas

---

[7] Por el contrario, nuestra Constitución concede la facultad expresa a la Asamblea Legislativa para "crear, consolidar o reorganizar departamentos ejecutivos y definir sus funciones". Art. III, Sec. 16, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 343. Esta disposición fortalece nuestra conclusión de que, ausente alguna disposición en contrario, los empleados públicos no tienen interés propietario alguno sobre las funciones que desempeñen.

[8] Tampoco existe acuerdo o contrato alguno que sustente el reclamo de interés propietario de los miembros del Consejo.

circunstancias, concluimos que la legislación impugnada no priva a los miembros del Consejo de interés propietario alguno. Éstos no pueden fundar su reclamo en la vertiente procesal de la cláusula de debido proceso.

Los miembros del Consejo intentan además establecer que la legislación viola la cláusula del debido proceso en su modalidad substantiva. Esta vertiente persigue proteger y salvaguardar derechos fundamentales de la persona. *Rodríguez Rodríguez v. E.L.A.*, supra. Por tal razón, si se ve afectado algún derecho fundamental de los reconocidos por nuestro ordenamiento, se somete la legislación a un estándar estricto de revisión judicial. Por otro lado, si no se ve afectado algún derecho fundamental, la vertiente substantiva de la cláusula sólo protege contra las actuaciones arbitrarias o caprichosas del Gobierno que no respondan a interés legítimo alguno. *Nebbia v. New York*, 291 U.S. 502 (1934); *U.S. v. Carolene Products Co.*, 304 U.S. 144 (1938); *Williamson v. Lee Optical Co.*, 348 U.S. 483 (1955). Bajo este criterio, la legislación será válida si es racional concluir que ésta persigue un objetivo legítimo gubernamental. *Nebbia*, supra; *Carolene Products*, supra; *Williamson*, supra.

En este caso, a los miembros del Consejo no se les ha afectado derecho fundamental alguno que active el escrutinio estricto bajo esta cláusula. Los derechos fundamentales, protegidos por la vertiente substantiva de la cláusula de debido proceso, constituyen un limitado conjunto relacionado a las áreas de la intimidad, el derecho al voto, la libertad de expresión y la asociación, el procesamiento penal, la igualdad ante la ley y la libertad de culto. *Rodríguez Rodríguez v. E.L.A.*, supra. Ninguno de ellos está implicado aquí.[9]

---

[9] Los miembros del Consejo argumentan que se afecta el derecho a la educación, según plasmado en nuestra Constitución (Art. II, Sec. 5, L.P.R.A., Tomo 1). Aparte del problema de legitimación para invocar los derechos constitucionales de terceros, este planteamiento no procede. La educación universitaria no está comprendida en el ámbito de nuestra cláusula constitucional sobre educación. *Asoc. Aca-*

Más aún, la legislación impugnada no es caprichosa ni arbitraria. Por el contrario, responde a un fin legítimo gubernamental: evitar un posible conflicto de intereses debido a que el mismo grupo de personas gobierne la Universidad del Estado y, a la misma vez, otorgue licencias de operación y acredite las instituciones privadas de educación superior en Puerto Rico. A la luz de la prueba sometida, no podemos concluir que la decisión de reorganizar el Consejo y otorgarles a sus miembros únicamente el poder para acreditar las instituciones privadas haya sido un acto arbitrario que no persiguiera un objetivo legítimo del Estado.

Examinada la normativa anterior, es evidente que la legislación impugnada no viola la cláusula constitucional de debido proceso. Aclarados estos extremos, procede que se examine el señalamiento de los miembros del Consejo de que mediante esta legislación fueron despedidos de sus posiciones por razones político-partidistas.

## VII

### Discrimen político

Los miembros del Consejo también aducen que, por razón de su afiliación partidista, se les despojó de su función de dirigir la Universidad de Puerto Rico para ser sustituidos por personas nombradas por el Gobernador, quien está afiliado a otro partido político. Por su parte, el Gobernador alega que esta teoría no se presentó ante el Tribunal Superior, por lo cual no puede ser considerada ahora en la etapa apelativa.

Hemos establecido la regla general de que no atenderemos asuntos que no se hayan presentado ante el foro de

---

demias y Col. Cristianos v. E.L.A., 135 D.P.R. 150 (1994).

Por otro lado, aunque el reclamo de libertad académica institucional está fundado en la libertad de expresión, los miembros del Consejo no han alegado que la legislación impugnada infrinja sus derechos personales de libertad de expresión.

instancia. En *Murcelo v. H.I. Hettinger & Co.*, 92 D.P.R. 411, 426 (1965), resolvimos que si un señalamiento de derecho no es inicialmente expuesto ante los tribunales inferiores, no lo consideraremos. Conforme a dicha norma, en *Trabal Morales v. Ruiz Rodríguez*, 125 D.P.R. 340 (1990), nos negamos a adjudicar cuestiones no planteadas por las partes ante el foro de instancia. Aunque esta norma no es un dogma inquebrantable y en ciertas ocasiones hemos permitido que una parte modifique su teoría del caso en apelación, en los casos que se alegue que hubo un discrimen político, corresponde al demandante alegarlo y probarlo en el foro de primera instancia. *Sánchez v. Eastern Air Lines, Inc.*, 114 D.P.R. 691, 694–695 (1983); *Santiago Cruz v. Hernández Andino*, 91 D.P.R. 709, 711–712 (1965).

El argumento de los miembros del Consejo de discrimen político, apoyado por la jurisprudencia correspondiente, fue traído por primera vez en el escrito de apelación presentado a este Tribunal.[10] Por lo tanto, declinamos la invitación de apartarnos de la norma general y considerar el planteamiento en esta etapa apelativa. Los miembros del Consejo no expusieron su teoría ante el Tribunal Superior y no presentaron la prueba para apoyar dicho reclamo. Sin haber intentado probar, ante el tribunal de instancia, los elementos del discrimen político, por prudencia no debemos adjudicar en apelación este complejo asunto.

Por otro lado, aun si ignoráramos esta normativa, los miembros del Consejo no pueden prevalecer. La doctrina de discrimen político en el empleo se desarrolla bajo la Primera Enmienda a la Constitución federal, y nuestra jurisprudencia ha reconocido esta protección. *Elrod v. Burns*, 427 U.S. 347 (1976); *Branti v. Finkel*, 445 U.S. 507 (1980);

---

[10] Aunque se sostuvo ante el foro de instancia que la legislación impugnada representaba un intento del Gobierno para imponer en la Universidad de Puerto Rico su ideología política, social y cultural, dicha teoría se presentó para demostrar que se estaba violando la libertad académica de la Universidad. No es hasta el escrito de apelación que los miembros del Consejo presentan la teoría de discrimen político contra empleados públicos y reclaman que se ha discriminado contra ellos en su carácter individual como empleados públicos.

*Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990); *Orta v. Padilla Ayala*, supra; *McCrillis v. Aut. Navieras de P.R.*, supra; *Colón v. C.R.U.V.*, 115 D.P.R. 503 (1984); *Feliciano v. Mun. de Fajardo*, 115 D.P.R. 675 (1984); *Franco v. Mun. de Cidra*, 113 D.P.R. 260, 264 (1982); *Ramos v. Srio. de Comercio*, 112 D.P.R. 514 (1982); *Báez Cancel v. Alcalde Mun. de Guaynabo*, 100 D.P.R. 982 (1972). En estos casos, el demandante tiene el peso inicial de probar mediante preponderancia de la prueba que la conducta protegida fue el factor sustancial o motivador para la acción del despido. *McCrillis v. Aut. Navieras de P.R.*, supra, pág. 142. Corresponde al empleado demostrar que su despido se debió a motivaciones políticas; también deberá establecer la ausencia de motivo racional para el despido y la sustitución por otro empleado de diferente afiliación política que resulte afín con la de la autoridad nominadora. *Rodríguez Cruz v. Padilla Ayala*, 125 D.P.R. 486 (1990); *McCrillis v. Aut. Navieras de P.R.*, supra, págs. 140–143. Es particularmente importante que el demandante demuestre la afiliación política de la persona que lo sustituya. *McCrillis v. Aut. Navieras de P.R.*, supra, págs. 145–146.

En el caso de autos, los miembros del Consejo no pueden prevalecer puesto que no se alegó, ni mucho menos se demostró, que las personas nombradas para formar parte de la Junta de Síndicos compartieran la afiliación partidista del Gobernador.[11] *McCrillis v. Aut. Navieras de P.R.*, supra, pág. 143. Además, dado que el objetivo de separar las funciones de gobierno universitario y acreditación es legítimo, los miembros del Consejo no pueden alegar que solamente por ser despojados de una (1) de las dos (2) funciones fueron víctimas de discrimen político. Aunque sí podrían argumentar que el Estado discriminó al decidir despojarlos de la función de dirigir la Universidad en lugar

---

[11] Esto es así aun sin tomar en cuenta que el Gobernador no tiene control sobre la identidad de tres (3) de los trece (13) miembros que constituyen la Junta de Síndicos.

de quitarles la función de acreditación, no se ha esbozado por qué el gobierno universitario es una función de mayor importancia que la de acreditación, presupuesto lógico y necesario para sostener que han quedado afectados adversamente por la opción legislativa adoptada. Por el contrario, la función de licenciar y acreditar las instituciones privadas de educación superior en Puerto Rico es muy importante para el país.

No obstante, debemos aclarar que aunque en el caso ante nos la alegación de discrimen político no prosperó por las razones expuestas, en una situación distinta en la cual un funcionario universitario alegue oportunamente el discrimen político y logre probar sus elementos, permanecemos preparados para hacer valer sus derechos ante el Estado.

## VIII

*Libertad académica*

Los miembros del Consejo sostienen que la legislación impugnada es inconstitucional por infringir la libertad académica y autonomía de la Universidad de Puerto Rico. Aducen que tanto la Constitución federal como la nuestra protegen a las instituciones universitarias contra interferencias indebidas del Estado con sus asuntos. Sostienen que el Tribunal Superior erró al negarse a reconocer un rango constitucional a la autonomía universitaria. Alegan que aunque dicho foro reconoció la libertad académica institucional de la Universidad de Puerto Rico frente al Estado, erró al validar los estatutos en controversia.

A.   Para evaluar la teoría de los miembros del Consejo, es necesario examinar antes el desarrollo de los conceptos "autonomía universitaria" y "libertad académica", así como la relación entre ambos. En primer lugar, examinaremos

cómo la autonomía universitaria se ha manifestado en otras jurisdicciones y en la nuestra.

La autonomía universitaria es el principio que consiste en aislar, en mayor o menor grado, a una universidad pública del control, la reglamentación y la intervención gubernamental. Está reconocido en varias jurisdicciones que un máximo de autonomía es beneficioso para una universidad pública, pues reduce a un mínimo las influencias políticas sobre la tarea universitaria.([12]) Por tal razón, varios estados le han otorgado un rango constitucional a la autonomía universitaria para que la institución no esté sujeta a las ideas cambiantes y, a veces, caprichosas sobre la educación y los métodos administrativos que le parecen sabias a los organismos políticos.([13]) H.W. Horowitz, *The Autonomy of the University of California under the State Constitution*, 25 U.C.L.A. L. Rev. 23, 25 (1977). Sin embargo, como son fondos públicos los que sostienen la universidad pública, esta autonomía rara vez es total. Véase, en general, J.P. Byrne, *Academic Freedom: A "Special Con-*

---

([12]) Durante su historia, la Universidad de Puerto Rico ha sido víctima de intervenciones políticas y, como regla general, su estudiantado ha clamado por mayor autonomía para dicha institución.

"... [L]a autoridad conferida a la Junta de Síndicos por la ley de 1925 la mantenía [a la Universidad] sometida a los vaivenes de la política partidista local y privada de la independencia académica consubstancial al buen funcionamiento de una institución de educación superior." Isabel Picó de Hernández, *Los estudiantes universitarios y el proceso político puertorriqueño (1903–1948)*, Tesis, Departamento de Gobierno de la Universidad de Harvard, 1974, pág. 194. Véase, además, íd., págs. 117, 196–208 y 227–239.

([13]) Las Constituciones de los siguientes estados otorgan expresamente un rango constitucional a la autonomía de sus universidades públicas: California, Georgia, Hawaii, Idaho, Michigan, Minnesota, Montana, Nebraska y Oklahoma. J.P. Byrne, *Academic Freedom: A "Special Concern of the First Amendment"*, 99 Yale L.J. 251, 327 esc. 303 (1989). Véase, también, H.W. Horowitz, *The Autonomy of the University of California under the State Constitution*, 25 U.C.L.A. L. Rev. 23, 25 (1977); *Regents of University of Minnesota v. Lord*, 257 N.W.2d 796, 800 (1977). En Minnesota, donde la Universidad pública tiene un rango constitucional, la jurisprudencia ha resuelto que el propósito de dicha disposición constitucional fue el poner " 'the management of the greatest state educational institution beyond the dangers of vacillating policy, ill informed or careless meddling and partisan ambition that would be possible in the case of management by either legislature or executive' ". *Regents of the University of Minnesota v. Lord*, supra, pág. 800.

*cern of the First Amendment"*, 99 Yale L.J. 251, 327–331 (1989).

Por otro lado, en España se ha reconocido que la autonomía universitaria es un derecho fundamental con protección constitucional. Sentencia del Tribunal Constitucional Núm. 55 de 23 de febrero de 1989, *Boletín Oficial del Estado* de 14 de marzo de 1989; Sentencia del Tribunal Constitucional Núm. 26 de 27 de febrero de 1987, *Boletín Oficial del Estado* de 24 de marzo de 1987; J.M. Martínez Val, *La autonomía universitaria ante el Tribunal Constitucional*, 541 Rev. Gen. Der. 6439 (1989). Dicho Tribunal expresó lo siguiente:

> ... "La autonomía universitaria tiene como justificación asegurar el respeto a la libertad académica, es decir, a la libertad de enseñanza y de investigación. Más exactamente, la autonomía universitaria es la dimensión institucional de libertad académica que garantiza y completa su dimensión individual, constituida por la libertad de cátedra." [Fundamento jurídico 4, a), párrafo quinto]. (Énfasis suprimido.) Citado en Martínez Val, *supra*, págs. 6448–6449.

En relación con este desarrollo, un comentarista español señaló que la autonomía universitaria protegida constitucionalmente "debe considerarse como instrumental al servicio de la 'individual', que es más primaria y radical ... ninguna Universidad ni ninguno de los órganos universitarios [pueden], a pretexto de que la autonomía es universitaria, impedir o limitar abusivamente la libertad individual de Cátedra". (Énfasis suprimido.) Martínez Val, *supra*, págs. 6456–6457.

En Puerto Rico, la historia de su Universidad refleja que fue el estudiantado quien inicialmente impugnó la falta de autonomía universitaria en la propia estructura y funcionamiento de la Universidad. En 1935 se publicó el Informe del Comité de Ponencia de la Asamblea de Estudiantes, que señaló la necesidad de independizar la Universidad de la intervención indebida de la política partidista en la Junta de Síndicos y exigió una mayor

participación estudiantil en el proceso educativo. También propusieron que los problemas académicos fuesen de la exclusiva incumbencia del claustro. Véase I. Picó Vidal, *Estudiantes UPR: del nacionalismo cultural al nacionalismo político*, 24 Rev. C. Soc. U.P.R. 516, 540–543 (1985).

Por su parte, además, el claustro fue reclamando mayores poderes en el proceso académico, y en la década de los cuarenta (40) los nuevos sectores de profesionales, intelectuales y estudiantes unieron esfuerzos e impulsaron la autonomía universitaria a través de la reforma educativa de 1942. Picó Vidal, *supra*, pág. 551. Posteriormente, en 1966, después de otro intenso período de actividad estudiantil y reclamos de más poderes por los profesores y estudiantes, se aprobó la Ley Universitaria, la cual alteró sustancialmente la estructura administrativa y académica de la Universidad y creó el Consejo.

Nuestra legislación acoge en cierto grado el principio de autonomía universitaria. Como ejemplo, la autonomía fiscal de la Universidad de Puerto Rico está reconocida. Por virtud del estatuto vigente, la partida presupuestaria anual correspondiente a la Universidad es calculada automáticamente sobre la base de una fórmula, por lo que, al no permitirse discreción en la fijación de dicha partida, se alienta que la Universidad persiga su misión con relativa libertad de consideraciones político-partidistas.[14]

La autonomía fiscal no es la única manera en que nuestra legislación refleja la autonomía otorgada a la Universidad de Puerto Rico. Se dispone también que la Universidad será una corporación pública dirigida por un cuerpo colegiado cuyos miembros son nombrados por un término fijo. Por ende, el poder del Gobernador para remover estos fun-

---

[14] Le corresponde anualmente a la Universidad el 9.33% del promedio del monto total de las rentas anuales ingresadas al Fondo General del Tesoro Estatal en los dos (2) años anteriores al año corriente y de lo ingresado en cualesquiera fondos especiales creados mediante legislación a partir del 1ro de julio pasado, que se nutran de recursos generados por imposiciones contributivas. Sec. 1 de la Ley Núm. 46 de 6 de agosto de 1992 (18 L.P.R.A. secs. 621-1 y 621a).

cionarios está limitado a situaciones en las cuales exista justa causa. Aunque bajo la Ley Universitaria los miembros del Consejo eran nombrados por el Gobernador con el consejo y consentimiento del Senado, mediante el sistema de nombramientos escalonados los cambios en la composición del Consejo ocurrían gradualmente y se aislaba parcialmente a la Universidad de los cambios en las ramas políticas. De este modo, se evitaba que una sola administración gubernamental sustituyera súbitamente a toda la junta de gobierno universitaria y se garantizaba cierto grado de independencia y continuidad en el proceso decisional.

De acuerdo con estos principios, la Ley Universitaria de 1966 permitió a quienes antes componían el organismo de gobierno universitario (Consejo Superior de Enseñanza) pasar a formar parte del Consejo creado por dicha legislación. Al aprobar la legislación que se impugna en este caso, el Gobierno escogió un camino distinto al de la legislación de 1966. No nos compete juzgar la sabiduría de esta determinación; sólo su constitucionalidad. No obstante, es evidente que el principio de autonomía, mediante el cambio gradual en la composición de la junta de gobierno universitaria, quedaría eliminado si cada cuatro (4) años una nueva administración desplazara totalmente a los integrantes de dicha junta de gobierno para constituir otra nueva con personas de su predilección ideológica.

B. Luego de haber examinado cómo el concepto de autonomía universitaria se ha concebido tradicionalmente, pasamos a reseñar el significado que se le ha adscrito a la libertad académica. Dicha labor es necesaria, puesto que la protección constitucional relacionada a la libertad académica no surge del vacío. Previo a su reconocimiento, ya existía el concepto de libertad académica, según promulgado por la comunidad académica, en particular, los profesores universitarios. Es menester examinar este historial

para luego analizar en justa perspectiva el desarrollo jurídico de este concepto.

En Estados Unidos, la noción tradicional de libertad académica se origina a finales del siglo pasado y principios de éste. W.P. Metzger, *Profession and Constitution: Two Definitions of Academic Freedom in America*, 66 Tex. L. Rev. 1265, 1267–1272 (1988). El desarrollo de este concepto proviene de la reacción de los profesores universitarios de la época ante las juntas de síndicos o consejos de administración (*board of trustees*) que estaban al mando de las universidades privadas. Estas juntas estaban compuestas por personas ajenas al mundo académico y ejercían presión contra el claustro para que las ideas y conclusiones de sus componentes se ajustaran y coincidieran con las de ellas. Byrne, *supra*, págs. 267–269, 273–277 y 292; D.M. Rabban, *A Functional Analysis of "Individual" and "Institutional" Academic Freedom under the First Amendment*, 53 (Núm. 3) Law & Contemp. Probs. 227, 229 y 233 (1990); Metzger, *supra*, págs. 1267–1285.

El objetivo de los profesores —al promulgar el concepto tradicional de libertad académica— fue liberarse de influencias externas no académicas para así desempeñar limpia y propiamente su trabajo. Los claustrales deseaban libertad para plantearse los problemas y las preguntas que estimaran pertinentes, para investigar dichos asuntos y para llegar a conclusiones, todo ello de acuerdo con la metodología impuesta por la disciplina académica correspondiente. Deseaban trabajar con independencia de las juntas de síndicos. Byrne, *supra*, pág. 278.[15]

En apoyo de la adopción por las instituciones universitarias de la libertad académica, los profesores argumentaron que de no disfrutar de ella, su trabajo no podría ser

---

[15] Conforme a lo anterior, la Asociación Americana de Profesores Universitarios ha definido la "libertad académica" como " 'a scholar's right to be free of institutional (or governmental) control in professional utterance' ". (Escolio omitido.) D.M. Rabban, *A Funcional Analysis of "Individual" and "Individual" Academic Freedom under the First Amendment*, 53 (Núm. 3) Law & Contemp. Probs. 227, 260 (1990).

realizado adecuadamente, lo cual resultaría en una pérdida para la sociedad en general. El asunto fue esbozado por ellos como uno de beneficio general para la sociedad, más allá de sus particulares intereses gremiales.

Para reflejar estas preocupaciones y aspiraciones se preparó la "Declaración de 1915". *General Report of the Committee on Academic Freedom and Academic Tenure*, American Association of University Professors, 1 A.A.U.P. Bull. 17 (1915), transcrito en el Apéndice A, 53 (Núm. 3) Law & Contemp. Probs. 93 (1990). Este documento es de singular importancia en el desarrollo de la libertad académica. En él se expone —de manera sucinta y lúcida— cuál es la misión de las universidades y de los profesores, los beneficios resultantes para la sociedad y, finalmente, la necesidad del claustro de gozar de libertad académica para llevar a cabo su trabajo de una manera efectiva y competente. Se establece que la libertad académica del profesor comprende de la libertad para plantearse preguntas y problemas, para investigar, para enseñar y hasta para expresarse y actuar fuera del recinto universitario. La existencia de estas libertades se justifica conforme a las funciones que tienen las universidades, siendo las principales educar y aumentar el caudal del conocimiento humano.

Por otro lado, la declaración de 1915 también se ocupa de la amenaza que las Legislaturas representan para la libertad académica de las universidades públicas. Véase Rabban, *supra*, pág. 233. Se expone que cuando una universidad depende de la gracia legislativa para poder obtener fondos, ha sucedido que la conducta de la institución se ha visto afectada por consideraciones políticas y que esto amenaza la libertad académica en cuanto promueva la supresión de ideas y opiniones contrarias a las prevalecientes en el ambiente social, político y económico del momento.[16]

---

[16] Resumiendo estas ideas, nos expresa un comentarista lo siguiente:

"... the 1915 declaration worried that legislators might try to use the state's purse strings to manipulate the academic inquiries of professors, particularly when

Finalmente, la declaración sostiene que el mecanismo principal para poner en vigor y proteger la libertad académica consiste en el sistema de permanencia (*tenure*). Conforme con este principio, la responsabilidad de mantener estándares profesionales adecuados está en manos del claustro, al menos inicialmente. Mediante este sistema se libera al profesor de la preocupación de perder su empleo, una vez expira determinado período probatorio. Byrne, *supra*, pág. 311.([17])

## IX

Habiendo expuesto un marco de referencia para la discusión que sigue, emprendemos la tarea de analizar, en términos ya propiamente jurídicos, la existencia y el ámbito de la libertad académica y de la autonomía universitaria, así como la relación entre ambas.

El término "libertad académica" puede usarse para denominar tanto a los derechos individuales del profesor universitario, como a la protección constitucional de la institución universitaria propiamente.([18]) Para distinguirlos,

---

scholarly views might deviate from strong public opinions or from established government policies." Rabban, *supra*, pág. 233.

([17]) Varios comentaristas actuales coinciden en que el sistema de permanencia es un mecanismo importante para proteger la libertad académica. Se ha señalado que este sistema

"...eliminates the gravest evils of lay control over universities —ignorant interference with painstaking investigation and discussion of controversial problems— by insisting that professors be evaluated only for professional competence and only (in the first instance) by peers." Byrne, *supra*, pág. 279.

Cuando se usa el sistema de permanencia, "personnel decisions are based largely on scholarship and teaching ability by placing primary responsibility for hiring and promotion on peers". Byrne, *supra*, págs. 310–311.

En 1940, la A.A.U.P. le dio seguimiento a la declaración de 1915 con otra declaración. *Policy Documents and Reports* 3 (A.A.U.P. 1984), transcrito en el Apéndice B, *1940 Statement of Principle on Academic Freedom and Tenure*, 53 (Núm. 3) Law & Contemp. Probs. 407 (1990). En ésta se dibuja con más detalle los procedimientos que deben existir para que un sistema de permanencia (*tenure*) proteja adecuadamente la libertad académica tradicional de los profesores.

([18]) La libertad académica individual consiste principalmente en excluir a no-académicos de la toma de decisiones académicas, así como en exigir que quienes tomen dichas decisiones lo hagan sobre bases propiamente académicas. Byrne, *su-*

usaremos el término "libertad académica individual" para referirnos a la protección constitucional que se le ha reconocido a los derechos individuales de los profesores, y "libertad académica institucional" para el derecho que protege a la universidad como institución.[19]

Como veremos más adelante, reconocemos que, por virtud de la libertad académica institucional que emana de la Primera Enmienda de la Constitución federal y de nuestra cláusula constitucional de libertad de expresión, la Universidad posee un mínimo de autonomía frente al Estado, la cual protege a la Universidad de una intervención indebida del Estado en sus asuntos académicos medulares. No obstante, es necesario aclarar que la libertad académica institucional, por ser de un alcance más limitado, no incorpora el concepto "autonomía universitaria", según éste se conoce y se utiliza tradicionalmente en círculos universitarios. Si bien la doctrina general de la autonomía universitaria ha influido en el desarrollo de la libertad académica en todas sus dimensiones, lo cierto es que la primera tiene un alcance más amplio que generalmente ha dependido del éxito de los reclamos de los estudiantes y profesores universitarios frente al Estado. A su vez, la extensión de la zona de protección constitucional otorgada por la libertad académica institucional depende de los contornos de la libertad de expresión.

---

pra, pág. 304.

[19] Los conceptos "libertad académica individual" y "libertad académica institucional" son independientes. De hecho, se ha sostenido que ambos derechos pueden ser contradictorios debido a que cuanta más libertad tenga una universidad frente al Estado, menos espacio tienen los profesores y estudiantes para defenderse de la universidad mediante reclamos en los tribunales. Por otro lado, cuantos más derechos tengan los profesores como individuos, menos capacidad tiene la institución universitaria para determinar, libre de influencias del Estado, los asuntos relacionados a la administración y política educacional de la institución. Véanse, en general: Byrne, *supra* págs. 257–258; Comentario, *The Burden of Proof and Academic Freedom: Protection for Institution or Individual?*, 82 N.W. L. Rev. 492, 510 esc. 108 (1988); *Regents of the University of Michigan v. Ewing*, 474 U.S. 214, 226 esc. 12 (1985). Véanse, también: *Piarowski v. Illinois Community College*, 759 F.2d 625, 629 (7mo Cir.), *cert.* denegado, 474 U.S. 1007 (1985); Rabban, *supra*, pág. 229.

# X

Los miembros del Consejo parten de la premisa de que la Universidad de Puerto Rico tiene un derecho constitucional de libertad académica frente al Estado. El Gobernador aceptó esa premisa y reconoce que este derecho constitucional protege a la institución contra "intervenciones indebidas del Estado".[20] Esta posición refleja el sentir mayoritario de que las universidades públicas no sólo gozan de unos derechos constitucionales contra el propio Estado, sino que esto es lo más deseable.[21] Véanse: Byrne, *supra*, págs. 300 y 329–330;[22] Rabban, *supra*, págs. 231, 278 y 266–280; Metzger, *supra*, págs. 1318–1319. *Endosamos esta posición.*

La libertad académica institucional está reconocida como un principio constitucional derivado de la libertad de expresión. *Regents of University of Michigan v. Ewing*, 474 U.S. 214, 226 esc. 12 (1985).[23] El Tribunal Supremo fede-

---

[20] Véanse: Contestación a la demanda, pár. 19; Réplica del demandado de 14 de julio de 1993, pág. 2; Alegato del demandado de 20 de diciembre de 1993, pág. 29. ("Desde nuestra comparecencia inicial, la parte aquí apelada ha reconocido la existencia de un derecho constitucional de libertad académica institucional. ... Bajo esta nueva vertiente la universidad, como institución independiente y separada de los estudiantes y profesores que la componen, puede reclamar ciertas prerrogativas contra una intervención indebida del estado.")

Lo que el Gobernador alega es que los miembros del Consejo carecen de acción legitimada para oponer este derecho ante el poder ejecutivo del cual forma parte. Ya consideramos y resolvimos contra el Gobernador dicho planteamiento.

[21] A estos efectos, véanse: *Regents of the University of Michigan v. Ewing*, supra; *Widmar v. Vincent*, 454 U.S. 263, 277–281 (1981), opinión concurrente, del Juez Stevens, pág. 278; *University of California Regents v. Bakke*, 438 U.S. 265, 312 (1978), opinión del Juez Powell, anunciando el fallo del Tribunal; *University of Pennsylvania v. EEOC*, 493 U.S. 182, 198 esc. 6 (1990); *Consejo Educación Superior v. U.I.A.*, 120 D.P.R. 224, 235 esc. 12 (1987). Aunque esta noción no goza de apoyo universal, quienes la oponen forman un grupo minoritario. M.G. Yudof, *Three faces of Academic Freedom*, 32 Loy. L. Rev. 831, 855–856 (1987). Véase, también, Rabban, *supra*, págs. 266–280, y fuentes allí citadas.

[22] "A state university is a unique state entity in that it enjoys federal constitutional rights against the state itself." Byrne, *supra*, pág. 300.

[23] "Although the meaning of constitutional academic freedom remains ambiguous, the Supreme Court has clearly recognized it as an unenumerated first amendment right with both individual and institutional components that can be in tension with each other." Rabban, *supra*, pág. 300.

ral ha sido enérgico al señalar las virtudes del derecho de libertad académica y en reconocer dicho principio como esencial en un sistema democrático.([24]) Aunque el Tribunal Supremo federal no ha formulado una teoría sistemática sobre esta normativa,([25]) ésta ha sido aplicada para proteger tanto a los profesores como a las instituciones académicas contra interferencias indebidas del Estado con sus asuntos académicos medulares.

Como veremos más adelante, la jurisprudencia del Tribunal Supremo federal, que ha reconocido la libertad académica institucional como un derecho bajo la Primera Enmienda de la Constitución federal, no apoya el reclamo de los miembros del Consejo. Por nuestra parte, en *Consejo Educación Superior v. U.I.A.*, 120 D.P.R. 224, 231 esc. 10 (1987), expresamente nos reservamos de resolver el planteamiento de libertad académica institucional hecho por una universidad privada.([26]) Sin embargo, en dicho caso afirmamos que "[p]ara que las universidades, bien sean las privadas o la del Estado, cumplan su función social de ser foro de 'discusión enérgica de ideas' mediante la investigación, el estudio y la crítica social, debemos velar por que se les asegure 'una relativa libertad en el examen de ideas'. ...

---

([24]) "Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." (Citas omitidas.) *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967).

([25]) "The court has been far more generous in its praise of academic freedom than in providing a precise analysis of its meaning." Byrne, *supra*, pág. 257. Véanse, en general: Byrne, *supra*, págs. 252–254, 311 y 312–339; Metzger, *supra*, págs. 1289–1291; Rabban, *supra*, pág. 230 y 300; Comentario, *supra*, pág. 512; *Wilson v. Chancellor*, 418 F.Supp. 1358, 1362 (D. Or. 1976).

([26]) Hasta ahora, no nos habíamos enfrentado a problemas relacionados a la libertad académica individual e institucional. Lo que hemos examinado son problemas generales de la libertad de expresión en el escenario particular universitario y escolar. *Sánchez Carambot v. Dir. Col. Univ. Humacao*, 113 D.P.R. 153 (1982); *Rodríguez v. Srio. de Instrucción*, 109 D.P.R. 251 (1979). El lenguaje que hemos utilizado, que exalta las virtudes de la libertad académica, ha sido empleado para apoyar la conclusión de que la libertad de expresión también protege a los profesores y estudiantes dentro de las instituciones universitarias. No debe confundirse la libertad académica con los principios generales de Primera Enmienda de la Constitución federal, L.P.R.A., Tomo 1. Byrne, *supra*, págs. 262–265.

En este caso la institución ... merece el mismo respeto y deferencia que le hemos reconocido a los profesores y estudiantes". *Consejo de Educación Superior*, supra, pág. 235.

Los miembros del Consejo sustentan su teoría en los casos *Sweezy v. New Hampshire*, 354 U.S. 234 (1957), y *Keyishian v. Board of Regents*, 385 U.S. 589 (1967). Hacen referencia a la retórica contenida en dichos casos como apoyo fundamental para su posición. Contrario a lo que alegan los miembros del Consejo, esta jurisprudencia no aplica por no haber sido resuelta al amparo de la libertad académica.[27]

No obstante, en la opinión concurrente del Juez Frankfurter en *Sweezy v. New Hampshire*, supra, se hicieron las expresiones más importantes sobre libertad académica y la naturaleza de una universidad en la historia del Tribunal Supremo federal:

In a university knowledge is its own end, not merely a means to an end. A university ceases to be true to its own nature if it becomes the tool of Church or State or any sectional interest. ...
... It is the business of a university to provide that atmosphere which is most conducive to speculation, experiment and creation. *Sweezy v. New Hampshire*, supra, págs. 262–263, opinión concurrente del Juez Frankfurter.

En dicha opinión concurrente, el Juez Frankfurter iden-

---

[27] En *Sweezy v. New Hampshire*, 354 U.S. 234 (1957), la Corte dio la razón a un conferenciante, que no quería divulgar al Estado una información sobre lo dicho por él en una conferencia que ofreció como invitado en una clase en la universidad pública del Estado. No obstante, el caso se resolvió sobre bases técnicas no relacionadas en absoluto a la libertad académica.

En *Keyishian v. Board of Regents*, supra, el Tribunal Supremo federal resolvió que era inconstitucional que el Estado prohibiera a los profesores de la universidad pública de Nueva York, mediante el efecto indirecto de ciertos estatutos, tratar en clase temas relacionados al Marxismo u otras ideas revolucionarias. No obstante, *Keyishian*, supra, no fue resuelto sobre bases relacionadas a la libertad académica; se resolvió al amparo de la doctrina de vaguedad, principio general derivado de la Primera Enmienda de la Constitución federal. Es importante notar también que el problema principal estaba relacionado con la libertad académica individual de los profesores frente a los intentos indirectos del Estado de intervenir o regular el contenido del discurso universitario, y sólo en menor grado estaba involucrada la libertad académica institucional.

tificó, con elocuencia, cuatro (4) libertades esenciales de una universidad, que consisten en decidir por sí misma, conforme con los criterios académicos; quién enseñará; a quién se admitirá a estudiar; qué se enseñará, y cómo se enseñará:

> ... It is the business of a university to provide ... an atmosphere in which there prevail "the four essential freedoms" of a university—to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study. (Citas omitidas.) *Sweezy v. New Hampshire*, supra, pág. 263, opinión concurrente del Juez Frankfurter.[28]

Los miembros del Consejo también buscan apoyo para su posición en *University of California Regents v. Bakke*, 438 U.S. 265 (1978). En dicho caso, la Universidad del Estado argumentó que tenía un derecho de libertad académica institucional que, incondicionalmente, protegía el uso de criterios raciales al seleccionar quién sería admitido a estudiar. La opinión del Juez Powell, que resultó ser la decisiva, aunque le reconoce un papel significativo a la libertad académica institucional, rechaza que ésta proteja la práctica cuestionada en el caso, para declarar así inconstitucional la política de admisiones impugnada por infringir la cláusula constitucional de la igual protección de las leyes.[29]

---

[28] Respecto a los problemas relacionados con las ciencias sociales y naturales, expresa la opinión que "[f]or society's good —if understanding be an essential need of society— inquiries into these problems, speculations about them, stimulation in others of reflection upon them, must be left as unfettered as possible. Political power must abstain from intrusion into this activity of freedom, pursued in the interest of wise government and the people's well-being, except for reasons that are exigent and obviously compelling". *Sweezy v. New Hampshire*, supra, pág. 262, opinión concurrente del Juez Frankfurter.

[29] En esta opinión se reconoce que la Universidad tiene derecho, bajo la libertad académica institucional, a tomar en consideración el factor racial al evaluar aspirantes, cuando al hacerlo se persiguen objetivos académicos legítimos y siempre que no se violente el principio constitucional de igual protección de las leyes.

Sin embargo, el Juez Powell fue el único que acogió en alguna medida la teoría de la Universidad sobre la libertad académica institucional. En *University of California v. Bakke*, 438 U.S. 265 (1978), no hubo opinión del Tribunal. Los cuatro (4)

El Tribunal Supremo federal reconoce expresamente por primera vez en *Regents of University of Michigan v. Ewing*, supra, que la libertad académica institucional existe y que comprende las cuatro (4) libertades previamente reconocidas por el Juez Frankfurter en su opinión concurrente en *Sweezy v. New Hampshire*, supra. La libertad académica institucional se usó como fundamento para establecer un estándar laxo de revisión judicial bajo la cláusula del debido proceso, en su vertiente substantiva, frente a la impugnación de una decisión académica de una institución universitaria.

En el caso más reciente del Tribunal Supremo federal sobre la libertad académica, *University of Pennsylvania v. EEOC*, 493 U.S. 182 (1990), se establece mediante opinión unánime que, no obstante la retórica que previamente se ha empleado para alabar la libertad académica, su ámbito es limitado y está relacionado sólo con los esfuerzos del Gobierno para controlar o dirigir el contenido de la expresión en las universidades (el "discurso universitario"). Se resuelve que no existe privilegio, bajo la libertad académica institucional, que ampare a una universidad privada contra un requerimiento de divulgación por la *Equal Employment Opportunity Commission* (E.E.O.C.) de los materiales y documentos relacionados al proceso decisional encaminado a denegarle la permanencia a una profesora, cuando ésta ha alegado que la decisión ha sido producto de discriminación por razón de sexo y raza en contravención a los estatutos federales correspondientes.([30])

---

Jueces, que hubiesen resuelto a favor de discreción sin límite para la universidad, no usaron como fundamento la libertad académica institucional. Por otro lado, los cuatro (4) Jueces que hubiesen resuelto que la universidad no puede tomar en consideración para nada el factor racial en sus decisiones de admisión, ello por razones estatutarias, ni siquiera discutieron si la libertad académica institucional de la universidad le daría espacio a ésta para tomar en cuenta la raza del solicitante.

([30]) En palabras del propio Tribunal federal, la controversia consistía en determinar si una universidad "enjoys a special privilege, grounded in ... the First Amendment, against disclosure of peer review materials that are relevant to charges of racial or sexual discrimination in tenure decisions". *University of Pennsylvania v.*

La universidad sostuvo que, como parte de su libertad académica institucional de decidir quién enseña, tenía derecho a un privilegio, absoluto o al menos limitado, que protegiera la confidencialidad del proceso decisional. Argumentó que, de lo contrario, se vería afectado adversamente el proceso institucional de decidir libremente, mediante el uso de criterios académicos, quién enseñaría en la universidad, debido al efecto intimidante que podría tener sobre los encargados de la decisión el saber que todo lo que expresen podría ser luego divulgado.

El Tribunal Supremo federal rechaza este planteamiento y concluye que como la intervención gubernamental en este caso no afectaba directamente el contenido del discurso universitario, la libertad académica institucional —reconocida previamente— no aplicaba. Distingue sus precedentes sobre la libertad académica al expresar que en aquéllos se intentaba, de modo directo, controlar o dirigir el contenido de la expresión. El Tribunal federal expresó que tanto en *Sweezy v. New Hampshire*, supra, como en *Keyishian v. Board of Regents*, supra, estaba involucrada una reglamentación fundamentada en el contenido (*content-based regulation*). *University of Pennsylvania v. EEOC*, supra, pág. 197.[31]

El Tribunal Supremo federal, además de concluir que sus precedentes no amparaban a la universidad en su reclamo, rechazó también ampliar la libertad académica institucional para que tuviera este alcance. Como fundamento, adujo el Tribunal que el vínculo entre la divulgación exigida por la E.E.O.C. y el efecto adverso so-

---

*EEOC*, supra, pág. 184.

[31] En *University of Pennsylvania v. EEOC*, supra, no se alegó que la E.E.O.C. pretendiera o fuera de hecho a dirigir el contenido del discurso universitario hacia o en rechazo a determinados temas o puntos de vista. Como consecuencia, no fue necesario enfrentar la interrogante de hasta qué punto la libertad académica institucional protegería a una universidad ante los intentos indirectos de parte del Gobierno de influenciar el contenido del discurso universitario. *University of Pennsylvania*, supra, pág. 198.

bre la libertad de la universidad para decidir quién enseña era muy atenuado y especulativo.([32])

## XI

De ordinario, tenemos autoridad para darle un contenido más amplio a nuestras cláusulas constitucionales del que el Tribunal Supremo federal otorga a cláusulas análogas de la Constitución federal.([33]) Por tal razón, le reconocemos, al amparo del Art. II, Sec. 4 de nuestra Constitución, L.P.R.A., Tomo 1, contornos más amplios a la libertad académica individual e institucional. El caso de *University of Pennsylvania v. EEOC*, supra, limita la libertad académica institucional bajo la Primera Enmienda de la Constitución de Estados Unidos a los asuntos estrictamente relacionados con intervenciones gubernamentales con el contenido de la investigación y la enseñanza, al no otorgarle importancia al aspecto de la selección por la institución de las personas que integrarán el claustro y al poner en entredicho los amplios pronunciamientos hechos por el Juez Frankfurter en *Sweezy v. New Hampshire*, supra.([34])

---

([32]) El resultado y análisis en *University of Pennsylvania v. EEOC*, supra, ha sido motivo de preocupación entre los defensores de la libertad académica institucional. W.W. Van Alstyne, *Academic Freedom and the First Amendment in the Supreme Court of the United States: An Unhurried Historical Review*, 53 (Núm. 3) Law & Contemp. Probs. 79, 139 esc. 207 (1990); Byrne, *supra*, págs. 318–319 y 320.

([33]) Al reconocerle un ámbito más amplio a la libertad académica institucional, únicamente estamos limitados por el ámbito de la libertad académica individual al amparo de la Constitución federal, en cuanto dichas libertades advengan en conflicto. En este caso no se presenta dicho problema.

([34]) Coincidimos con el siguiente comentario sobre el caso de *University of Pennsylvania v. EEOC*, supra:

"Purporting to distinguish *Sweezy* on the basis that the inquiry in that case went to the content of teaching, whereas here it went to the determination of professional qualification (though why that difference should be thought to matter is nowhere explained), the Court rejected the claim [of the university]. ... The tenor and decision in *University of Pennsylvania* are more at odds with *Sweezy* than any other single case to come from the Supreme Court during the past thirty-five years." (Citas omitidas.) Van Alstyne, *supra*, pág. 139 esc. 207.

También estamos de acuerdo con las siguientes expresiones, hechas por un comentarista al reseñar la controversia del caso, cuando todavía estaba pendiente de resolverse:

Bajo nuestra Constitución, hoy reconocemos que la libertad académica institucional comprende no sólo la enseñanza, investigación y publicación de trabajos, sino los aspectos de selección de personal docente y estudiantes, así como otras actividades administrativas y académicas que deban ser protegidas para evitar que el Estado manipule políticamente los procesos académicos universitarios.

Al resolver un reclamo al amparo de la libertad académica individual o institucional, se deberá tomar en cuenta cuál es la función universitaria, qué la hace única, qué la distingue de las que llevan a cabo otras instituciones y cuál es el beneficio de esta función para la sociedad. También se deberá distinguir cuidadosamente entre los varios contextos en que puedan surgir problemas de libertad académica constitucional: los reclamos de profesores contra colegas, administradores o síndicos; los reclamos de profesores o funcionarios universitarios análogos contra el Estado, y finalmente, los reclamos de la universidad contra el Estado. Van Alstyne, *supra*, págs. 86–87; Rabban, *supra*, pág. 231. Será además importante, al resolver estas controversias, considerar la naturaleza pública o privada de la institución universitaria.

El Estado no puede intervenir con las decisiones puramente académicas que tome la universidad relacionadas con sus cuatro (4) libertades fundamentales: decidir quién enseñará o ocupará cargos docentes relacionados a la investigación; qué se enseñará; cómo se enseñará, y quién

---

"Beyond invoking Frakfurter's 'four freedoms', the Supreme Court has not provided any guidance as to which administrative activities are protected by constitutional academic freedom from political regulation. Peer review certainly comes within the protection of institutional academic freedom if any university activity other than teaching and scholarship does. Peer review is the canonical procedure for determining 'who will teach'. ...

"... A cavalier disregard for the interests of the university in the process of peer review would be disastrous; this would relegate institutional academic freedom, at least as to activities other than teaching and scholarship, to a trivial status, a makeweight in decisions reached on undisclosed grounds." Byrne, *supra*, págs. 318–319 y 320.

será admitido a estudiar. La libertad académica institucional protege a la Universidad contra las intervenciones del Estado en asuntos académicos medulares e impide que la reglamentación estatal prive a la universidad del control directo sobre su destino académico. Byrne, *supra*, págs. 255 y 330. Las Ramas Ejecutiva y Legislativa no pueden reducir la universidad a un instrumento pasivo de cálculo político o utilitario sujeto a las vacilaciones políticas del proceso electoral. Byrne, *supra*, págs. 331 y 339–340.

No obstante, la libertad académica institucional no tiene un ámbito ilimitado.[35]·La razón de ser de esta libertad, la protección de los rasgos particulares y distintivos de las universidades, demarca sus límites.[36] Byrne, *supra*, pág. 332–333; Van Alstyne, *supra*, págs. 86–87. La libertad académica institucional no impide una reglamentación que incidentalmente afecte los derechos protegidos o que establezca unos requisitos mínimos de calidad en la enseñanza universitaria.[37]

---

[35] Véase, en general, en el contexto de las universidades públicas, Rabban, *supra*, págs. 271–272 y 276–280.

[36] La principal función y característica, que hace únicas a las universidades, es la investigación desinteresada. Existen también otras funciones y valores únicos de las universidades, constitutivos del fundamento de la libertad académica institucional, todos en cierta medida relacionados al principal. Byrne expone los siguientes: "disinterested inquiry, reasoned and critical discourse, and liberal education." Byrne, *supra*, pág. 338 Véase, en general, íd., págs. 332–339.

[37] La Ley Núm. 17 de 16 de junio de 1993 (18 L.P.R.A. secs. 852–852*l*), que crea el nuevo Consejo, dispone que toda institución privada de educación superior necesita una licencia de dicho cuerpo para poder operar o continuar operando en Puerto Rico. Art. 11 de la Ley Núm. 17, *supra*, 18 L.P.R.A. sec. 852i. Establece que el Consejo examinará las credenciales de la facultad, calidad y suficiencia de los programas que han de ofrecerse, las instalaciones físicas y facilidades, y la solvencia económica de la institución. Art. 7(2) de la Ley Núm. 17, *supra*, 18 L.P.R.A. sec. 852e. Estas normas responden a un interés legítimo del Estado de asegurar a todo estudiante, que se matricule en dichas instituciones, que éstas estén mínimamente cualificadas para la labor educativa. Véase Art. 13 de la Ley Núm. 17, *supra*, 18 L.P.R.A. sec. 852k. De su faz, el esquema de licenciamiento establecido mediante esta legislación no presenta problemas de libertad académica institucional por constituir unos requisitos generales que no están dirigidos a suprimir o avanzar ciertos puntos de vista, que interfieren sólo de manera incidental con las libertades institucionales correspondientes.

*Conclusión*

La libertad académica individual no está involucrada en este caso, puesto que nadie plantea que la legislación pretenda directa o indirectamente afectar a los funcionarios universitarios en sus labores académicas.

Más bien, los miembros del Consejo alegan que la legislación, que eliminó la junta de gobierno de la Universidad de Puerto Rico y creó una nueva con miembros distintos, infringe la libertad académica institucional de la Universidad. Los miembros del Consejo no pueden prevalecer al amparo de jurisprudencia federal sobre la libertad académica institucional. Esta libertad, reconocida por el Tribunal Supremo federal, no cubre las situaciones en que no se alegue alguna interferencia directa o indirecta con el contenido del discurso universitario. En este caso no se alega tal intervención.

Aun bajo la teoría más protectora de libertad académica institucional que hoy adoptamos bajo nuestra Constitución, los miembros del Consejo no pueden prevalecer. En este caso no se ha alegado ni demostrado que el Gobierno pretenda, mediante la legislación impugnada, intervenir con los asuntos académicos universitarios. No se ha planteado que la legislación impugnada sea un intento del Gobierno para afectar —de determinada manera— el contenido del discurso universitario, de la enseñanza o de la investigación académica y la publicación de sus resultados. Tampoco se sostiene que el Gobierno intente indirectamente, por medio de la sustitución de los componentes de la junta de gobierno universitaria, afectar otros asuntos académicos tales como la política de admisión de estudiantes o de selección de personal académico investigativo o docente. No se ha señalado ningún acto específico del Estado que implique un intento por imponer algún punto de vista específico en la Universidad o suprimir ideas con las cuales el Estado no simpatice. No basta para ello la alega-

ción de que el Gobernador sea de un partido político distinto al de los miembros del Consejo, esto sin perjuicio de la alegación que, bajo la doctrina de discrimen político, pueda hacer un funcionario universitario.

Los miembros del Consejo alegan que el Gobierno pretende mediante esta legislación implantar en la Universidad de Puerto Rico su ideología política, cultural, social y económica. Aunque la Junta de Síndicos podría intentar hacerlo así, lo cierto es que su mera creación no violenta la libertad académica institucional de la Universidad. Actualmente, el vínculo entre la legislación impugnada y lo que la Junta podría hacer es especulativo y la acción incoada no contiene la prueba necesaria para demostrar que la mera creación de la Junta constituye una intromisión indebida con la libertad académica.

*Claro está, ni la Junta ni cualquier funcionario administrativo puede actuar contra la libertad académica individual o institucional, y confiamos que los nuevos integrantes de la Junta respeten esta libertad académica individual e institucional. Los tribunales deberán examinar rigurosamente cualquier reclamo de que el Estado o la Junta estén violando la libertad académica individual e institucional mediante unos actos específicos.*

Resumiendo, por lo antes expuesto concluimos que, como correctamente argumentaron los miembros del Consejo, la controversia examinada es justiciable. Dichos miembros tienen legitimación activa para incoar este pleito, y éste no es académico ni presenta una cuestión política que impida su adjudicación.

Al amparo de nuestra Constitución, *le reconocemos a la Universidad de Puerto Rico un derecho de libertad académica institucional frente al Estado. Este derecho podrá ser invocado en los tribunales por los universitarios cuando el Estado intervenga directa o indirectamente con el discurso académico mediante intervenciones políticas que persigan*

*imponerle criterios o ideas que sólo respondan a diferencias ideológicas y no a legítimas consideraciones académicas.*

Aunque hoy determinamos que la libertad académica institucional de la Universidad de Puerto Rico no fue infringida mediante la legislación impugnada y que no se le privó a los miembros del Consejo de su derecho al debido proceso, nuestros pronunciamientos reconocen el derecho de la *Universidad de Puerto Rico a que el Estado no intervenga arbitrariamente con los asuntos universitarios, para desvirtuar así el carácter académico de dicha institución.*

La vital función universitaria de añadir al caudal de conocimiento humano y de estudiar críticamente las ideas prevalecientes en el mundo requiere un espacio de libertad e independencia, no contaminado por influencias políticas ajenas a la disciplina académica. El discurso universitario no es un botín de guerra; debe estar protegido contra la supresión de ideas y opiniones que pueda provocar la efímera ideología política, social y económica de un determinado momento histórico.

Los tribunales se mantendrán siempre preparados para proteger celosamente el derecho de libertad académica tanto de la Universidad como del claustro. Así aseguramos que en la Universidad siempre prevalezca un ambiente que garantice el libre fluir de ideas y el intercambio crítico y enérgico que debe caracterizar a dicha institución.

— O —

Opinión disidente emitida por el Juez Asociado Señor Alonso Alonso, a la cual se une el Juez Asociado Señor Fuster Berlingeri.

DISIENTO de la sentencia emitida por el Tribunal por entender que *las leyes impugnadas son inconstitucionales.* Mediante subterfugios carentes de legitimidad, se han violentado derechos fundamentales de los miembros del Con-

sejo de Educación Superior (en adelante C.E.S.) garantiza-
dos por nuestra Constitución y la de Estados Unidos (en
adelante EE. UU.) y se han socavado los pilares sobre los
cuales descansa nuestra democracia y la vida universitaria
que la nutre.

Coincido y me uno a las expresiones hechas en las par-
tes I, III, IV y V de la opinión concurrente del Juez Aso-
ciado Señor Hernández Denton. Estoy, además, conforme
con las partes VIII, IX, X y XI de su opinión, que tratan
sobre la libertad académica, pues éstas reconocen parte de
los derechos existentes sobre la libertad académica, aun-
que no su totalidad como entiendo que existen, y explico,
en esta opinión.

Hoy más que nunca tiene especial relevancia el princi-
pio expresado por este Foro hace más de tres (3) décadas
en *Pueblo v. Luciano Arroyo*, 83 D.P.R. 573, 582 (1961), *en
cuanto a que los jueces no debemos pecar de ingenuos y ser
tan inocentes como para creer cosas que nadie más creería.*

El imperio de la ley es la respuesta más enfática del
Estado liberal a los problemas del poder y de la libertad.
Debemos distinguir entre el uso del poder legítimo y el
ilegítimo, de lo contrario la sociedad liberal y el hombre
estarán condenados a la búsqueda de una justicia que no
existe y las estructuras sociales y públicas perderán legiti-
midad por su falta de contenido moral. Más allá de las
formalidades legales y del instrumentalismo burocrático,
hay que buscar el sentido de equidad, solidaridad social y
justicia real. R.M. Unger, *Law in Modern Society*, Nueva
york, Ed. Free Press, 1976.

La leyes impugnadas *son inconstitucionales de su faz y
en su aplicación cuando*: (1) hayan violentado la libertad
de expresión consagrada en nuestra Constitución y en la
Constitución federal; (2) hayan violentado, además, la li-
bertad académica institucional y la autonomía universita-
ria sin existir ningún interés apremiante que lo justifique;
(3) los miembros del C.E.S. hayan sido despedidos de jure y

de facto en forma discriminatoria por razones político-partidistas y sin justa causa, y (4) la legislación impugnada no sea otra cosa que un subterfugio para tomar indebidamente la Universidad de Puerto Rico como si fuera un botín de guerra. Nos explicamos.

*Existe un vínculo fuerte, firme e inquebrantable entre la vivencia universitaria y el ejercicio de la democracia. La Universidad es democracia conforme con su destino. Este destino de la Universidad está íntimamente ligado al contenido del Preámbulo de nuestra Constitución, en cuanto a "continuamente enriquecer nuestro acervo democrático en el disfrute individual y colectivo de [los] derechos". Preámble, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 251. La Universidad es la convivencia democrática de la sociedad civil y el máximo laboratorio para la experimentación democrática. Intervenir indebidamente con ella es intervenir peligrosamente con la democracia y violentar los valores constitucionales que la hacen viable y sobre los cuales se sostiene.*

*La amplitud del derecho a la libertad de expresión*, garantizado en nuestra Constitución, *cobija* la autonomía universitaria. La autonomía universitaria es un pilar fundamental en nuestra aspiración como pueblo a enriquecer, de manera continua, nuestro acervo democrático y al disfrute individual y colectivo de nuestras libertades, según lo dispone la Constitución.

Por otra parte, el concepto moderno de administración académica se deriva en *forma directa de la libertad de expresión individual y colectiva*. Hace viable el logro de los objetivos de la docencia. La libertad académica institucional incluye no sólo el componente de la docencia, sino el de la administración académica. Intervenir de forma indebida con la administración académica afecta directamente la docencia *y viola la libertad académica individual, pues tiene un efecto congelante ("chilling effect") sobre ésta y sobre la libertad de expresión de la comunidad universitaria.*

Ello es así, puesto que *quebranta el diálogo, la discusión y la deliberación universitaria, que son su razón de ser para que los estudiantes tengan una educación plena que los exponga a todas las corrientes del conocimiento.*

El C.E.S. ostenta una *obligación fiduciaria* de velar por todos los intereses de los elementos que componen la comunidad universitaria. Su capacidad para demandar y ser demandado la estableció la Sec. 2 de la Ley Núm. 135 de 7 de mayo de 1942 (18 L.P.R.A. sec. 632), *la cual está en pleno vigor. Así también lo hemos reconocido antes en nuestros dictámenes.* Por ello, tiene capacidad para comparecer a este pleito. Además del C.E.S., sus miembros tienen legitimación activa debido a que han sufrido un daño claro, inmediato, grave, concreto y palpable al ser despojados de *todas sus funciones fiduciarias y administrativas* sobre la Universidad. Sólo se le ha dejado la función de acreditar y licenciar instituciones de educación privadas, lo cual no es una función relacionada con administrar y dirigir la docencia universitaria. El C.E.S. y sus miembros están obligados a defender la Constitución y, por ende, los derechos de la libertad de expresión y el debido proceso de ley. Si una ley infringe estos derechos, su deber es cuestionar la constitucionalidad de ésta, como lo han hecho.

*La Universidad no es una agencia o corporación pública más del Gobierno.* La Universidad no es una propiedad privada del Estado ni tampoco es un departamento del Gobierno, como veremos más adelante.

En atención al interés público involucrado, siendo consecuentes con éste, *para respetar los principios antes expuestos —de que el Estado no debe intervenir con la Universidad y con los procesos que la propia comunidad universitaria ya ha llevado a cabo— y para proteger los derechos constitucionales fundamentales y evitar crear una inestabilidad,* ordenaríamos el siguiente remedio:

1. *Declarar inconstitucional la Ley Núm. 12 de 7 de junio de 1993 (18 L.P.R.A. sec. 621c) y las Leyes Núms. 16 y*

*17 de 16 de junio de 1993 (18 L.P.R.A. sec. 602 y 18 L.P.R.A. secs. 852–852l, respectivamente, por lo que se restituyen a los miembros del C.E.S. cuyos nombramientos no hayan vencido a la fecha de la presente opinión.*

*2. Declarar inconstitucional la Junta de Síndicos y el Consejo de Educación Superior, según creados por las referidas leyes. Cualquier actuación de estos organismos posterior a la fecha de esta opinión se declara también inconstitucional.*

*3. En cuanto al nombramiento de funcionarios tales como el Presidente de la U.P.R. en consideración a los factores antes señalados, dejaríamos a éstos en sus cargos hasta tanto el C.E.S. decida lo contrario.*

## I

*La naturaleza de la Universidad*

Existe un vínculo *firme, fuerte* e inquebrantable entre la vivencia universitaria y el ejercicio de la democracia. La Universidad es una democracia conforme a su destino; es la institución que, en mayor medida, está capacitada para abordar los grandes problemas a que hoy se enfrenta la humanidad con serenidad y espíritu reflexivo, y para proponer las soluciones o reformas adecuadas.

La Universidad necesita acentuar su condición dialogal, que entienda su labor de enseñanza como una interlocución entre [profesores] y estudiantes, requiriendo de éstos, no la actitud pasiva de recibir el saber ya elaborado, sino [mediante una actitud dinámica donde] la actividad de cuestionar y pensar por su cuenta [sea] lo que el [profesor facilite] u ofrece. A este diálogo de los [profesores] con los estudiantes, propio de la enseñanza efectiva, se ha de agregar el de los [profesores] entre sí, el de los estudiantes entre sí, el diálogo de los que piensan hoy con los que ayer pensaron y cuyas obras se preservan para su estudio y por fin, el diálogo de la universidad con las diversas instancias de la comunidad que la alberga. Esto último requiere que la universidad no dependa de las autoridades de esta comunidad, puesto que ha de ser interlocutor frente a

ellas; que no sea un mero eco de lo que estas autoridades dicen, que tenga una voz propia y diferente de la de estas autoridades. Esto se deja expresar en una sola locución: autonomía universitaria, tanto en lo académico como en lo relativo a su gobierno y administración. Dr. J. Echevarría, *Universidad, Democracia y Destino*, conferencia pronunciada el 2 de febrero de 1993, al asumir funciones de Humanista Residente del Recinto de Río Piedras de la Universidad de Puerto Rico.

Cuando se interviene con la Universidad, como en este caso, *se quebranta este diálogo* y, *por ende, se viola la libertad de expresión* garantizada por la Constitución a los profesores y estudiantes.

En la democracia liberal, lo que el Gobierno de la mayoría debe respetar y proteger no se limita sólo a la minoría que se le opone. Incluye, además, un conjunto de instituciones deliberativas que contribuyen a dar contenido y forma al proyecto de sociedad que cada Nación ha de elaborar para dar solución a los problemas que se le presenten y superar los vicios que le aquejan en el presente. Entre estas instituciones se encuentra, desde luego, ocupando un lugar central y eminente *la Universidad,* que ha sido caracterizada, conforme apunta acertadamente el profesor Echevarría, como "la simbiosis de investigación y enseñanza al servicio de la imaginación creadora". Se comprende bien que este programa, sobre lo que la Universidad ha de aspirar a ser, va mucho más lejos de la concepción que se suele tener de ella. Con la locución "imaginación creadora" se ha denominado a la función social de contribuir a generar el futuro de la comunidad y, en cierta medida, de la humanidad en su conjunto.

Como bien expresara Don José Ortega y Gasset: la Universidad consiste primero, y por lo tanto, en la enseñanza superior que debe recibir el hombre medio para hacerlo un hombre culto y un buen profesional y situarlo a la altura de sus tiempos. J. Ortega y Gasset, *Obras Completas*, T. IV pág. 335.

El rigor y la disciplina de la vida intelectual constituyen un

punto de referencia de tal importancia que no pueden sacrificarse a determinados oleajes históricos. ...

Resulta indispensable al hombre, a la sociedad y al futuro de la libertad, la existencia de comunidades de escolares empeñadas en el esfuerzo desinteresado por conocer, entender y esclarecer la realidad; por conservar y trasmitir el saber, leales a los métodos y a las normas que la vocación intelectual exige. La vocación intelectual es uno de los resortes indispensables a la vida del conocimiento y su sede institucional radica desde hace ocho siglos en la universidad. J. Benítez, *Junto a la torre: jornadas de un programa universitario*, San Juan, Ed. U.P.R., 1962, prólogo, págs. 13–14.

Y es que el compromiso primario de la Universidad radica en la sociedad intelectual. Son la duda creativa y la búsqueda de la verdad, el respeto a la disidencia, la investigación, la transmisión de la información y la calidad académica lo que establece la distinción con otras instituciones sociales igual de buenas, pero ciertamente distintas de la Universidad.

Si algo importante debe tener un sistema democrático como el nuestro es que las instituciones existan en forma estable, por encima de los intereses inmediatos que puedan tener las personas particulares.

La autonomía universitaria quiere decir, entre otras cosas, que el Pueblo de Puerto Rico colectivamente prefiere que sean los universitarios quienes tomen las decisiones fundamentales sobre lo que debe desarrollarse dentro del ámbito de la Universidad de Puerto Rico. La autonomía no es una ficción poética.

Es una fuerza real que nos permite escoger libremente nuestros estudiantes, profesores y empleados; que nos permite evaluarlos con criterios universitarios, que nos permite decidir responsablemente lo que investigamos, que nos permite criticar y valorar, pensar, soñar, volar libres, nos permite analizar, luchar, diferir, crear, que nos permite desarrollar nuestros programas sin interferencia impropia. Es como si el pueblo de Puerto Rico le hubiese dicho a la Universidad: queremos que si alguien se equivoca en lo que debe hacerse en la Universidad, sean los universitarios y no las personas que están fuera de la universidad. F. Agrait (Presidente de la U.P.R.), Discurso pro-

nunciado en la colación de grados del Recinto de Río Piedras el 7 de junio de 1987.

El hecho de que el Estado se haya visto obligado en los tiempos modernos a financiar en gran parte el funcionamiento de las universidades, en manera alguna las convierte, ni siquiera a la pública, en dependencias o agencias del Estado sometidas a su tuición y administración, si tal Estado pretende poseer el honroso calificativo de democrático, en el sentido moderno de esta expresión. Pues no es democrático sino despótico, y acaso hasta tiránico, cuando el Gobierno invoca a la mayoría que lo sustenta e invade territorios que no son suyos, como ocurre por desgracia cuando una comunidad se deja llevar por el carisma de un líder o por una ideología sin suficientes raíces en la conciencia de los gobernados. No sólo las personas individuales tienen destinos, sino también lo tienen las instituciones en cuanto llevan inscrito en ellas la posibilidad de ser más y mejores de lo que son en el presente. Echevarría, *supra*.

Este destino de la Universidad está estrechamente ligado al contenido del Preámbulo de la Constitución del Estado Libre Asociado de Puerto Rico en cuanto a "continuamente enriquecer nuestro acervo democrático en el disfrute individual y colectivo de [los] derechos". *Preámbulo*, supra, pág. 251. En fin, existe un vínculo firme y fuerte entre la vivencia universitaria y el ejercicio de la democracia. *El destino de la Universidad es darle contenido empírico al Preámbulo de la Constitución, de lo cual se enriquece y fortalece la democracia.*

En cuanto a esta indelegable misión de la Universidad como conciencia democrática de la sociedad civil y máximo laboratorio para la experimentación democrática, "reino de la inconformidad y la disidencia" —como bien la catalogara la ilustre puertorriqueña Nilita Vientós Gastón— basta recordar cómo históricamente las universidades han sido los principales enemigos contra los cuales se han ensañado los regímenes totalitarios en todo el planeta. J.R. Fernández,

*Universidad y Poder, Diálogo*, 14 de abril de 1992. En democracias liberales como la nuestra, el Gobierno de la mayoría debe respetar y proteger a la Universidad como una de las instituciones deliberativas "que contribuye a dar contenido y forma al proyecto de sociedad" que nuestra Nación ha de elaborar para dar solución a los problemas que se le presentan y superar los vicios que en el presente le aquejan. Echevarría, *supra*. La Universidad de Puerto Rico ocupa, entre estas instituciones, un lugar central y eminente.

En la medida que se interviene de forma indebida con esta función, el diálogo, la discusión y la deliberación se quebrantan, *violentándose así la libertad de expresión* garantizada por nuestra Constitución y la Constitución federal.

*Las intervenciones indebidas que en el pasado haya hecho el Gobierno con la Universidad, las cuales no están ante nos, no justifican ni legitiman la que se ha hecho en este caso. Estas son igualmente censurables.*

## II

*La Universidad no es una agencia más de Gobierno*

La entidad que hemos descrito como Universidad, obviamente no es una agencia más del Gobierno, de la Rama Ejecutiva o una corporación pública de las utilizadas comúnmente en Puerto Rico para adelantar el desarrollo económico, prestar servicios públicos y llevar a cabo funciones tradicionalmente gubernamentales. Tampoco es un gobierno municipal.

La Universidad no es el Gobierno; la Universidad no es el Estado; la Universidad es mucho más. Es una comunidad inmersa dentro de otra, dentro de una sociedad de la cual forma parte, que con su vida propia *enriquece la libertad* y la búsqueda de la felicidad del ser humano. Las entidades que el Estado crea, para ser componentes de la

comunidad, no son de su pertenencia. La Universidad no pertenece al Gobierno ni al Estado.

Por todo lo anterior, las facultades de la Asamblea Legislativa y del Gobernador de Puerto Rico, al reorganizar la Universidad, *tienen unos parámetros más limitados* que cuando se trata de las agencias gubernamentales tradicionales. Especialmente cuando estos parámetros se han establecido para preservar *la libertad de expresión*, la libertad del hombre, la búsqueda de la felicidad y la preservación de los derechos inalienables de todos los seres humanos del planeta. Por ello la Constitución española de 27 de diciembre de 1978 eleva a rango constitucional la autonomía universitaria. Además, veintisiete (27) estados de EE. UU. hacen referencia específica a la educación superior en sus constituciones y nueve (9) estados garantizan en sus constituciones la autonomía universitaria para protegerla de las intervenciones indebidas de las Ramas Ejecutiva y Legislativa. A. Kern y E.S. Solomon, *College and University Law*, Virginia, 1972, Ed. Michie Co., pág. 26.

Nuestra Constitución, tanto en su Preámbulo como en su Carta de Derechos y en sus diversas disposiciones, expresamente se levanta sobre estos principios de libertad, de búsqueda de la felicidad, de inviolabilidad a la dignidad del ser humano y de democracia. Veamos ahora los hechos particulares de este caso y por qué esta legislación es inconstitucional.

## III

*Hechos*

La Ley Núm. 1 de 20 de enero de 1966, conocida como la Ley de la Universidad de Puerto Rico, 18 L.P.R.A. sec. 601 *et seq.*, estableció a la Universidad de Puerto Rico (en adelante U.P.R.) como una corporación pública, cuya junta de gobierno la constituye el C.E.S. Al C.E.S. se le asignó la función dual de administrar o gobernar la U.P.R. y, a su

vez, licenciar y acreditar a las instituciones educativas privadas de educación superior en Puerto Rico. Con la aprobación de la Ley Núm. 31 de 10 de marzo de 1976 (18 L.P.R.A. sec. 2101 *et seq.*), el proceso de licenciamiento y acreditación se hizo obligatorio.

A raíz del resultado de las elecciones generales en Puerto Rico efectuadas en noviembre de 1992, el Hon. Pedro J. Rosselló González, Presidente del Partido Nuevo Progresista (P.N.P.), fue instalado como Gobernador del Estado Libre Asociado. Aproximadamente cinco (5) meses después, fueron aprobadas tres (3) leyes para enmendar la referida Ley de la Universidad de Puerto Rico e introducir cambios sustanciales en el esquema de gobierno y administración de la U.P.R.

La Ley Núm. 12, *supra*, designó a la Junta de Síndicos, en sustitución del C.E.S., como el órgano con la facultad para establecer los procedimientos correspondientes para solicitar, recibir, custodiar y administrar los fondos de la U.P.R.[1]

La Ley Núm. 16, *supra*, eliminó al C.E.S. como cuerpo rector de la U.P.R. y creó en su lugar la Junta de Síndicos para "gobernar y administrar el sistema universitario del estado".[2] En síntesis, esta ley traspasó a la Junta *todos* los poderes que tenía el C.E.S. en su capacidad de junta de gobierno de la U.P.R.

Conforme a la citada Ley Núm. 16, la Junta de Síndicos estará compuesta por trece (13) miembros, diez (10) de ellos serán ciudadanos de la comunidad nombrados por el Gobernador, con el consejo y consentimiento del Senado, y tres (3) serán electos mediante voto secreto por los profesores y estudiantes, representantes del estudiantado y del personal docente en la Junta Universitaria.

---

[1] Mediante la aprobación de esta ley, *sólo se enmendó el Art. 5* de la Ley de la Universidad de Puerto Rico, Ley Núm. 2 de 20 de enero de 1966 (18 L.P.R.A. sec. 621c).

[2] Exposición de Motivos de la Ley Núm. 16 de 16 de junio de 1993, Leyes de Puerto Rico, pág. 50.

La tercera de estas leyes, la Ley Núm. 17, *supra,* separó las funciones de licenciar y acreditar instituciones universitarias privadas de las funciones correspondientes al gobierno y administración de la U.P.R. Para ello creó un nuevo organismo, también denominado "Consejo de Educación Superior". Por disposición de esta ley, los miembros del C.E.S. *pasarían a formar parte del nuevo Consejo de Educación Superior* creado, hasta las expiraciones de sus respectivos términos.

El 17 de junio de 1993, el C.E.S. y sus miembros[3] presentaron ante el Tribunal Superior una acción contra el Gobernador del Estado Libre Asociado de Puerto Rico, Hon. Pedro J. Rosselló González. En ésta, los demandantes figuran como miembros del C.E.S. y en su carácter individual. El C.E.S. también figura en representación de la U.P.R. Los demandantes solicitan que se declaren inconstitucionales las leyes referidas y, a su vez, que se le prohíba al Gobernador ponerlas en vigor.[4]

En síntesis, los demandantes alegan que las leyes impugnadas son inconstitucionales porque violan la libertad académica institucional y la autonomía de la U.P.R., además de destituirlos de manera discriminatoria y en violación al debido proceso de ley. Los demandantes alegan, además, que las leyes impugnadas violan el Art. II, Secs. 1, 4 y 7 de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, y la Primera, Quinta y Dé-

---

[3] El Consejo de Educación Superior (en adelante C.E.S.) está compuesto por ocho (8) miembros. Al aprobarse las leyes impugnadas, existía una vacante. Los miembros de C.E.S. y la fecha de expiración de sus nombramientos son los siguientes: Ing. Richard Camino Carlo (11 de diciembre de 1997); Prof. Awilda Aponte Roque (Presidenta, 19 de enero de 1998); Lcdo. Francisco L. Acevedo (20 de enero de 1995). El nombramiento del Lcdo. Salvador Antonetti vencía el 20 de enero de 1994, pero surge del expediente que el 26 de agosto de 1993 éste presentó su renuncia a su cargo como miembro del C.E.S. al Gobernador, efectiva de inmediato.

[4] Durante el trámite del caso ante el tribunal de instancia, el Gobernador nombró a los diez (10) miembros de la Junta de Síndicos, y los profesores y estudiantes nombraron sus respectivos representantes ante la Junta. La Junta se constituyó y escogió a su presidente.

cimocuarta Enmiendas de la Constitución de Estados Unidos.

El demandado, por su parte, sostiene que el caso trata sobre una cuestión política que no es susceptible de adjudicación judicial. Señala, además, que el C.E.S. carece de legitimación activa; que la libertad académica institucional no ampara sus reclamos y que a los demandantes no les cobija derecho constitucional alguno para continuar ejerciendo sus funciones. El demandado niega la existencia de motivación político-partidista o discriminatoria como fundamento para la aprobación de las leyes impugnadas.

El 5 de agosto de 1993 el tribunal de instancia dictó una sentencia, en la cual declaró sin lugar la demanda al resolver que el C.E.S. carece de legitimación activa para demandar. Resolvió, a su vez, que la autonomía universitaria no tenía un rango constitucional sino estatutario, y que la libertad académica institucional bajo la Primera Enmienda de la Constitución federal no se extiende a la fase administrativa o de gobierno de la Universidad. Con respecto a las alegaciones de discrimen y privación de propiedad sin un debido proceso de ley, el tribunal de instancia concluyó que los miembros del C.E.S. (en su carácter individual) carecen de un interés propietario en el cargo que ocupan. Finalmente y en resumen, sobre la discriminación alegada contra los demandantes, el tribunal concluyó que existía una controversia sobre el posible conflicto de intereses dimanante de la dualidad de funciones del C.E.S. Por ello, resolvió que las leyes impugnadas presentan en realidad un enfoque o política pública distintos, los cuales están dentro del ámbito que le confiere la Constitución a la Rama Ejecutiva del Gobierno.

Inconformes, los miembros del C.E.S. apelaron ante este Tribunal. En apoyo a su contención principal de que las leyes referidas son inconstitucionales, plantean los siguientes errores:

1.   ... [R]esolver que no existe un derecho constitucional a la

autonomía universitaria bajo las libertades garantizadas por la Primera y Décimocuarta Enmiendas de la Constitución de los Estados Unidos y por las secciones 4 y 6 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico.

2. ... [R]esolver que no existe un derecho constitucional a la autonomía universitaria bajo el derecho fundamental a la educación garantizado por la sección 5 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico.

3. ... [R]esolver que las Leyes Núm. 16 y 17 de 16 de junio de 1993 y Núm. 12 de 7 de junio de 1993 no violan el derecho constitucional a la libertad académica institucional y a la autonomía de la Universidad de Puerto Rico, garantizados por las Enmiendas Primera y Décimocuarta de la Constitución de los Estados Unidos y las secciones 4, 5 y 6 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico.

4. ... [R]esolver que la Universidad de Puerto Rico, representada por el Consejo de Educación Superior, no tiene legitimación activa para demandar al Gobernador en defensa de su derecho a la libertad académica institucional y a la autonomía.

5. ... [R]esolver que al CES y sus miembros no les ampara el derecho a la libertad académica institucional por que las funciones del CES. son funciones administrativas y no académicas y sus miembros no toman decisiones académicas sino puramente administrativas.

6. ... [R]esolver que los miembros del CES no fueron destituidos de sus cargos como junta de gobierno de la Universidad.

7. ... [R]esolver que la destitución de los miembros del CES no se debió a motivaciones políticas, en violación de sus derechos constitucionales bajo la Primera y Décimocuarta Enmiendas de la Constitución de Estados Unidos y bajo las secciones 4 y 6 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico.

8. ... [R]esolver que no se violó el derecho de los miembros del CES al debido proceso de ley, en sus vertientes sustantiva y procesal, garantizado por las Enmiendas quinta y décimocuarta de la Constitución de los Estados Unidos y las Secciones 1 y 7 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico al separar [a los miembros del C.E.S.] de sus cargos en la Junta de gobierno de la Universidad en violación a su derecho a la libertad, igualdad y dignidad, sin vista ni justa causa. Escrito de apelación, págs. 6–7.

Por plantear una cuestión constitucional sustancial novel, acogimos el recurso. Ante su importancia, acordamos darle atención prioritaria. Durante la etapa apelativa, autorizamos la intervención de la U.P.R. y del recién creado

C.E.S., así como la comparecencia de la Asociación de Colegios y Universidades Privadas, Inc. de Puerto Rico (A.C.U.P.) como *amicus curiae*.[5]

## IV

*Capacidad para demandar y legitimación activa del C.E.S.*

Desde *Rivera Maldonado v. E.L.A.*, 119 D.P.R. 74, 81 (1987), explicamos que "persona jurídica" es "la colectividad de personas o conjunto de bienes que, organizado para la realización de un fin permanente, *obtiene el reconocimiento del Estado como sujeto de derecho*". (Énfasis suplido.) (Citando a D. Espín Cánovas, *Manual de Derecho Civil español*, 6ta ed., Madrid, Ed. Rev. Der. Privado, 1977, Vol. I, Cap. VI, pág. 370.) "Esta recibe su personalidad directamente de la ley, por la que los límites de sus facultades, derechos y responsabilidades están fijados por la ley creadora." Íd. (Citando a J.L. Lacruz Berdejo, *Derecho Civil*, Barcelona, Ed. Bosch, 1974, Vol. 2, Cap. V, Sec. 31, pág. 176.) En *Rivera Maldonado v. E.L.A.*, supra, pág. 82, también señalamos que "como regla general, un departamento ejecutivo no tiene personalidad jurídica".[6] Claro está que la Universidad, como señalaremos más adelante, *no es un departamento ejecutivo*.

El Estado, a través de la Rama Legislativa, goza de la facultad de conferirle a las instrumentalidades que crea la estructura organizativa más apropiada a fin de lograr su funcionamiento más óptimo y efectivo. *Pagán et al. v. E.L.A. et al.*, 131 D.P.R. 795 (1992). En consonancia con lo anterior, aquel organismo creado por ley tendrá la capaci-

---

[5] Al expedir el recurso el 24 de septiembre de 1993, una moción en auxilio de jurisdicción fue declarada no ha lugar. Los Jueces Asociados Señores Hernández Denton, Alonso Alonso y Fuster Berlingeri hubiesen paralizado los procedimientos en instancia.

[6] Citado más recientemente en *Pagán et al. v. E.L.A. et al.*, 131 D.P.R. 795, 801 esc. 2 (1992).

dad para comparecer ante los tribunales bajo dos (2) instancias. Primero, si la ley orgánica que lo crea le otorga expresamente dicha capacidad, o segundo, cuando esta capacidad pueda razonablemente inferirse de la ley.[7] Esto último significa que es necesario analizar e interpretar la ley orgánica que crea la entidad para determinar si dentro del contexto de sus atribuciones, poderes y objetivos tiene capacidad para demandar. Veamos.

El C.E.S. fue creado como la Junta de Gobierno de la U.P.R. mediante el Art. 3 de la Ley Núm. 1, *supra*, según enmendada, 18 L.P.R.A. sec. 602. El Art. 16 de esta Ley Núm. 1, contenía unas disposiciones generales y transitorias, entre las cuales se incluyeron las siguientes:

(4) *Cualesquiera deberes, atribuciones, prerrogativas, o funciones asignadas al Consejo Superior de Enseñanza, al Rector o a la Universidad de Puerto Rico por las leyes de la Asamblea Legislativa de Puerto Rico promulgadas con anterioridad a la presente ley y que no sean incompatibles con sus disposiciones, continuarán rigiendo y obligando al Consejo de Educación Superior*, al Presidente de la Universidad o a la Universidad de Puerto Rico, respectivamente.

(5) Todas las prerrogativas, atribuciones y responsabilidades contraídas por cualquier organismo o funcionario oficial de la Universidad de Puerto Rico bajo leyes en vigor antes de la aprobación de ésta o a virtud de cualquier ley federal, concesión o contrato cuya transferencia no esté específicamente establecida por las disposiciones de esta ley, quedan por ésta reconocidas y continúan en vigor. ....″ (Énfasis suplido.) 1966 Leyes de Puerto Rico 105.

La anterior Ley de Reorganización de la Universidad de Puerto Rico, la cual creó el Consejo Superior de Enseñanza (que fue sustituido por el C.E.S. mediante la ley de 1966), *disponía que el Gobierno de la Universidad residiría en*

---

[7] En nuestra jurisprudencia abundan diversos criterios o elementos que hemos utilizado para reconocerle una personalidad jurídica a ciertas instrumentalidades. Véanse, por ejemplo: *Unión de Empleados Carreteras v. J.R.T.*, 119 D.P.R. 116 (1987), opinión concurrente de la Juez Asociada Señora Naveira de Rodón; *A.A.A. v. Unión de Empleados A.A.A.*, 105 D.P.R. 437 (1976); *Canchani v. C.R.U.V.*, 105 D.P.R. 352 (1976); *Pagán et al. v. E.L.A. et al.*, supra.

*dicho Consejo Superior de Enseñanza*. Sec. 3 de la Ley Núm. 135 de 7 de mayo de 1942 (18 L.P.R.A. ant. sec. 633). En la Sec. 2 de esta Ley de 1942 (18 L.P.R.A. ant. sec. 632), se dispuso que las facultades del Consejo Superior de Enseñanza serían las siguientes:

> Sección 2.—*El Consejo Superior de Enseñanza*, nombrado según se provee en la sección 3 de esta Ley, y sus sucesores, constituirá, y *por la presente constituye, una corporación bajo la denominación de "La Universidad de Puerto Rico", y con este nombre tendrá derecho a demandar y ser demandada, a adquirir y poseer bienes muebles o inmuebles, a hipotecar y vender los mismos, a contraer deudas, a celebrar contratos, a adoptar y usar un sello común y a modificarlo cuando guste, y a hacer y mandar a hacer todo lo que sea necesario para llevar a cabo las funciones que más adelante se indican*, incluyendo la aceptación y administración de donaciones *inter vivos* y *mortis causa*. El Consejo Superior de Enseñanza *estará a cargo de la custodia, el gobierno y la administración de todos los bienes raíces y personales y de todos los dineros de la Universidad; Disponiéndose*, que podrá delegar estos poderes y responsabilidades en el Rector. (Énfasis suplido.) 1942 Leyes de Puerto Rico 767 y 769.

El C.E.S. creado por la Ley Núm. 1, *supra, al igual que su antecesor*, el Consejo Superior de Enseñanza, *como parte de su función primordial de gobernar y administrar a la U.P.R., ostenta una obligación fiduciaria de velar por todos los intereses de los elementos que componen la comunidad universitaria*. Fue a esta entidad o junta de gobierno a quien, bajo el nombre de la Universidad y en protección a sus mejores intereses, *se le concedió desde 1942 la facultad de demandar y ser demandada. Esta facultad quedó vigente bajo la Ley Núm. 1, supra.* Interpretamos además que, bajo las disposiciones generales del citado Art. 16(4), *quedó inalterada la capacidad de demandar y ser demandado del C.E.S.*

La Ley de la Universidad de Puerto Rico establece que la U.P.R. "tendrá todas las atribuciones, prerrogativas, responsabilidades y funciones propias de una entidad corporativa ... *las cuales ejercerá a través del Consejo. Tendrá autoridad para demandar y ser demandada*". (Énfasis

suplido.) 18 L.P.R.A. sec. 602(f)(1). La Universidad no fue creada como un departamento ejecutivo, por lo que el C.E.S. tampoco puede ser definido como tal.[8] En esencia, el texto de la sección citada mantuvo vigentes todos los poderes y las atribuciones que el antiguo Consejo Superior de Enseñanza tenía para ejercer su función de gobierno y administración de la Universidad.

Además, al C.E.S. *se le ha reconocido* personalidad jurídica en diversas instancias. Refiérase por ejemplo a la Opinión del Secretario de Justicia Núm.1983-31, en la cual se le reconoció la facultad al C.E.S. para autorizar la creación de una corporación sin fines pecuniarios denominada "Hospital Pedriátrico Universitario, Inc". Véanse, además: Art. 2 de la Ley Núm. 263 de 14 de marzo de 1945 (18 L.P.R.A. sec. 671); Art. 8 de la Ley Núm. 31 de 10 de mayo de 1976 (18 L.P.R.A. sec. 2108).

Por otro lado, nuestra jurisprudencia ha reconocido la capacidad del C.E.S. para ser demandado. Véanse: *Pagán Hernández v. U.P.R.*, 107 D.P.R. 720 (1978); *Bayrón Toro v. Serra*, 119 D.P.R. 605 (1987); *Henríquez v. Consejo Educación Superior*, 120 D.P.R. 194 (1987); *Fac. C. Soc. Aplicadas, Inc. v. C.E.S.*, 133 D.P.R. 521 (1993).[9] Hemos reconocido inclusive, al examinar el historial legislativo de la Ley Universitaria, que el C.E.S. no sólo es la junta de gobierno de la Universidad, sino que es *"el organismo en el cual residirá el poder y el interés público en la educación al nivel*

---

[8] Esto hace inaplicable al caso ante nuestra consideración el caso *Gobierno de la Capital v. Consejo Ejecutivo*, 63 D.P.R. 434 (1944). Es además cuestionable que después de *Board of Education v. Allen*, 392 U.S. 236 (1968), la opinión en *Gobierno de la Capital v. Consejo Ejecutivo*, supra, pueda considerarse la norma vigente en Puerto Rico. Refiérase a J.J. Álvarez González, *Derecho Constitucional*, 61 Rev. Jur. U.P.R. 637, 654–655 y escs. 63 y 65 (1992).

[9] Refiérase, también, a *Chamorro Pérez v. Consejo de Educación Superior, et al.*, Caso Núm. CE-94-109, Resolución del Tribunal Supremo de 15 de abril de 1994, mediante la cual se denegó el recurso solicitado al presentarse fuera de término la petición. Allí explicamos que a la U.P.R. y al C.E.S. no les aplica el término de sesenta (60) días para interponer un recurso aplicable al E.L.A., sus funcionarios o una instrumentalidad que no fuere una corporación pública.

*superior"* por lo que "se le confiere *la máxima autoridad administrativa ...".* (Énfasis en el original.) *Rivera Santana v. U.P.R.,* 105 D.P.R. 701, 707 (1977).

Por todo lo señalado antes, concluimos que el C.E.S., como junta de gobierno de la U.P.R. y su entidad fiduciaria, tiene la capacidad para comparecer en este pleito como demandante.

En *torno a la legitimación activa del C.E.S.,* determinada su capacidad para demandar, réstanos examinar si "su interés es uno 'de tal índole que, con toda probabilidad, habrá de proseguir su causa de acción vigorosamente y habrá de traer a la atención del tribunal las cuestiones en controversia' ". *Noriega v. Hernández Colón,* 135 D.P.R. 406, 427 (1994). En síntesis, los requisitos con los que deberá cumplir el promovente son: haber sufrido un daño claro y palpable; que el daño sea real, inmediato y preciso, y no abstracto o hipotético; que exista una conexión entre el daño sufrido y la causa de acción ejercitada, y que la causa de acción surja bajo el palio de la Constitución o de una ley. *Hernández Torres v. Hernández Colón et al.,* 131 D.P.R. 593 (1992).

El C.E.S., al igual que cada uno de sus miembros codemandantes en este caso, *han sufrido un daño claro, inmediato y real.* El C.E.S., como junta de gobierno y *entidad fiduciaria,* estaba legal y debidamente constituida por unos miembros *con nombramientos por unos términos fijos.* El C.E.S. había estado en pleno ejercicio de sus funciones a través de los últimos años. La legislación impugnada *despojó* al C.E.S. de todas sus funciones *fiduciarias y administrativas* con respecto a la U.P.R. y, *por ende,* a cada uno de sus miembros de estas funciones. Sin duda, esto constituye un *daño concreto* y *palpable* por el cual tanto el C.E.S. como sus miembros están legitimados para reclamar judicialmente. No puede separarse válidamente la recla-

mación de cada miembro del C.E.S. de la de éste como entidad.

La causa de acción ejercitada por los demandantes persigue precisamente anular —por ser inconstitucionales— las leyes que despojaron al C.E.S. y a sus miembros no sólo de una de sus funciones más importantes, sino de sus prerrogativas y atribuciones.

El reclamo de inconstitucionalidad del C.E.S. y sus miembros surge bajo los derechos de la *libertad de expresión y del debido proceso de ley*, bajo la Constitución del Estado Libre Asociado de Puerto Rico y la Constitución federal. El C.E.S. como cuerpo de gobierno y entidad fiduciaria, al igual que cada uno de sus miembros, están obligados a defender la Constitución. Si éstos estiman que las leyes que los despojan de sus funciones son inconstitucionales, su deber es impugnarlas judicialmente. Véanse: *Board of Education v. Allen*, 392 U.S. 236 (1968); *Bender v. William Area School Dist.*, 475 U.S. 534 (1986) reh. den. 476 U.S. 1132 (1986).

Concluimos, por lo antes explicado, que tanto el C.E.S. como sus miembros tienen legitimación activa para instar este pleito. Precisamente en este caso, al comparecer la Universidad como parte interventora, *por gestiones de la Junta de Síndicos recién creada*, cobra mayor relevancia reconocerle capacidad y legitimación activa al C.E.S y no sólo a sus miembros.(¹⁰) Ello es así porque la controversia que la aprobación de las leyes impugnadas ha generado entre el C.E.S. y la Junta de Síndicos *quebranta la libertad de expresión y la libertad académica institucional de la U.P.R.*

---

(¹⁰) En *Fac. C. Soc. Aplicadas, Inc. v. C.E.S.*, 133 D.P.R. 521 (1993), nuestras expresiones sobre la responsabilidad del C.E.S. de implementar la política pública del Estado, se referían *exclusivamente* a la función del C.E.S. de evaluar y acreditar las universidades privadas. No consideramos allí la *función fiduciaria* de gobernar la Universidad de Puerto Rico.

## V

*El derecho a la libertad de expresión y la libertad académica institucional*

Según indicamos al comienzo, estamos conformes con las expresiones sobre la libertad académica incluidas en la opinión concurrente del Juez Asociado Señor Hernández Denton, aunque sostenemos que su alcance es mayor. Caben destacarse, a modo introductorio, algunas de sus conclusiones vertidas en torno a la autonomía universitaria.[11]

Conforme se explica en dicha opinión, fueron el estudiantado y, posteriormente, el claustro quienes aunaron esfuerzos e impulsaron el concepto y principio de la autonomía universitaria. La Ley de la Universidad de Puerto Rico acogió en cierto grado el principio de la autonomía universitaria traducido en una autonomía fiscal y en el desarrollo de la Universidad como una corporación pública que ha de ser gobernada y custodiada por un cuerpo colegiado denominado Consejo de Educación Superior.

Los elementos antes identificados en la Ley de la Universidad de Puerto Rico como aquellos que definen los contornos de la autonomía universitaria, muestran que *mediante una fórmula para el cálculo automático del presupuesto anual de la U.P.R.* se ha pretendido que ésta pueda cumplir su misión con relativa *libertad de consideraciones político-partidistas.*

Por otro lado, al nombrarse los miembros del C.E.S. por el Gobernador con el consejo y consentimiento del Senado, *mediante un sistema de nombramientos escalonados,* las vacantes ocurrirían gradualmente, con lo cual *se ha pretendido aislar parcialmente* a la Universidad de los cambios e intervenciones de las ramas políticas de gobierno.

---

[11] Refiérase a las págs. 115–119 de la opinión concurrente del Juez Asociado Señor Hernández Denton.

Las dos (2) medidas antes mencionadas han permitido cierto grado de independencia y continuidad en la U.P.R. y en el C.E.S. La propia Ley de la Universidad de Puerto Rico limitó el poder del Gobernador *para remover* a los miembros del C.E.S. a situaciones *en las cuales medie justa causa*. Paralelo a esto, la fórmula para la asignación presupuestaria evita que sean consideraciones partidistas las que gobiernen la determinación del monto de los recursos fiscales de la U.P.R.

En la opinión se adopta el término de "libertad académica" conforme éste es interpretado por Byrne,[12] en cuanto "puede usarse para denominar tanto a los derechos individuales del profesor universitario, como a la protección constitucional de la institución universitaria propiamente". Opinión concurrente, pág. 122. Para facilitar la distinción entre ambas, se acuñan los términos "libertad académica individual", para referirse a la protección constitucional que se le ha reconocido a los derechos individuales de profesores, y *"libertad académica institucional", el cual se refiere al derecho que protege a la Universidad como institución.*

La libertad académica institucional, reconocida como un derecho constitucional, *se deriva directamente de la libertad de expresión bajo la Primera Enmienda de la Constitución federal.* Refiéranse a *Regents of the University of Michigan v. Ewing*, 474 U.S. 214 (1985); *Widmar v. Vincent*, 454 U.S. 263 (1981); *University of California Regents v. Bakke*, 438 U.S. 265 (1978).

Al amparo del Art. II, Sec. 4 de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, reconocemos al igual que en la opinión "que la libertad académica institucional comprende no sólo la enseñanza, investigación y publicación de trabajos, sino los aspectos de selección de personal docente y estudiantes, *así como otras*

---

[12] J.P. Byrne, *Academic Freedom: A "Special concern for the First Amendment"*, 99 Yale L.J. 251 (1989).

*actividades administrativas y académicas que deban ser protegidas para evitar que el Estado manipule políticamente los procesos académicos universitarios"*. (Énfasis suplido.) Opinión concurrente, pág. 131.

El reconocimiento de la autonomía universitaria y de la libertad académica institucional *como parte del derecho a la libertad de expresión* nos permite salvaguardar adecuadamente a la Universidad contra una intervención impermisible del Estado. La protección constitucional que hoy conferimos a la libertad académica institucional *se justifica con los mismos fundamentos que tradicionalmente sostienen la protección brindada a la libertad académica individual.* De otro modo, al atentar contra la libertad académica institucional, el Estado interfiere impermisiblemente con las garantías y los derechos constitucionales de los componentes de la comunidad universitaria.

*La amplitud del derecho a la libertad académica bajo nuestra Constitución incorpora elementos esenciales de la autonomía universitaria.* Su reconocimiento forma parte de la aspiración colectiva de nuestro pueblo, plasmada en el Preámbulo de la Constitución, a enriquecer contínuamente nuestro acervo democrático en el disfrute individual y colectivo de nuestras libertades. Corresponde, pues, a los tribunales interpretar y vindicar este derecho.

> Es indispensable en una democracia que las universidades mantengan *un clima de libre pensamiento y expresión* en sus actividades académicas y extracurriculares, pues de lo contrario se imposibilitan las funciones universitarias de educar las nuevas generaciones según las mejores tradiciones democráticas; procurar la verdad y el avance del conocimiento mediante la libre confrontación de teorías e ideales; y dar orientación y ejemplo a la comunidad, no sólo en los aspectos substantivos de las ciencias y las artes, sino también en los estilos de tolerancia, respeto e iniciativas de libre discusión. (Énfasis suplido.) Comisión de Derechos Civiles, *Informe especial sobre la libertad académica en la Universidad de Puerto Rico*, San Juan, Departamento de Hacienda, 15 de marzo de 1967, pág. 13.

La libertad académica institucional necesariamente

consta *de dos (2) componentes* entrelazados de forma inquebrantable, y la ausencia de uno no justifica la existencia del otro. Por un lado, tenemos *el componente de la docencia y, por el otro, el de la "administración académica".* Ello es así porque la Universidad *es un conjunto de elementos que interaccionan entre sí y con la sociedad.* Hoy el concepto "Universidad" incluye no sólo estudiantes y profesores, sino también al personal no docente y de apoyo a la docencia, cursos, currículos, programas y grados. "Universidad" ya no es sólo *enseñanza e investigación,* sino que además es *servicio.* Todo esto es en el contexto de salones, laboratorios, talleres, clínicas, bibliotecas, centro de recursos, etc. Para una coordinación efectiva de elementos tan variados, resulta indispensable el componente de la administración académica. Esta es necesaria para la mayor eficiencia y efectividad de los procesos universitarios. *Se trata del componente que hace viable el logro de los objetivos de la docencia, del proceso de enseñanza y aprendizaje, de la investigación y del servicio a la sociedad.*

El derecho a la libertad académica institucional en nuestro país requiere como mínimo lo siguiente:

(1) En la selección, las promociones, las destituciones y todos los demás aspectos del trato de [profesores] y [estudiantes] no debe entrar en juego ningún factor ajeno al criterio de idoneidad.

(2) Los esfuerzos de encontrar y expresar la verdad deben manifestarse sin restricción alguna que no sea la del rigor de la propia conciencia y la metodología. Ninguna consideración ajena, de consecuencias favorables o desfavorables, que pueda provenir de las autoridades constituidas [sic] o de las mayorías predominantes, debe afectar las actuaciones de los estudiosos.

(3) Las instituciones educativas deben estar organizadas y gobernadas de modo que puedan proteger eficazmente las referidas oportunidades de libertad contra riesgos de procedencia externa o interna.

(4) Aquellos que disfruten de las garantías mencionadas deben cultivarse en el ejercicio intenso y responsable del pensamiento libre, para que su propio ejemplo sea la mejor defensa de su libertad. *Informe del Comité del Gobernador para el Es-*

*tudio de los Derechos Civiles en Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1959, pág. 25.

Tradicionalmente el componente de la docencia (o académico) de la libertad académica institucional se ha levantado contra los intentos del Estado, directamente o a través de la administración o gobierno de la Universidad, de socavar o coartar éste. Por la complejidad y sofisticación de la Universidad de nuestro tiempo, *surge la necesidad de reconocer un componente de administración académica dentro de la libertad académica institucional y la libertad de expresión individual. A su amparo, la administración académica queda adecuadamente protegida de los intentos del Estado de controlar o intervenir indebidamente en ésta. Al reconocer este componente de la libertad académica institucional, se protege también el componente de la docencia contra los intentos del Estado de intervenir o coartar la subrepticiamente o a través de la administración académica.*

Por lo antes señalado, al amparo de nuestra autoridad para interpretar nuestra Constitución, *reconocemos que la libertad académica institucional incluye no sólo el componente de la docencia y la libertad de expresión individual, sino el de la administración académica.* Esto es enteramente compatible con la metodología analítica que se ha de seguir para resolver un reclamo al amparo del derecho a la libertad académica institucional. Opinión concurrente, pág. 132. En la opinión se explica que al resolver estas reclamaciones debemos tomar en cuenta[13]

> ... cuál es la función universitaria, qué la hace única, qué la distingue de las que llevan a cabo otras instituciones y cuál es el beneficio de esta función para la sociedad. También se deberá distinguir cuidadosamente entre los varios contextos en que

---

[13] Citando a W.W. Van Alstyne, *Academic Freedom and the First Amendment in the Supreme Court of the United States: and Unhurried Historical Review*, 53 (Núm. 3) Law & Contemp. Probs. 79, 86–87 (1990), y a D.M. Rabban, *A Functional Analysis of "Individual" and "Institutional" Academic Freedom Under the First Amendment*, 53 (Núm. 3) Law & Contemp. Probs. 227, 231 (1990).

puedan surgir problemas de libertad académica constitucional: los reclamos de profesores contra colegas, administradores o síndicos; los reclamos de profesores o funcionarios universitarios análogos contra el Estado, y finalmente, los reclamos de la universidad contra el Estado. ... Será además importante, al resolver estas controversias, considerar la naturaleza pública o privada de la institución universitaria. Opinión concurrente, pág. 131.

Tomando en consideración los factores antes citados, *sostenemos que la administración académica, como componente esencial de la libertad académica institucional y de la libertad de expresión individual, no puede ser utilizada para intervenir indebidamente en la Universidad, pues ello no sólo afectaría la docencia y la libertad académica* individual, *sino que tendría un efecto congelante ("chilling effect") sobre ésta y sobre la libertad de expresión individual y de la comunidad universitaria, pues quebranta el diálogo creador, la discreción enriquecedora y la deliberación libre de los individuos y de los componentes de la comunidad universitaria.*

En *Sánchez Carambot v. Dir. Col. Univ. Humacao,* 113 D.P.R. 153, 161 (1982), citando a *Rodríguez v. Srio. de Instrucción,* 109 D.P.R. 251 (1979), señalamos que se trata "de proteger [la] discusión enérgica de las ideas, que es tan esencial para el cabal desarrollo del hombre, como para la conservación y el sostenimiento del bienestar común en una sociedad que viva en democracia". (Escolio omitido.) Lo indicado antes fue expresamente reconocido por la Asamblea Legislativa al disponer que la U.P.R., en el cumplimiento de su misión, debería " '[t]ener presente que por su carácter de Universidad y por su identificación con los ideales de vida de Puerto Rico, *ella está esencialmente vinculada a los valores e intereses de toda comunidad democrática'* ... 18 L.P.R.A. sec. 601 inciso b(6)". (Escolio omitido y énfasis suplido.) *Sánchez Carambot v. Dir. Col. Univ. Humacao,* supra, pág. 161.

El caso de autos trata precisamente de los reclamos de

la Junta de Gobierno o *entidad fiduciaria de la universidad contra el Estado.*

En *Consejo Educación Superior v. U.I.A.*, 120 D.P.R. 224, 235 (1987), reconocimos que "[p]ara que las universidades, bien sean las privadas o la del Estado, cumplan su función social *de ser foro de 'discusión enérgica de ideas' mediante la investigación, el estudio y la crítica social, debemos velar por que se les asegure 'una relativa libertad en el examen de ideas'.* ... En este caso *la institución ... merece el mismo respeto y deferencia que le hemos reconocido a los profesores y estudiantes".* (Énfasis suplido.)

En *Sweezy v. New Hampshire*, 354 U.S. 234, 262–263 (1957), el Juez Frankfurter, en su opinión concurrente, explicó lo siguiente:

> In a university knowledge is its own end, not merely a means to an end. A university ceases to be true to its own nature if it becomes the tool of church or state or any sectional interest. ...
> ... It is the business of a university to provide that atmosphere which is most conducive to speculation, experiment and creation.

En la referida opinión concurrente de *Sweezy v. New Hampshire*, el Juez Frankfurter identificó las cuatro (4) libertades esenciales de una universidad. En específico, se identificaron éstas:

> ... It is the business of a university to provide ... [an] atmosphere in which there prevail *the four essential freedoms of a University —to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.* (Énfasis suplido y citas omitidas.) *Sweezy v. New Hampshire*, supra, pág. 263, opinión concurrente del Juez Frankfurter.

Las cuatro (4) libertades esenciales de la Universidad —la cual, conforme a criterios académicos, decide quién enseñará, qué se enseñará, cómo se enseñará y quién será admitido a estudiar— encierran inexorablemente no sólo el componente de la docencia de la libertad académica indivi-

dual e institucional, *sino el componente de la administración académica. Si el Estado controla o interfiere con la administración académica, entonces interviene de forma impermisible con las cuatro (4) libertades esenciales antes señaladas.* En el libro *Dimensions of Academic Freedom*, DeBardeleben reconoce el rol de la administración académica para la preservación de la libertad académica. Allí se explica lo siguiente:

> The governing body, whether denominated regents or trustees, the university administration, and the faculty each has an important role in the preservation of academic freedom against challenges from external forces and influences.
>
> . . . . . . . .
>
> *The governing board of a university has a primary duty, in the exercise of its policy-making function, to assure the codification and observance of rules of tenure which guarantee to persons having tenure status the freedom of inquiry, investigation, and expression ....*
>
> *In addition, a governing board has the responsability of safeguarding and fostering an environment and an atmosphere unqualifiedly conducive to the free and untrammeled search for truth. It is the duty of a governing board to resist the pressures, clamors, and demands of ideological groups and other special interests —all who would compromise the goals of scholarship— whether alumni, politicians, private donors, the press; or segments of the public. A governing board should protect the faculty and the students against all outside pressures which would divert them from scholarly pursuits.* (Escolios omitidos y énfasis suplido.) A. DeBardeleben, "The University's External Constituency", en *Dimensions of Academic Freedom*, Chicago, Ed. U. of Ill. Press, 1969, págs. 83–84.

En virtud del derecho a la libertad académica individual e institucional, el componente de la administración académica —representada por el C.E.S.— no está sujeto a intervenciones indebidas de ninguna de las ramas políticas de gobierno. El derecho a la libertad académica individual e institucional cobija a la administración de la universidad frente al Estado. Véanse: *Regents of the University of California v. Bakke*, supra; *Regents of the University of Michigan v. Ewing*, supra; *Widmar v. Vincent*, supra, págs.

277–281, opinión concurrente del Juez Stevens. *Cf. University of Pennsylvania v. EEOC*, 493 U.S. 182 (1990).([14]) Véase, además, J.P. Byrne, *Academic Freedom: A "Special concern of the First Amendment"*, 99 Yale L.J. 251, 327–330 (1989).

Por la naturaleza y la extensión del derecho a la libertad académica individual e institucional que hoy reafirmamos, toda legislación que pretenda restringir o limitar ese derecho estará sujeta *a un escrutinio estricto*. La legislación sólo sería válida si el Estado demuestra que existe un interés público apremiante que justifique la restricción o limitación y, además, demuestre que no existe otro medio menos oneroso para promover o alcanzar dicho interés público. Véanse: *Soto v. Srio. de Justicia*, 112 D.P.R. 477 (1982); *López Vives v. Policía de P.R.*, 118 D.P.R. 219 (1987); *Arroyo v. Rattan Specialties, Inc.*, 117 D.P.R. 35 (1986); *P.N.P. y P.I.P. v. Rodríguez Estrada*, 122 D.P.R. 490 (1988); *Rodríguez Rodríguez v. E.L.A.*, 130 D.P.R. 562 (1992); *Defendini Collazo et al. v. E.L.A., Cotto*, 134 D.P.R. 28 (1993).

---

([14]) El caso *University of Pennsylvania v. EEOC*, 493 U.S. 182 (1990), se distingue, con claridad, de la controversia ante la cual nos enfrentamos hoy. Allí el Tribunal Supremo debía resolver si la universidad gozaba de un privilegio especial que cobijaba el descubrimiento de los materiales de la evaluación realizada por los pares (*peer review materials*), relevantes a la reclamación de una profesora que alegaba que le había sido denegada la permanencia por discrimen por razón de género y raza. Ante el reclamo de la Universidad de intentar cobijar su negativa a proveer los documentos solicitados bajo la libertad académica, el Tribunal expresó "[i]n addition to being remote and attenuated, the injury to academic freedom claimed by petitioner is also speculative. ... Moreover, some disclosure of peer evaluations would take place even if petitioner's 'special necessity' test were adopted. Thus, the 'chilling effect' petitioner fears is at most only incrementally worsened by the absence of a privilege. Finally, we are not so ready as petitioner seems to be to assume the worst about those in the academic community. Although it is possible that some evaluators may become less candid as the possibility of disclosure increases, others may simply ground their evaluations in specific examples and illustrations in order to deflect potential claims of bias or unfairness. Not all academics will hesitate to stand up and be counted when they evaluate their peers". Íd., págs. 200–201.

El Tribunal, por considerar que no estaba involucrado ningún derecho de la institución bajo la Primera Enmienda dé la Constitución federal, *no tuvo que evaluar* si se trataba de un interés apremiante del Estado que justificase la alegada violación. Por último, en el caso *University of Pennsylvania v. EEOC*, supra, se suscitó la controversia en el contexto de la reclamación de un profesor contra la universidad, mientras que en el caso ante nos estamos ante la reclamación de la institución universitaria frente a la intervención directa del Estado.

Surge de la Exposición de Motivos de la Ley Núm. 16 de 16 de junio de 1993, Leyes de Puerto Rico, pág. 50, que ésta pretende, en síntesis, separar la función de gobernar la U.P.R. de la función de acreditar y licenciar otras instituciones de educación superior. Con ello se espera que la junta de gobierno de la U.P.R. "pueda dedicar todo su tiempo y esfuerzo a servir como cuerpo rector de la Universidad" y evitar "una situación de posible conflicto de intereses". Ello, aunque prima facie parece ser un objetivo válido, *el problema que confronta es que el medio que las leyes impugnadas han escogido para llevarlo a cabo ha sido mediante la creación de una nueva junta de gobierno y limitando al C.E.S. sólo a la función de licenciar y acreditar.* No guarda correspondencia alguna este medio con el objetivo señalado tanto en la Ley Núm. 16, *supra,* como en la Núm. 17, *supra,* cuando no surge de la Exposición de Motivos que hubiese un problema con respecto a la función de gobierno de la U.P.R. propiamente.

Observamos que gran parte de la prueba documental sometida por la parte demandada va dirigida a sostener que las quejas y el alegado conflicto surgían por la función de licenciar y acreditar instituciones. El denominar otra Junta de Gobierno para el ejercicio de la función del C.E.S. con respecto a la Universidad no guarda relación con el objetivo señalado. *La legislación impugnada seleccionó el medio más oneroso para alcanzar su objetivo en menosprecio de la libertad académica individual e institucional y la autonomía universitaria.*

Concluimos que sostener, bajo estas circunstancias, la constitucionalidad de estas leyes equivaldría a adjudicar una importancia mayor al reclamo de separación de las funciones del C.E.S. que a la libertad académica institucional y a la autonomía universitaria. La Legislatura, al ampararse en el reclamo de separación de funciones del C.E.S., ha desprovisto a la Universidad de Puerto Rico de una junta de gobierno *constituida con validez.* El interés

público en la acreditación de las instituciones educativas privadas y la separación de ésta de la función de gobierno de la U.P.R. del C.E.S. *no constituye un interés apremiante del Estado que justifique la intervención impermisible y el efecto congelante ("chilling effect") de estas leyes sobre la libertad académica institucional y la autonomía universitaria. Por ello, entendemos que las leyes impugnadas son inconstitucionales de su faz.*

## VI

*El "despido" discriminatorio de los miembros del C.E.S.*

Los miembros del C.E.S. han sostenido que la legislación impugnada infringe la cláusula constitucional del debido proceso tanto en su modalidad sustantiva como en la procesal. En lo sustantivo, la cláusula constitucional persigue proteger y salvaguardar los derechos fundamentales de la persona. *Rodríguez Rodríguez v. E.L.A.*, supra. En lo procesal, al Estado se le impone la obligación de garantizar que la interferencia con los intereses de libertad y de propiedad del individuo se haga a través de un procedimiento que, en esencia, sea justo y equitativo.

En el contexto de una reclamación al amparo de la cláusula del debido proceso, en su vertiente procesal, es necesario tener algo más que una mera expectativa unilateral de titularidad; se debe tener un derecho concreto protegido por el ordenamiento jurídico estatal. *Orta v. Padilla Ayala*, 131 D.P.R. 227 (1992); *Board of Regents v. Roth*, 408 U.S. 564 (1972).

En Puerto Rico, al seguir la doctrina establecida por el Tribunal Supremo federal en *Branti v. Finkel*, 445 U.S. 507 (1980), resolvimos que cuando un empleado de confianza, que haya sido cesanteado, alegue y presente pruebas a los efectos de que su despido se debió a motivaciones políticas, recaerá sobre la autoridad nominadora el deber de desfilar prueba demostrativa de que la afiliación política particular

del empleado es un " 'requisito apropiado' para el desempeño efectivo del cargo en cuestión, o sea, le corresponde establecer la existencia de intereses gubernamentales que son de importancia y jerarquía superior a los derechos del empleado bajo la Primera Enmienda" de la Constitución federal. *Ramos v. Srio. de Comercio*, 112 D.P.R. 514, 516 (1982). Véase *Clemente v. Depto. de la Vivienda*, 114 D.P.R. 763, 769–770 (1983). Le corresponde entonces al Estado refutar la prueba del discrimen político presentada o demostrar que la afiliación política del empleado es un requisito necesario para el desempeño efectivo del cargo en cuestión, por razón de que dicho empleado participa en la formulación de la política pública. *Ramos v. Srio. de Comercio*, supra; *Clemente v. Depto. de la Vivienda*, supra.

En *Rodríguez Cruz v. Padilla Ayala*, 125 D.P.R. 486, 502 (1990), aclaramos que "la mera alegación de discrimen político no activa la fuerte presunción, o inferencia de discrimen" (énfasis suprimido), debido a que el empleado despedido " 'tiene el peso inicial de probar por preponderancia de prueba que la conducta protegida fue el factor sustancial o motivante para la actuación del despido' ". Íd. Véanse, también: *McCrillis v. Aut. Navieras de P.R.*, 123 D.P.R. 113 (1989); *Orta v. Padilla Ayala*, supra.

Un examen de la Ley Núm. 1, *supra*, muestra que a su amparo los miembros del C.E.S. tenían un interés propietario en ocupar *sus puestos por un término fijo*. Por su naturaleza *fiduciaria y* como junta de gobierno, *su derecho era a continuar ejerciendo como tal*, a menos que fueran destituidos por una causa justa. En torno a la función de licenciar y acreditar, interpretamos que la propia ley subordina *esta función* a la principal del C.E.S. como órgano rector de la U.P.R. Véase 18 L.P.R.A. sec. 602(g). Ahora bien, es la función como junta de gobierno de los miembros del C.E.S. la que forma parte de la limitada autonomía universitaria reconocida en la Ley Núm. 1, *supra*. Por otro lado, y conforme explicamos antes, es esta función fiducia-

ria —denominada "administración académica"— la que está cobijada bajo el palio del derecho a la libertad académica institucional.

En la medida que las leyes impugnadas restrinjan y coarten a los miembros del C.E.S. de su derecho a continuar ejerciendo su función como Junta de Gobierno, aun cuando las referidas leyes les permitieran a éstos ejercer *sus otras funciones* (de licenciar y acreditar), se ha privado a los codemandantes *de su derecho a continuar en sus cargos por los términos fijos establecidos por ley.*

La estrategia de dividir funciones y crear dos (2) entidades (C.E.S. y Junta de Síndicos) ha servido el propósito de facto *de destituir a los miembros del C.E.S.*; ello se infiere al no haberse creado otro organismo para que ejerciera las funciones de licenciar y acreditar, las cuales *precisamente* han sido la justificación para la aprobación de estas leyes. Ante los medios seleccionados para lograr los propósitos de las leyes impugnadas, no podemos sostener que éstas persigan un objetivo o interés apremiante que legitime la acción del Estado.

Por otro lado, en nuestra jurisdicción se ha reconocido que el discrimen asume formas diversas.[15] Hemos sostenido *que aun un traslado* puede constituir una actuación discriminatoria o arbitraria que genere una causa de acción. Véanse, entre otros: *Cintrón v. E.L.A.*, 127 D.P.R. 582 (1990); *Carle García v. Supte. de la Policía*, 114 D.P.R. 667, 668 (1983), voto explicativo del Juez Asociado Señor Negrón García.

En nuestra jurisdicción también se ha reconocido la *figura del despido implícito* cuando, por los actos voluntarios e injustificados de un patrono dirigidos a obligar al em-

---

(15) Refiérase, por ejemplo, a nuestras expresiones en *Rodríguez Meléndez v. Sup. Amigo, Inc.*, 126 D.P.R. 117, 136 (1990), sobre que en el contexto de una reclamación por hostigamiento sexual, reconocimos que "[e]l *ordenamiento jurídico, hasta muy recientemente desfasado de esta nueva realidad social, ha evolucionado e incorporado la normativa necesaria para que otras modalidades de hostigamiento sexual en el empleo —algunas sofisticadas— que antes nos negábamos a reconocer, pierdan la aureola de manifestaciones culturales aceptables*". (Énfasis en el original.)

pleado a dejar su cargo, la única alternativa razonable de éste es abandonar el cargo. Véase *Vélez de Reilova v. R. Palmer Bros., Inc.*, 94 D.P.R. 175, 178 (1967).

El Tribunal Supremo de Estados Unidos, en *Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990), reiteró la norma de *Branti v. Finkel*, supra, y *Elrod v. Burns*, 427 U.S. 347 (1976), al resolver que a la práctica de tomar decisiones sobre ascensos, traslados, reempleo y empleo de funcionarios públicos, fundamentada en la afiliación política de éstos, le aplica la prohibición pautada en los casos mencionados. Al así resolver, el Tribunal rechazó limitar la aplicación de los casos citados sólo a situaciones sustancialmente equivalentes a un despido. A esos efectos, el Tribunal expresó lo siguiente:

> We therefore determine that promotions, transfers, and recall after layoffs based on political affiliation or support are an impermissible infringement on the First Amendment rights of public employees. In doing so, we reject the Seventh Circuit's view of the appropriate constitutional standard by which to measure alleged patronage practices in government employment. The Seventh Circuit proposed that only those employment decisions that are the "substantial equivalent of a dismissal" violate a public employee's rights under the First Amendment. ... We find this test unduly restrictive because it fails to recognize that *there are deprivations less harsh than dismissal that nevertheless press state employees and applicants to conform their beliefs and association to some state-selected orthodoxy.* (Citas omitidas y énfasis suplido.) *Rutan v. Republican Party of Illinois*, supra, pág. 75.

Al ser limitada o coartada la función principal del C.E.S., a los miembros codemandantes *no les quedó otra alternativa* que negarse a asumir sus cargos en la nueva entidad creada. La limitación impuesta por estas leyes al C.E.S., en su función fiduciaria y de Junta de Gobierno de la U.P.R., *constituye una destitución o un despido constructivo de los miembros del C.E.S.*

Los miembros del C.E.S., ciertamente, tenían una ex-

pectativa de continuar el ejercicio de sus funciones durante el término de sus respectivos nombramientos. A su vez, por la naturaleza fiduciaria de las funciones que éstos ejercían como junta de gobierno, los miembros del C.E.S. tenían una expectativa legítima de continuar ejerciendo tal función y de no ser desprovistos *discriminatoriamente* de estas posiciones.

En el caso ante nuestra consideración, concluimos que la inferencia de discrimen quedó establecida por razones político-partidistas. En primer lugar, las leyes impugnadas —de su faz— muestran el esquema sustitutivo diseñado, al limitar al C.E.S. sólo a funciones que le coartan toda ingerencia con la administración académica de la Universidad. Dicha función fue asignada *exclusivamente* para ser ejercida por una nueva junta que ha sido nombrada por el Gobernador recién electo y confirmadas por la también recién electa Asamblea Legislativa. En segundo lugar, como indicamos antes, el medio seleccionado para alegadamente cumplir el propósito de la ley, al no guardar relación con éste, nos permite inferir el propósito discriminatorio del esquema legislativo.

Los tribunales no estamos obligados a aceptar como válidos los propósitos que se le atribuyen a determinada legislación cuando un examen *del debate legislativo revele su verdadera intención.* Véanse: *Eisenstadt v. Baird*, 405 U.S. 438 (1972); *Jiménez v. Weinberger*, 417 U.S. 628 (1974); *U.S. Dept. of Agriculture v. Moreno*, 413 U.S. 528 (1973); *Store v. Grahan*, 449 U.S. 39 (1980); *Wallace v. Jaffree*, 472 U.S. 38 (1985); *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977); *Washington v. Davis*, 426 U.S. 229 (1976); *Legislative Motivation (A Symposium)*, 15 San Diego L. Rev. 925 (1978); P. Brest, *Palmer v. Thompson: An Approach to the Problem of Unconstitutional Legislative Motive*, 1971 Sup. Ct. Rev. 95; J.H. Ely, *Le-*

*gislative and Administrative Motivation in Constitutional
Law*, 79 Yale L.J. 1205 (1970).

Del debate legislativo en la Cámara de Representantes
surgen, entre otras, las expresiones siguientes:

SR. QUILES RODRIGUEZ:

.    .    .    .    .    .    .    .

*Porque la Universidad de Puerto Rico ha estado asaltada permanentemente por el liderato del Partido Popular. Permanentemente asaltada.*

Y el amigo Arrarás decía que no podía defender a los funcionarios. Lo comprendemos. ¿Cómo se puede defender a una Awilda Aponte Roque, que no pudo cometer su cometido (sic) en el Departamento de Instrucción Pública, y luego se le da un premio nombrándola Presidente del Consejo de Educación Superior? No puede defenderlos.

Y no puede defender a un Saldaña, que en el año 1992, los estudiantes tuvieron que levantarse en huelga para protestar por la ineficiencia, la incompetencia, de ese administrador de la Universidad. Y ustedes dirán, "Pero, no administraba bien porque no tenía dinero". Pero miren, en los últimos seis años de administración universitaria, vemos cómo la matrícula de la Universidad desciende, y cómo el presupuesto de la Universidad se multiplica.

Del año de 1987 al '92, la matrícula de la Universidad mermó en tres mil quinientos cuarenta y dos estudiantes; los últimos cinco años. Sin embargo, el presupuesto de la Universidad aumentó en ciento veinticinco millones de dólares. ¿Dónde estaba el liderato del Partido Popular cuando eso ocurría? Y mientras los ingresos de la Universidad aumentaban, se recurría al aumento de la matrícula de los estudiantes pobres de este país, para complacer los caprichos de los administradores de la Universidad. Porque miren, lo insólito se dio en Utuado.

Fueron los acreditadores de la Middle State a evaluar el Colegio Regional de la Montaña, y la presidenta, o la Rectora de ACR, no pudo pernoctar en Utuado, y sus Decanos. Se ubicaron en el Parador de Guajataca, y todos los días viajaban en helicóptero desde Guajataca hacia Utuado. ¿Y quién pagaba por esos gastos? Pues nosotros los contribuyentes, el pueblo. No había dinero para becas de estudiantes, había que aumentar la matrícula, pero estos administradores se daban vida de Marajá.

Otro caso más insólito, en uno de los pueblos más pobres de la patria puertorriqueña, se fue, fueron a presentar el resultado de esa evaluación, y se ubicó la Rectora de los Colegios Regio-

nales, y su séquito, en el Hotel Caribe Hilton a recibir el informe.

Y hace poco estuvieron en el Colegio Regional de la Montaña, en otra actividad, en una comida; ocho mil dólares. No la compraron en Utuado; llevaron mozos de San Juan, llevaron la comida de San Juan.

Compañeros del Partido Popular, ¿qué es esto? ¿Es esto administrar bien los dineros del pueblo? ¿Es esto bregar con conciencia de lo que es la Universidad de Puerto Rico? Allá en mi pueblo de Utuado le llaman de otra forma. Le llaman de otra forma allá.

.    .    .    .    .    .    .    .    .

Pero lo que pasa es que esto va más allá de una Junta de Síndicos; es que tenemos que ir a las raíces mismas del problema de la Universidad de Puerto Rico, que es mi Universidad, que es vuestra Universidad. Porque se sostiene con fondos de nosotros los contribuyentes. Con los fondos y con las contribuciones que paga mi hijo. Con los fondos de las contribuciones que pagan los hijos de nosotros, y aún aquel que en los artículos de uso y consumo paga el seis punto seis por ciento; *ese está contribuyendo a que los magnates y los administradores de la Universidad se den vida de Marajá.* Y no lo decimos nosotros, lo dicen los mismos profesores de la Universidad.

.    .    .    .    .    .    .    .    .

SR. FIGUEROA COSTA:

.    .    .    .    .    .    .    .    .

Porque horita hablaba el compañero de los Caribe Hilton y de otras cosas. *En ese Consejo se llega al nivel del derroche que le pagan un viaje en helicóptero de Mayagüez a San Juan, o de San Juan a Mayagüez, a cualquiera que ellos quieran, como si fuera los mismo que comprar un cometa Gayla por uno veintinueve en Walgreens y levantarlo. Esos son los estilos de vida del Consejo de Educación Superior.*

*Aquí no se está atacando la autonomía universitaria. Aquí se le están poniendo cortapisas a aquellos que han utilizado la institución que produce la autonomía universitaria para llevar a la Universidad de Puerto Rico al deterioro en que se encuentra hoy. Un Consejo de Educación Superior que ni siquiera ha logrado mantener la unidad del movimiento universitario, de los recintos y los colegios regionales; porque si alguien no le reconoce autonomía a los recintos, es el Consejo de Eduación Superior allá en Río Piedras. A los zares de la Universidad de Puerto Rico.*

Un Consejo de Educación Superior que en el 1985 heredó el fondo de reserva de la Universidad de Puerto Rico, con un su-

perávit de veinticuatro millones de dólares, y hoy lo tienen con un déficit multimillonario. Y uno se pregunta ¿y los chavos, donde están?

Porque la Universidad de Puerto Rico en muchos de sus sectores y edificios no tiene nada que envidiarle a las mazmorras medievales. Da vergüenza y da pena ver cómo se encuentran algunos edificios del Recinto de Río Piedras y algunos de sus colegios regionales. *¿Y donde están los chavos? En el derroche, en los contratos.* Todavía no se ha entrado a averiguar quién tiene contratos allí. Y cuando dentro del mismo sistema universitario se producía algo que aportara positivamente a la Universidad, entonces no, había que contratarlo afuera; algún catamarán que viniera por ahí soplando el viento, respondiendo a los intereses del Partido Popular. Porque era popular hay que contratarlo.

## SR. GRANADOS NAVEDO:

Yo no puedo concebir que se hable de autonomía universitaria mientras se pretende perpetuar la centralización gubernamental del control de todas las instituciones educativas de este país. Que nos hable el compañero Colberg Toro de que esa perpetuidad del control de las instituciones gubernamentales de las instituciones educativas del país en manos de unos universitarios. El alega que necesitamos que las personas que rijan la universidad sean universitarios, escogidos por los universitarios. Sí. Pero cuando pasamos revista sobre quiénes son los miembros del Consejo de Educación Superior, vemos cuán universitarios son, y cuán identificados con la comunidad universitaria están:

*Carlos Ríos, quien fuera Secretario de Justicia bajo RHC; doña Wiwi (la ex Secretaria de Educación), de ingrata recordación y sobre quien no tenemos que elaborar nada más; el doctor Rodríguez Bou ... sí, miembro de la comunidad universitaria ... un cromañón universitario; el doctor Padró, siquiatra de Rafael Hernández Colón; Héctor Ledesma, quien era presidente de un banco; Francisco Acevedo, tengo que confesar que no sé ni quién es. Por tal razón, ¿de dónde se sacan de que el sistema universitario está controlado por personas provenientes de la comunidad universitaria y que surgen de una vida universitaria, cuando las personas que componen el Consejo de Educación Superior son personas que provienen de distintos sectores del país?*

... Cuando se nos habla de asalto de la autonomía universitaria, nos preguntamos si es asalto o desasalto (sic). Porque

cuando hay un ejército que toma a la fuerza, a mansalva, una institución, y luego es necesario que el pueblo se exprese en las urnas, precisamente para recobrar el control de esta institución, nos preguntamos si ese proceso de recobro de control, ¿es un asalto o es un desasalto? Si no es desenredar el asalto inicial.

*Pasen juicio sobre los que hoy componen el Consejo de Educación Superior. Pasen juicio sobre la forma en que ha actuado durante los años ese Consejo de Educación Superior, para determinar si lo que se hace ahora no es un intento —que esperamos sea fructífero—, de corregir el asalto a mansalva, a la sujeción a que han mantenido ustedes las instituciones universitarias puertorriqueñas a través de las décadas.*

Y en aquellas ocasiones en que asaltaron la Universidad no fue luego de una expresión de voluntad del pueblo.

Y ahora ustedes pretenden que esta Mayoría legislativa deje sin efecto los ofrecimientos que se hicieron y se plasmaron en el programa de gobierno del Partido que recibió la sanción electoral en las urnas, y que nosostros ahora le demos la espalda a lo que el pueblo puertorriqueño votó. Y el pueblo puertorriqueño votó por lo que hoy se está haciendo en esta Cámara Legislativa. Y el pueblo puertorriqueño votó para cambiar la situación de sujeción política en la que han mantenido ustedes las instituciones universitarias a través de las décadas. El pueblo puertorriqueño dijo "Basta ya" en las urnas, y ustedes no van a invalidar con sus objeciones la expresión de voluntad democráticamente expresada en las urnas por el pueblo puertorriqueño.

No estamos actuando a espaldas de nuestro país. El pueblo votó a favor de lo que hoy estamos haciendo, de la misma manera que votó para derogar la ley del Idioma Oficial que ustedes impusieron. Y no solamente en esta, sino en muchas otras piezas legislativas, ustedes habrán de tratar de mantener el status quo, mientras esta Mayoría legislativa habrá de saber imponer la voluntad del pueblo puertorriqueño expresada en las urnas. Y todas las artimañas parlamentarias, e incluso las amenazas de ellos que antes fueran abogados del Partido Popular y que hoy se encuentran entronizados en el Tribunal Supremo de Puerto Rico, no habrán de impedir que nosotros cumplamos con la misión de reforma que nos impusimos y que el pueblo puertorriqueño sancionó en las urnas. Bajo ningún concepto nosotros habremos de claudicar a la misión que tenemos de crear un sistema universitario que reconozca las realidades dinámico, un sistema universitario que reconozca las realidades actuales, y de enterrar para siempre el sistema de Rafael y

de doña Wiwi.

.    .    .    .    .    .    .    .

SRA. HERNANDEZ TORRES:

.    .    .    .    .    .    .    .

Gracias, señor Presidente.

De costa a costa fue la pela que cogieron. Y ahora se convierten en intérpretes del mandato.

Yo debo felicitar al compañero Arrarás. El producto de la orquestación de los discursos, magistralmente realizados en la computadora, ha surtido efecto. Pero ciertamente, no logran encadenar un solo argumento válido para oponerse a los tres Proyectos de ley que hoy estamos aprobando. Es más, salvo dos compañeros de la Minoría Parlamentaria del Partido Popular, todos hablaban de, "el Proyecto de ley"; en singular. Si es que no los han leído. No saben que son tres. No saben que de lo que se trata es de realizar la base para poder propulsar una profunda reforma educativa, que estamos invitando a que surja del pleno de la Universidad de Puerto Rico. Le estamos diciendo que hagan esa reforma a la propia comunidad universitaria y que nos las traigan aquí, en doce, catorce, quince meses. De eso es de lo que se trata. De armar el esqueleto. Porque si continúan allí las leyes orgnánicas como están, se convierten en el peor enemigo de la reforma universitaria, proque ninguno de los organismos que están, de la manera que están, auspician, ni quieren, ni endosan, una reforma universitaria.

.    .    .    .    .    .    .    .

*La Universidad de Puerto Rico es la prueba del secuestro por un Partido de una institución. Si algo ha secuestrado por décadas el Partido Popular, es a la Universidad de Puerto Rico. ¿Dónde han vivido y de qué han vivido los Agrait? ¿Dónde han vivido y de qué han vivido los Moscoso? ¿Dónde han vivido y de qué han vivido los Benítez? De la Universidad de Puerto Rico. De ahí. Esas tres familias, hace unos cuantos años había una broma en Puerto Rico que decía que en lugar de inscribir los hijos en el Registro Demográfico, los inscribían en la Oficina de Presupuesto y Gerencia. Esas mismas tres familias.*

*Y ahora vienen aquí a darnos lecciones de lo que es autonomía, de lo que es independencia, de lo que es gobernar; amenazas de que si fuimos y no vamos a ser. Y cualquiera que los oye* piensa que en los últimos ocho años dictaron cátedra aquí de democracia y de legislación de avanzada, y de respeto a las Minorías. Cualquiera que los escucha hablar piensa que en los últimos ocho años, aquí, aunque se discrepara de la idea, había respeto. ¿Respeto de qué? ¡Si lo primero que no se respetaba era la institución de la Cámara de Representantes! Y ahora, quie-

nes no respetaron su propia casa, nos acusan de atacar la Universidad de Puerto Rico.

No hay "standing" —como diría el Tribunal Supremo—, no hay legitimación activa, señores legisladores.

La mejor prueba, la prueba más contundente de que no hay razonas fundamentadas para estar en contra de estas piezas legislativas, ¿ustedes saben cuál es? Nótese en el ejercicio de debate que ellos han efectuado. Sus mejores deponentes lo más que han tomado son diez minutos, señor Presidente. No han podido. Para tres Proyectos. Los mejores debates que esperamos siempre, ¿dónde están? Cinco, diez minutos. Nada más. De dos horas no sé cuantos minutos que ha habido de debate.

*Si alguien vulneró el concepto de autonomía universitaria, fue el Partido Popular. Que lo puso como un manto protector para a la menor provocación desgarrarlo. Como lo hicieron mediante el ataque que perpetraron en el presupuesto de este país. Como lo han hecho en las personas que han nominado para ser miembros del Consejo de Educación Superior. Eso es vulnerar el concepto de autonomía universitaria. Es más, le han querido hacer creer a la comunidad puertorriqueña, que tienen autonomía; y no tienen autonomía na'. ¿Cómo va a haber autonomía en un sistema donde no hay participación de toda la comunidad?*

Por primera vez, con estas piezas legislativas, señor Presidente y compañeros, se da esa participación. Si es mucha o es poca, si es sensata o insensata, eso lo dirá el tiempo. Ojalá y sea poco y estas sean las bases donde germine una mayor participación de todos los sectores de la comunidad universitaria.

¿Qué Proyecto de ley de envergadura sobre la Universidad han traído en los últimos doce años? Ninguno. Recortes presupuestarios, como apuntaba el compañero Navarro Alicea; errores fiscales, que los pagaron los estudiantes con el alza en las matrículas. *Un déficit creado en menos de dos años por el entonces presidente Agraít, después que había tomado la Unviersidad con veinticinco millones de dólares de superávit. Esa es la gran obra del Partido Popular en cuanto a autonomía universitaria se refiere.*

Y como la han tenido secuestrada, se creen dueños. Pero el secuestrador nunca es dueño de su víctima; sigue siendo secuestrador, y la otra, víctima. Hasta que alguien abre la puerta o logra el rescate. Y eso es lo que estamos haciendo; *abriendo la puerta para lograr el rescate de la Universidad de Puerto Rico y liberarlo de las garras del Partido Popular. Que a cuerpo de rey viven de los dineros asignados a la Universidad de Puerto Rico, y vemos el claro deterioro de la calidad de estudio que se da en nuestro primer centro docente.* Que dentro de poco, sino se ataja, dejará de serlo. Y será una quimera referirnos a la Uni-

versidad de Puerto Rico como nuestro primer centro docente. Para desgracia no sólo de los exalumnos, para desgracia de este pueblo. Pero como la reforma, las reestructuraciones conllevan denuncias de las situaciones que están sucediendo, no las acepte.

．　　　．　　　．　　　．　　　．　　　．　　　．　　　．

Se han dedicado a hablar de que se ha vulnerado la autonomía universitaria. Y en boca del Partido Popular la vulneración de autonomía universitaria, como "independencia judicial", como "defensa de la cultura", suena un chiste de mal gusto. Porque si alguien ha tenido la oportunidad de hacer grandes cosas por la Universidad de Puerto Rico, ha sido el Partido Popular. Y se han conformado con dejarla como último recobeco para aquellos que sustentan el status quo. Y han llegado al extremo de que la Torre de la Universidad está tan frágil como el Estado Libre Asociado, y eso es mucho decir.

De manera que, señor Presidente y compañeros de Cámara, quienes han dicho que nunca se había realizado lo que hoy se hace, tienen razón. Tienen toda la razón. Nunca ellos había[n] hecho el esfuerzo que se ha hecho por dotar a la Universidad del verdadero andamiaje donde ellos puedan formular su propia reforma universitaria. Y traerla aquí en un plazo, que hoy se dice doce meses, o quince, o dieciocho, el que finalmente sea, pero esperamos por ellos para la discusión de la reforma universitaria.

La pregunta es, ¿hubiese sido capaz el Partido Popular de poner en las manos de la comunidad universitaria ese poder? Claro que no, señor Presidente. Eso es pedirle peras al olmo. (Énfasis suplido.) Diario de Sesiones (Cámara de Representantes), 4 de mayo de 1993, págs. 90–141.

Las expresiones antes citadas *muestran, con claridad, que la intención, tras la aprobación de la legislación impugnada, era sustituir a los miembros del C.E.S. y a otros funcionarios universitarios por personas de la afiliación política del Partido Nuevo Progresista.* A pesar de que la parte demandada recurrida intentó rebatir la presunción de discrimen aludiendo al propósito de separación de funciones del C.E.S., no logró hacerlo. Nuestro examen cuidadoso de las expresiones citadas antes nos revela *el propósito discriminatorio de las leyes referidas; por lo que éstas son discriminatorias tanto de su faz como en su aplicación.*

Abona a lo anterior el hecho de que posterior a las elecciones generales celebradas el 3 de noviembre de 1992, el entonces Gobernador electo, Dr. Pedro J. Rosselló González, *exhortó públicamente a los miembros del C.E.S., al Presidente de la U.P.R. y a sus rectores y decanos a que presentaran sus renuncias* en vista del mandato que le había dado el Pueblo de Puerto Rico. *Exhibit* 1–5 del demandante (artículo del perídico *El Nuevo Día* de 3 de noviembre de 1992). Les advirtió, además, que dichas renuncias podrían tornarse académicas cuando se creara la Junta de Síndicos en sustitución del C.E.S., debido a que esto permitiría al nuevo Gobierno designar los miembros de dicha Junta y ésta procedería a nombrar al nuevo Presidente de la U.P.R. Véase *Exhibit* 1–5 del demandante.

*Además, declaró públicamente que el Presidente actual de la U.P.R. no contaba con su confianza.* Véase el *Exhibit* 1–22 del demandante (transcripción de la conferencia de prensa celebrada el 21 de julio de 1993).

El tribunal de instancia, al emitir su dictamen, expresamente sostuvo que para dicho foro era *"verdad lo que el demandado [el Dr. Pedro J. Rosselló González] dijo lo que la prensa publicó"* y por ello relevó a los demandantes de probar ese hecho. "La vista evidenciaria es innecesaria puesto que admitimos en evidencia los recortes de prensa *y le otorgamos veracidad al contenido de los mismos.*" (Énfasis suplido.) Sentencia del tribunal de instancia, págs. 5–6.

*Si el Estado entendía que algunos miembros del C.E.S. o funcionarios de la U.P.R. habían incurrido en conducta impropia en el ejercicio de su cargo, el mecanismo apropiado para resolver este asunto era mediante la formulación de unos cargos y probar justa causa para su despido individual, para así cumplir con el debido proceso de ley y sin desmantelar la Junta de Gobierno de una institución universitaria mediante un subterfugio que no puede legitimar una acción claramente político-partidista e inconstitucional.*

*Por los fundamentos explicados en esta opinión, revoca-ríamos la sentencia recurrida y declararíamos inconstitu-cionales las leyes impugnadas.* En atención al interés pú-blico y por el efecto de esta decisión, a continuación exponemos el remedio que debería proveerse.

## VII

### El remedio

La función principal de este Tribunal es ser el guardián e intérprete de nuestra Constitución y de los principios y valores que ésta encarna. Art. V, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1; *Figueroa Ferrer v. E.L.A.*, 107 D.P.R. 250 (1978); *Santa Aponte v. Srio. del Senado,* 105 D.P.R. 750 (1977); *E.L.A. v. Aguayo,* 80 D.P.R. 552 (1958); *Defendini Collazo v. E.L.A.*, supra, opinión disidente. Al realizar esta delicada función, debemos tener en cuenta la relación de unas disposiciones de nuestra Constitución con otras y el conjunto de principios y valores que ésta ha encerrado y protegido durante diversos períodos históricos y realidades sociales, económicas y políticas. Al interpretar ese conjunto de principios, normas y valores que es nuestra Constitu-ción, este Tribunal no puede ni debe asumir posiciones res-trictivas, retrógradas o conservadoras. Tenemos que asu-mir posiciones liberales, valientes y vanguardistas para mantener una visión sociológica en la interpretación de problemas y realidades complejas de nuestra sociedad moderna.

En lo que respecta a los remedios, que este Tribunal provee al amparo de la Constitución del Estado Libre Aso-ciado de Puerto Rico, hemos de salvaguardar los derechos y las libertades individuales; los valores y principios sobre los cuales se sustenta nuestra democracia sobre las actua-ciones *ultra vires* de cualquiera de las ramas políticas del Gobierno. Hemos de procurar siempre que nuestras inter-

pretaciones sean el Norte que, a su vez, señalen el camino a las generaciones futuras.

En el ejercicio de nuestra función revisora, hemos confrontado en el pasado situaciones tan complejas *o más que la que hoy dilucidamos*. En éstas han estado involucrados derechos de igual jerarquía que los que hoy pretendemos salvaguardar. *Ante esas situaciones, este Tribunal ha enfrentado el reto de diseñar unos remedios innovadores para salvaguardar las garantías y los derechos constitucionales*, con cuidado de no afectar otros derechos protegidos ni crear una inestabilidad inmanejable en el sistema del que se trate. Así, por ejemplo, en *Sánchez y Colón v. E.L.A. I*, 134 D.P.R. 445 (1993), ordenamos que las papeletas en blanco fuesen adjudicadas como un voto que no favorece ninguna de las definiciones de *status* propuestas por los partidos. En *Granados v. Rodríguez Estrada V*, 127 D.P.R. 1 (1990), ponderamos las consecuencias y los problemas que se crearían de ordenarse la celebración de una nueva elección.[16] Anterior a esto, ya habíamos permitido la acumulación de numerosos electores cuyos votos no habían sido adjudicados, mediante edictos y por correo certificado. Véase *Granados v. Rodríguez Estrada II*, 124 D.P.R. 593 (1989), en el cual también ponderamos la deseabilidad de una medida menos drástica que la celebración de una nueva elección.[17] Véanse, además: *P.N.P. y P.I.P. v. Rodríguez Estrada*, supra; *Granados v. Rodríguez Estrada I*, 124 D.P.R. 1 (1989), en el cual ordenamos que se les permitiera votar a los electores añadidos a mano para garantizar el derecho sagrado al sufragio.

En consideración a que el derecho a la libertad académica institucional es consustancial con el derecho a la libertad de expresión, siendo constantes al aplicar fielmente los principios antes expuestos en cuanto a no intervenir con la Universidad y con los procesos *que la propia comu-*

---

[16] Refiérase a *Granados v. Rodríguez Estrada V*, 127 D.P.R. 1 (1990).

[17] Refiérase a *Granados v. Rodríguez Estrada II*, 124 D.P.R. 593 (1989).

*nidad universitaria ya ha llevado a cabo* y, a su vez, proteger derechos constitucionales fundamentales para evitar que se cree una inestabilidad, proveeríamos los siguientes remedios:

1. *Declarar inconstitucional la Ley Núm. 12, supra, y las Leyes Núms. 16 y 17, supra, por lo que se restituyen a los miembros del C.E.S. cuyos nombramientos no hayan vencido a la fecha de la presente opinión.*

2. *Declarar inconstitucional la Junta de Síndicos y el Consejo de Educación Superior según creados por las referidas leyes. Cualquier actuación de estos organismos posterior a la fecha de esta opinión se declara también inconstitucional.*

3. *En cuanto al nombramiento de funcionarios tales como el Presidente de la U.P.R. en consideración a los factores antes señalados, dejaríamos a éstos en sus cargos hasta tanto el C.E.S. decida lo contrario.*

Reconocemos la facultad de legislar de nuestra Asamblea Legislativa siempre y cuando actúe conforme a los parámetros de nuestra Constitución, para salvaguardar, en especial casos como el presente, los derechos de libertad académica institucional, libertad de expresión y sin menoscabo de la autonomía universitaria. *Por las razones expuestas, no podemos permitir que sean consideraciones político-partidistas las que orienten el futuro académico y el desarrollo institucional de la U.P.R.*

## VIII

*Resumen*

*La legislación impugnada es inconstitucional. Por ello, se debe restituir a los miembros del C.E.S. cuyos nombramientos no hayan vencido a la fecha de esta opinión. La Junta de Síndicos y el nuevo C.E.S. son inconstitucionales, y cualquier actuación de éstos, posterior a esta opinión,*

*también será inconstitucional.* En cuanto al nombramiento de funcionarios tales como el Presidente de la U.P.R., los dejaríamos en sus cargos, siendo compatibles con el respeto que se le debe dar a la comunidad universitaria hasta tanto el C.E.S. decida lo contrario.

La U.P.R. no es una agencia más del Gobierno. Es la convivencia democrática de la sociedad civil y el máximo laboratorio para la experimentación democrática.

*La legislación impugnada viola la libertad de expresión individual de los profesores, lo cual priva a nuestros estudiantes del diálogo y la discusión de ideas con libertad y sin temor; todo ello, por la intervención indebida del Gobierno con los organismos directivos de la docencia y de la administración académica.*

Todos los puertorriqueños aspiran a que sus hijos tengan una educación universitaria plena y enriquecedora. Una educación universitaria que los exponga a todas las corrientes del conocimiento para entender y esclarecer la realidad y desarrollar al máximo su personalidad, y para ser cada día personas más dignas, libres, con deseos y oportunidades de trabajar para alcanzar sus aspiraciones, felicidad y serles útiles a la sociedad donde conviven.

*Esta aspiración de nuestros estudiantes se frustra cuando se coarta la libertad de expresión en la universidad; la libertad académica institucional y la autonomía universitaria.* De igual manera, se coarta la libertad de expresión cuando se despiden en forma discriminatoria y sin justa causa, por razones político-partidistas, a los miembros del C.E.S., quienes ostentan el deber fiduciario sobre la docencia y la administración universitaria.

*La legislación impugnada no es otra cosa que un subterfugio para intervenir con la libertad de expresión y la docencia en la universidad, como si ésta fuera un botín de guerra. Todo ello resulta en detrimento de la aspiración del puertorriqueño de obtener una educación de excelencia en la búsqueda de la felicidad y una mejor calidad de vida.*

*Los errores de Gobiernos pasados, los cuales no están ante nos, no legitiman ni justifican los errores del presente sobre los cuales tenemos el deber y la obligación constitucional de corregir.*

Por todo lo anterior *DISIENTO* de la sentencia emitida por el Tribunal.

*LAS LEYES SON INCONSTITUCIONALES.*

— O —

Voto particular del Juez Asociado Señor Fuster Berlingeri.

Concurro plenamente con la opinión disidente del Juez Asociado Señor Alonso Alonso. Sólo los ingenuos, o quienes prefieran no reconocer lo que es patentemente evidente, pueden negar que en este caso existe una acción gubernamental motivada principalmente por razones político-partidistas. Las numerosas expresiones de los legisladores que aprobaron la ley, citadas por el Juez Alonso Alonso en su opinión, y las manifestaciones del Primer Ejecutivo, quien propuso y aprobó la legislación en cuestión —y que fueron admitidas como ciertas por el propio tribunal de instancia— constituyen en conjunto una prueba contundente de que la creación, mediante ley, de un nuevo organismo rector para la Universidad de Puerto Rico, que desplaza a los incumbentes del Consejo de Educación Superior, respondió primordialmente a propósitos y motivos político-partidistas.

Al igual, es innegable que, en nuestro ordenamiento jurídico, el Gobierno está constitucionalmente impedido para actuar conforme a fines político-partidistas cuando tal acción estatal afecte indefectible y adversamente los derechos fundamentales de otras personas. En Puerto Rico la libertad de expresión no puede ser restringida o menoscabada por el Estado, salvo que exista un interés público apremiante. *Sánchez Carambot v. Dir. Col. Univ. Humacao*, 113 D.P.R. 153 (1982); *Rodríguez v. Srio. de Instruc-*

*ción*, 109 D.P.R. 251 (1979); *Mari Bras v. Casañas*, 96 D.P.R. 15 (1968). No es necesario acudir a teorías jurídicas enjundiosas ni a profundos análisis de derecho para reconocer que las conveniencias partidistas de los gobernantes de turno no constituyen un interés público apremiante que justifique coartar los derechos de expresión. Nuestra Constitución, además, en su Art. II, Sec. 1, L.P.R.A., Tomo 1, expresamente prohíbe el discrimen por razones políticas, y en derecho es claro que aun una ley neutral de su faz es inválida si se prueba que el legislador tuvo algún ánimo o propósito discriminatorio al aprobarla. *Hunter v. Underwood*, 471 U.S. 222 (1985); *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252 (1977).

En este caso, el Gobierno privó a los demandantes de su derecho a continuar en sus cargos por los términos fijos establecidos por ley, y lo hizo crasamente por motivos político-partidistas. Lo que es peor aún, en un país como el nuestro, plagado todavía por el mal del autoritarismo y donde la convivencia colectiva continúa teniendo rasgos de carácter autocrático, la actuación gubernamental aludida constituye un atentado serio contra los derechos de expresión de los profesores y estudiantes de la Universidad de Puerto Rico. Al imponer con crudeza su voluntad político-partidista sobre la institución universitaria, el Gobierno afecta adversamente el clima de libertad que allí debe prevalecer y menoscaba el quehacer académico por el efecto intimidante y liberticida de su acción. Cualquiera que conozca a fondo nuestra Casa de Estudios sabe que acciones de rudo "mollero" político por el Gobierno, como la que tenemos ante nos aquí, tienden a propiciar en algunos sectores universitarios —ciertamente no en todos— unos comportamientos congraciatorios, que son antagónicos a las exigencias de la libertad académica. Tales acciones de despotismo gubernamental tienden a azuzar en ellos el recóndito temor hacia las figuras autoritarias y la docilidad que nuestra experiencia colonial ha consolidado en el psique de

muchos en el país, todo ello en grave detrimento de las condiciones necesarias para realizar bien la auténtica tarea docente. Véase E. Seda Bonilla, *Los derechos civiles en la cultura puertorriqueña*, Río Piedras, Ed. Universitaria, 1963. La acción gubernamental fundamentada en motivos político-partidistas, pues, viola la libertad académica, por el efecto disuasivo (*chilling effect*) que tiene respecto al ejercicio de esa libertad que la Constitución claramente garantiza.

Es menester enfatizar que, desde hace ya mucho tiempo, se ha reconocido que en el ámbito universitario los profesores y estudiantes disfrutan de un derecho fundamental a la libre expresión, que incluye la facultad de disputar con libertad las ideas y creencias tradicionales y de explorar sin cortapisas tanto los cimientos como las fronteras del conocimiento. Esa libertad de cuestionarlo todo, en aras de buscar la verdad, no puede ser conculcada *de modo alguno* por el Estado. A los poderes gubernamentales les está vedado, incluso, menoscabar el clima o ambiente de seguridad, abertura, franqueza y hasta de osadía erudita que debe prevalecer en una universidad para que esa libertad de cuestionarlo todo pueda ejercerse propiamente y florecer.

Uno de los grandes constitucionalistas americanos, el Juez Frankfurter del Tribunal Supremo de Estados Unidos, se expresó sobre el particular con las citas y los comentarios siguientes:

> Insights into the mysteries of nature are born of hypothesis and speculation. The more so is this true in the pursuit of understanding in the groping endeavors of what are called the social sciences, the concern of which is man and society... For society's good —if understanding be an essential need of society— inquiries into these problems, speculations about them, stimulation in others of reflection upon them, *must be left as unfettered as possible. Political power must abstain from intrusion into this activity of freedom* ....
> ... This means the exclusion of governmental intervention in the intellectual life of a university. *It matters little whether such*

*intervention occurs avowedly or through action that inevitably tends to check the ardor and fearlessness of scholars,* qualities at once so fragile and so indispensable for fruitful academic labor ....

... A university ceases to be true to its own nature if it becomes the tool of Church or State or any sectional interest. A university is characterized by the spirit of free inquiry... This implies the right to examine, question, modify and reject traditional ideas and beliefs ....

... Freedom to reason and freedom for disputation... are the necessary conditions for the advancement of scientific knowledge. A *sense of freedom* is also necessary...

*It is the business of a university to provide that atmosphere which is most conducive to speculation, experiment and creation."* (Énfasis suplido.)[1]

Conforme con esta atinada concepción de la libertad académica, las acciones gubernamentales que tienen el efecto de achantar el sentido de autonomía de los profesores y estudiantes y el clima de libertad de la institución universitaria, son ilícitas e inconstitucionales y deben invalidarse.

Debo enfatizar que tales acciones inconstitucionales deben invalidarse aunque parezcan leves o sutiles. Como bien señaló el Juez Frankfurter en las mismas expresiones citadas antes:

... in these matters of the spirit, *inroads on legitimacy must be resisted at their incipiency.* This kind of evil grows by what it is allowed to feed on. The admonition of this Court in another context is applicable here. 'It may be that it is the obnoxious thing in its mildest and least repulsive form; *but illegitimate and unconstitutional practice get their first footing in that way, namely by silent approaches and slight deviations from legal modes of procedure.* (Énfasis suplido.) *Sweezy v. New Hampshire,* 354 U.S. 234, 363–364 (1957).

Las acciones gubernamentales inconstitucionales son insidiosas, por mínimas que parezcan. Si no se atajan a tiempo, dan pie a acciones ilícitas futuras cada vez más

---

[1] *Sweezy v. New Hampshire,* 354 U.S. 234, 261–263 (1957).

palpables y conspicuas. Tal es la situación en el caso ante nos; es de lamentar que miembros de este Tribunal que, en otros casos han pontificado con gran indignación contra los abusos del Gobierno de menor trascendencia, ahora en este importante caso asuman una postura aquiescente, contra la sabia advertencia de Frankfurter.

No es necesario abundar más sobre las innegables realidades antes aludidas. La opinión del Juez Asociado Señor Alonso Alonso lo hace con meridiana claridad; lo hace, además, con un fino y profundo entendimiento de lo que es una universidad como la nuestra, y del alto deber que tenemos los Jueces de proteger los derechos de expresión en todas sus modalidades, la razón de ser más preeminente que justifica nuestros cargos.

## II

Para completar este voto particular, deseo comentar otro de los excesos del extremo partidismo político del Gobierno en este caso, que me atañe personalmente.

A. El licenciado que ocupa el cargo de Procurador General del país, Pedro A. Delgado, y otro contratado por el Gobierno para representarle también, Daniel R. Domínguez, pidieron mi inhibición en este caso. Su planteamiento alude a mis vínculos con la Universidad de Puerto Rico durante tres (3) décadas.

Durante muchos años fui miembro activo del claustro universitario. Fui profesor de miles de estudiantes en la Facultad de Derecho y en la Escuela Graduada de Administración de Empresas. Realicé numerosas investigaciones y estudios sobre temas jurídicos, que aparecen publicados en 4 libros y 15 monografías extensas, impresas en revistas académicas y profesionales. Serví a la Universidad como Decano de Estudiantes del Recinto de Río Piedras, como Decano de la Facultad de Derecho, como miembro del Senado Académico y de la Junta Administrativa de

ese recinto, y como miembro o presidente de docenas de comités institucionales. Representé a la Universidad en numerosas comisiones o congresos estaduales, nacionales e internacionales. Fui asesor jurídico ad honorem de varios rectores y presidentes de la institución.

Según los representantes legales del Gobierno, durante los 27 años que estuve vinculado a la Universidad de Puerto Rico supuestamente disfruté de "consideraciones" de parte de la institución, y ello alegadamente crea una *"apariencia"* de parcialidad que justificó solicitar mi inhibición.

En mi ponderado criterio, el planteamiento de los representantes legales del Gobierno es *inmeritorio y frívolo*. Las supuestas "consideraciones" de la Universidad de Puerto Rico en mi favor, en el transcurso de 27 años, *no son tal cosa*. Por el contrario, constituyen, esencialmente, unos derechos reglamentarios que yo tenía y que la institución estaba obligada a honrar. No se trata de prebendas que se me otorgaron de forma discrecional o gratuita, sino más bien de *derechos adquiridos* conforme mi *status* como miembro del claustro universitario.

Debe notarse, además, que el planteamiento de "apariencia de parcialidad" en el caso de marras es cuando menos ilógico, sino incoherente, porque la parte en este pleito respecto a la cual existe la supuesta "apariencia de parcialidad" *no es la que tuvo las alegadas "consideraciones" en mi favor.* Es decir, para que pueda siquiera contemplarse la posibilidad de una "apariencia de parcialidad", sería necesario establecer que los demandantes apelantes en este pleito, los aludidos miembros del Consejo que iniciaron este caso, fueron los mismos que tuvieron las supuestas "consideraciones" universitarias en mi favor. *Esa, claro está, no es la situación aquí.* Estos demandantes apelantes, como grupo, nunca han tenido nada que ver con ninguna de las supuestas "consideraciones" de la Universidad en mi favor. Las llamadas "consideraciones" fueron acreditadas

*por otras autoridades universitarias,* y el Consejo particular que demandó en este caso no participó como tal en ninguna de ellas. Es material y jurídicamente imposible que exista siquiera una "apariencia" de parcialidad mía en favor de un cuerpo de concejales, cuando tal cuerpo particular nunca ha decidido nada en mi favor.

. B. Durante los dos años pasados he participado como Juez Asociado de este Tribunal Supremo de Puerto Rico en *otros tres importantes y noveles casos* que involucraban a la Universidad de Puerto Rico y que dieron lugar a opiniones de este Tribunal. En uno de ellos se cuestionaba la validez de una decisión del Consejo de Educación Superior negándole acreditación a una institución universitaria privada (*Fac. C. Soc. Aplicadas, Inc. v. C.E.S.,* 133 D.P.R. 521 (1993)); en el segundo caso se cuestionaba la validez del sistema de admisiones de la Universidad de Puerto Rico (*Asoc. Academias y Col. Cristianos v. E.L.A.,* 135 D.P.R. 150 (1994)), y en el tercero se cuestionaba la validez de la decisión de la Junta de Relaciones del Trabajo de Puerto Rico de reconocerle a los profesores de la Universidad de Puerto Rico el derecho a unionarse y a la negociación colectiva (*U.P.R. v. Asoc. Pur. Profs. Universitarios,* 136 D.P.R. 336 (1994)). En estos tres casos de la Universidad de Puerto Rico comparecieron el Procurador General o los representantes legales del Gobierno o de la Universidad a presentar su caso, *y en ninguno de ellos solicitaron mi inhibición.* En ninguno de estos tres casos el Procurador General o los representantes legales del Gobierno consideraron que mis vínculos previos con la Universidad de Puerto Rico constituía un problema, a pesar de que en los tres la Universidad era parte indispensable del caso. Sin embargo, ahora, de buenas a primeras, en el caso de autos se alega que mi participación como Juez en este cuarto pleito, que involucra a la Universidad de Puerto Rico, puede constituir una alegada "apariencia" de parcialidad. ¿Por qué esta postura ahora y no antes? ¿Por qué ahora

hay una alegada "apariencia" de parcialidad que no la hubo en los tres casos anteriores? ¿Cómo se explica esta inconstancia, cuando mi relación con la Universidad de Puerto Rico ha sido la misma en cualquiera de los cuatro casos en cuestión?

La respuesta a esta interrogante me parece evidente. La frívola solicitud de inhibición no es meramente un exabrupto profesional de los licenciados aludidos. Es también parte de una estrategia política mayor relacionada con las actuaciones político-partidistas del Gobierno respecto de la legislación que se ha impugnado ante nos en este caso. Desde los comienzos de este litigio se ha sabido que el Tribunal Supremo estaba([2]) dividido en cuanto al asunto planteado en éste. Por eso, en el afán de prevalecer a toda costa para proteger los intereses político-partidistas del Gobierno, se ha acudido a la artimaña de intentar recusar a uno de los Jueces de este Tribunal que, se especulaba, podía votarles en contra.

Para realizar esta artimaña, quienes solicitaron mi inhibición, o las personas de quien hayan recibido instrucciones, *violentaron* el propio Reglamento General de la Universidad de Puerto Rico y la confidencialidad de mi expediente personal en esa institución, al hacer una extensa incursión en dicho expediente a los fines de este caso sin mi autorización o la de algún tribunal con jurisdicción. El Art. 33.6 del Reglamento General de la Universidad de Puerto Rico, revisión de diciembre de 1990, pág. 72, claramente garantiza la confidencialidad del expediente personal de un claustral. Dicho expediente no está sujeto a investigación sin autorización propia, como la que se ha hecho en este caso, para intentar fundamentar la frívola solicitud de inhibición.

Como parte de la artimaña, además, se ventiló el asunto

---

([2]) Véase nuestra Resolución de 24 de septiembre de 1993, mediante la cual se expide el recurso en este caso, por voto dividido, emitida dos meses antes de la moción de inhibición en cuestión.

de mi inhibición en la prensa del país. La moción de inhibición presentada ante este Tribunal fue subrepticiamente entregada dos veces distintas a determinados medios noticiosos, en un evidente intento de ejercer presión pública sobre la función judicial, en franco menosprecio del espíritu y la letra del Canon 11 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, que prohíbe ejercer influencias indebidas sobre los jueces en casos sometidos ante su consideración, y del Canon 14 de dicho Código, 4 L.P.R.A. Ap. IX, que prohíbe que se facilite la publicación en la prensa de detalles de un pleito pendiente.

Más aún, recientemente mi participación en este caso fue objeto de imputaciones vulgares y difamatorias, formuladas mediante anuncios políticos pagados y en comunicados de prensa promovidos por políticos del partido en el poder, evidencia contundente de que el intento de lograr mi inhibición ha sido una burda maniobra partidista.

C. Las normas jurídicas y los precedentes de este Foro preceptúan que la decisión de inhibición de un Juez del Tribunal Supremo reviste carácter *excepcional. Noriega Rodríguez v. Gobernador*, 120 D.P.R. 267, 276 (1988). No debe inhibirse un Juez del Tribunal Supremo salvo que existan circunstancias excepcionales que así lo requieran, debido a que "los jueces de este Foro tenemos ... la misión fundamental de expres[arnos] sobre los asuntos de honda repercusión pública que se nos sometan" (íd., pág. 275), y porque la naturaleza colegiada del Tribunal "asegura una justicia imparcial ... y garantiz[a] que la decisión final certificada [en cualquier caso] respond[erá] al legítimo criterio mayoritario informado, nunca a la situación individual o preferencias privadas de los componentes del Tribunal". Íd., pág. 276.

En este caso no sólo no se han presentado razones excepcionales que justifican mi inhibición, sino que las esgrimidas son patentemente frívolas. De modo alguno, pues,

puedo dejar de cumplir con mi deber constitucional de formular mi criterio y votar sobre el importante asunto público ante nuestra consideración.

Al rechazar la inverosímil solicitud de inhibición, lo hago, además, con el pesar que causa ver cómo la vorágine del partidismo político, unida a la ambición personal, engulle y se traga aun a quienes ocupan o pretenden ocupar posiciones cimeras en la noble profesión de abogado, de quienes se espera una conducta de verticalidad, de altura de miras y de independencia de criterio respecto de sus clientes, como requiere el Canon 8 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX.